ACCEPTED
05-18-00647-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 10:40 AM
LISA MATZ
CLERK

No. _____

In the Court of Appeals
Fifth District of Texas at Dallas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 10:40:22 AM
LISA MATZ
Clerk

## In re JOHN CALCE
### *Relator*

Original Proceeding from the 44th Judicial District Court
Dallas County, Texas
Hon. Bonnie Lee Goldstein, Presiding Judge
Cause No. DC-16-07706

# PETITION FOR WRIT OF MANDAMUS

James D. Shields
David A. Shields

SHIELDS LEGAL GROUP
16301 Quorum Drive
Suite 250B
Addison, Texas 75001
(972) 788-2040
(972) 788-4332 (facsimile)

P. Michael Jung
David N. Kitner
Jadd F. Masso
Chase J. Potter

CLARK HILL STRASBURGER
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (facsimile)

*Attorneys for Relator*

**Oral Argument Requested**

9997597.7/SP/38371/0105/060118

## Identities of Parties and Counsel

| *Party* | *Counsel* |
|---|---|
| John Calce<br><br>*Relator* | P. Michael Jung<br>David N. Kitner<br>Jadd F. Masso<br>Chase J. Potter<br><br>CLARK HILL STRASBURGER<br>901 Main Street, Suite 6000<br>Dallas, Texas 75202<br><br>James D. Shields<br>David A. Shields<br><br>SHIELDS LEGAL GROUP<br>16301 Quorum Drive<br>Suite 250B<br>Addison, Texas 75001<br>(972) 788-2040<br>(972) 788-4332 (facsimile) |
| Hon. Bonnie Lee Goldstein<br>44th Judicial District Court<br>600 Commerce Street<br>Dallas, Texas 75202<br><br>*Respondent* | |
| Centurion Logistics, LLC<br><br>*Real Party in Interest* | Mark E. Torian<br>Darren P. Nicholson<br><br>SAYLES WERBNER, P.C.<br>4400 Renaissance Tower<br>1201 Elm Street<br>Dallas, Texas 75270 |

# Table of Contents

Identities of Parties and Counsel..............................................................2

Table of Contents ....................................................................................3

Index of Authorities.................................................................................5

Statement of the Case .............................................................................9

Statement of Jurisdiction.......................................................................10

Introduction...........................................................................................11

Issue Presented .....................................................................................12

Statement of Facts ................................................................................13

Summary of the Argument ....................................................................18

Argument...............................................................................................19

I.      Standard for Mandamus Relief.....................................................19

II.     Calce has a clear and immediate right to reimbursement and
        advancement of his defense costs. .............................................20

        A.      The right to advancement or reimbursement of
                expenses and the right to indemnification are separate
                and distinct legal concepts.................................................21

        B.      Centurion Logistics cannot rely on its own allegations
                to deny Calce's right to advancement and
                reimbursement of defense costs.........................................26

        C.      Calce's contractual right to advancement and
                reimbursement is unambiguous and mandatory. ................29

                1.      The terms of the Company Agreement are
                        unambiguous.............................................................29

2. Section 6.2 of the Agreement requires Centurion Logistics to immediately reimburse Calce the expenses he pays or incurs in defending himself. .......30

3. Calce's reimbursable expenses include his attorneys' fees............................................................33

D. Summary judgment is the appropriate—and only meaningful—mechanism for Calce to exercise his right to advancement and reimbursement of defense costs..........34

III. Mandamus is warranted. ..............................................................35

Prayer ....................................................................................................36

Certification.........................................................................................37

Certificate Of Compliance.................................................................37

Certificate of Service .........................................................................38

Declaration Regarding Evidence .......................................................39

Appendix

A. Plaintiff's Original Petition

B. John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC

C. John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC

D. Plaintiff's Second Amended Petition

E. Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC

F. Tex. Bus. Orgs. Code § 8.104

# Index of Authorities

**CASES**

*Arch Ins. Co. v. U.S. Youth Soccer Ass'n*,
No. 05-12-00596-CV, 2014 WL 2941372,
2014 Tex. App. LEXIS 5068 (Tex. App.—Dallas
May 12, 2014, no pet.) (mem. op.)....................................................23

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*,
389 S.W.3d 802 (Tex. 2012) ........................................................29

*Evans v. Davis*,
No. 14-12-01053-CV, 2013 WL 6095723,
2013 Tex. App. LEXIS 14122 (Tex. App.—Houston
[14th Dist.] Nov. 19, 2013, no pet.) (mem. op.)..............................23

*Heine v. Bank of Oswego*,
144 F. Supp. 3d 1198 (D. Or. 2015) ..............................................33

*Heritage Res., Inc. v. NationsBank*,
939 S.W.2d 118 (Tex. 1996) .........................................................30

*Homestore, Inc. v. Tafeen*,
888 A.2d 204 (Del. 2005)........................................................22, 25

*Huie v. DeShazo*,
922 S.W.2d 920 (Tex. 1996) ....................................................19, 35

*In re Aguilar*,
344 S.W.3d 41 (Tex. App.—El Paso 2011,
orig. proceeding) ................................................................ passim

*In re AIU Ins.*,
148 S.W.3d 109 (Tex. 2014) .........................................................20

*In re Coppola*,
535 S.W.3d 506 (Tex. 2017) .........................................................20

*In re Dickason*,
987 S.W.2d 570 (Tex. 1998) .........................................................20

*In re Essex Ins.*,
   450 S.W.3d 524 (Tex. 2014) ...................................................... 19, 20

*In re McAllen Med. Ctr., Inc.*,
   275 S.W.3d 458 (Tex. 2008) ..................................................... 20, 35

*In re Nationwide Ins.*,
   494 S.W.3d 708 (Tex. 2016) ..................................................... 19, 35

*In re Prudential Ins. Co. of Am.*,
   148 S.W.3d 124 (Tex. 2004) ..................................................... 20, 35

*In re State Farm Lloyds*,
   520 S.W.3d 595 (Tex. 2018) ...........................................................19

*Int'l Airport Ctrs., LLC v. Citrin*,
   455 F.3d 749 (7th Cir. 2006) ........................................................25

*James River Mgmt. Co., Inc. v. Kehoe*,
   674 F. Supp. 2d 745 (E.D. Va. 2009)............................................27

*Kamen v. Kemper Fin. Servs., Inc.*,
   908 F.2d 1338 (7th Cir. 1990),
   *rev'd on other grounds*,
   500 U.S. 90 (1991) .........................................................................25

*Moayedi v. Interstate 35/Chisam Rd., L.P.*,
   438 S.W.3d 1 (Tex. 2014) ......................................................... 29, 30

*Morgan v. Grace*,
   Civ. A. No. 20430, 2003 WL 22461916,
   2003 Del. Ch. LEXIS 113 (Del Ch. Oct. 29, 2003) ........................34

*Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*
   *v. CBI Indus. Inc.*,
   907 S.W.2d 517 (Tex. 1995) .........................................................30

*Neurobehaviorial Assocs., P.A. v. Cypress*
   *Creek Hosp., Inc.*,
   995 S.W.2d 326 (Tex. App.—Houston
   [1st Dist.] 1999, no pet.)...............................................................25

*Peterson v. Farmers Tex. Cnty. Mut. Ins. Co.*,
    No. 05-15-00678-CV, 2016 WL 3448067,
    2016 Tex. App. LEXIS 6586 (Tex. App.—Dallas
    June 22, 2016, no pet.) (mem. op.) ............................................. 29, 30

*PopCap Games, Inc. v. MumboJumbo, LLC*,
    350 S.W.3d 699 (Tex. App.—Dallas 2011, pet. denied) ................... 29

*Reddy v. Elec. Data Sys. Corp.*,
    C.A. No. 19467, 2002 Del. Ch.
    LEXIS 69 (Del. Ch. June 18, 2002) ....................................... 28, 35

*Sacks v. Haden*,
    266 S.W.3d 447 (Tex. 2008) ........................................................ 30

*Walker v. Packer*,
    827 S.W.2d 833 (Tex. 1992) ........................................................ 19

**STATUTES**

Tex. Bus. Corp. Act art. 2.02-1 .................................................... 24

Tex. Bus. Orgs. Code § 8.001(3)(B) ............................................ 34

Tex. Bus. Orgs. Code § 8.104 ....................................................... 24

Texas Government Code Section 22.221(a) and (b)(1) ........................ 10

**OTHER AUTHORITIES**

Andrew J. Morrow, Jr., *Appendix: Task Force Report,
    Oregon Revised Model Business Corporation Act*,
    30 Willamette L. Rev. 407 (1994) ................................................ 33

Richard A. Rossman, et al., *A Primer of Advancement
    of Defense Costs: The Rights and Duties of Officers
    and Corporations*,
    85 U. Det. Mercy L. Rev. 29 (2007) ............................................. 22

Stephen A. Radin, *"Sinners Who Find Religion": Advancement
    of Litigation Expenses to Corporate Officials*

*Accused of Wrongdoing,*
25 Rev. Litig. 251 (2006) ............................................................... 25

## Statement of the Case

**Underlying Proceeding**    Suit by Centurion Logistics LLC against Relator John Calce, a manager of the LLC, and others alleging breach of fiduciary duty and related claims relating to a development project. (MR.1-23, 867-903.) Calce sought to require Centurion Logistics to reimburse his defense costs in this case as required by its Company Agreement. (MR.322-36.) The trial court denied Calce's motion. (MR.904-05.)

**Respondent**    Hon. Bonnie Lee Goldstein
44th Judicial District Court
Dallas County, Texas

**Respondent's Actions**    Refusing to enforce contractual provision requiring Centurion Logistics to reimburse Calce's defense-related expenses in this case as they are incurred.

## Statement of Jurisdiction

This Court has jurisdiction under Texas Government Code Section 22.221(a) and (b)(1), which authorizes this Court to "issue all writs of mandamus, agreeable to the principles of law regulating those writs, against: (1) a judge of a district or county court in the court of appeals district."

## **Introduction**

The right of a party to have defense costs advanced or reimbursed during ongoing litigation is a right that will be lost forever if not enforced during the pending litigation. *In re Aguilar*, 344 S.W.3d 41, 55 (Tex. App.—El Paso 2011, orig. proceeding).

In this case, Relator John Calce is entitled to reimbursement of his defense costs paid or incurred in this case—as they are paid or incurred. Real Party in Interest Centurion Logistics does not contest that Calce is an "Indemnified Person" or that this suit is a "Proceeding" for purposes of the Company Agreement, thus triggering Centurion Logistics obligation to reimburse Calce's ongoing defense expenses.

Calce's right to advancement or reimbursement of his defense expenses is separate and distinct from any right he may have to indemnification from Centurion Logistics. Indemnification, like Calce's potential obligation to repay any funds advanced to him for his defense, will be determined when this case is adjudicated on its merits.

Mandamus is necessary to vindicate Calce's right to advancement of defense costs. Appellate relief will be illusory because, by that point, Calce will have been completely deprived of the benefit of the right.

## Issue Presented

Did the trial court abuse its discretion by refusing to enforce Centurion Logistics' contractual obligation to reimburse Relator John Calce his defense costs as paid or incurred during the course of this litigation?

## Statement of Facts

### *The Parties*

Relator John Calce is a manager of Plaintiff and Real Party in Interest Centurion Logistics LLC. (MR.4, 338, 353, 872.)

Centurion Logistics was formed by Calce and others to pursue a project to purchase real property in Reeves County, Texas. (MR.4-5, 872.)

### *The Lawsuit*

In June 2016, Centurion Logistics brought this suit against Calce and several other defendants relating to an alleged railway-terminal development project. (MR.1-23.) Centurion Logistics generally claims that Calce and the other defendants caused Centurion Logistics to lose its interest in certain property, thus depriving it of the opportunity to construct a railway terminal for crude oil on that property. (*Id.*)

Against Calce, Centurion Logistics asserts claims for (1) breach of fiduciary duty as a manager of the company, (2) unjust enrichment, and (3) aiding and abetting fraudulent concealment. (MR.12-13, 15-17, 18-19.) Centurion Logistics later amended its petition, adding claims

against Calce for theft liability, tortious interference with contract, fraudulent inducement, and promissory estoppel. (MR.894-97.)

Since answering in this case, Calce has incurred, and continues to incur, significant expenses in defending against the claims that have been brought against him. (*See* MR.338.)

### *Calce's Right to Immediate Reimbursement of Defense Costs*

It is undisputed that Calce is a manager of Centurion Logistics. (MR.4, 782.) Calce is, as a result, an "Indemnified Person" under Centurion Logistics' Company Agreement. (Company Agreement § 1.1, MR.346.)

Section 6.2 of the Company Agreement requires Centurion Logistics to reimburse "Indemnified Persons," such as Calce, for expenses paid or incurred in defending himself in any "Proceeding":

> To the fullest extent permitted by applicable law, and subject to Section 6.3, [Centurion Logistics] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Logistics]. ***An Indemnified Person's***

> ***expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this <u>Article VI</u> is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

(Company Agreement § 6.2, MR.357 (emphasis added).) Such reimbursement is to be made as the expenses are paid or incurred. (*Id.*)

"Proceeding" is defined as "(a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding, and (c) any inquiry or investigation that could lead to any such proceeding." (Company Agreement § 1.1, MR.347.) Centurion Logistics does not dispute that this case is a "Proceeding" as defined by the Company Agreement. (MR.392.)

In the event an Indemnified Person is later determined not to be entitled to any expense-reimbursement payments made, the Indemnified Person is required to repay such amounts to Centurion Logistics. (Company Agreement § 6.3(c), MR.357-58.)

***Centurion Logistics' Refusal to Reimburse Calce's Costs***

In August 2017, Calce requested that Centurion Logistics, pursuant to Section 6.2 of the Agreement, (1) reimburse Calce the expenses he had incurred as of July 31, 2017, plus an additional $50,000 to be applied to future expenses as they are incurred, and (2) agree to reimburse Calce the additional expenses, in excess of such $50,000 advancement, that he pays or incurs in his defense of the suit as such expenses are paid or incurred. (MR.388-89.).

Calce's requested stated: "Pursuant to Section 6.3 of the [Company] Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3." (MR.389.) The request also provides that "Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law." (*Id.*)

Centurion Logistics denied Calce's request for reimbursement. (MR.391-93.) Despite denying the request, however, Centurion Logistics

conceded that Calce is an "Indemnified Person" and that this litigation is a "Proceeding" as those terms are defined in the Company Agreement. (MR.392.) To date, Centurion Logistics has not reimbursed Calce any amount for the expenses he has paid and incurred in defending himself against the claims brought against him in this case. (MR.338.)

*Procedural Background*

Calce filed a counterclaim asserting his right to immediate reimbursement of his defense costs. (MR.24-172, 173-321.) To compel compliance with Centurion Logistics' reimbursement obligation, Calce filed a motion for partial summary judgment. (MR.322-405.) By that motion, Calce sought a declaration that Centurion Logistics is required to reimburse his expenses, including attorney's fees, paid or incurred in defending himself in this case. (MR.334.) The motion also sought to require Centurion Logistics to reimburse future expenses within 10 days of Calce's submission of such expenses to Centurion Logistics. (*Id.*) On May 21, 2018, the trial court denied Calce's motion. (MR.904-05.)

## Summary of the Argument

Centurion Logistics' Company Agreement provides that, as a manager, Relator John Calce is entitled to reimbursement of his costs of defense in any "Proceeding." Centurion Logistics admits that this case is a "Proceeding." As a result, Calce is contractually entitled to reimbursement of any expenses he pays or incurs in defending himself in this lawsuit, including attorney's fees, as they are paid or incurred.

Calce's right to reimbursement of defense costs is separate and distinct from any right he may have to indemnification from Centurion Logistics. Calce's right to ongoing reimbursement of his expenses during the course of this case is supported by the Company Agreement, Texas case law, and the Texas Business & Organizations Code.

The trial court's refusal to enforce Centurion Logistics' obligation to advance Calce his defense costs has the effect of permanently depriving Calce of the benefit of this substantive right. By the time this case proceeds to trial and an appeal becomes available, the issue will be moot. Accordingly, mandamus relief is necessary. *In re Aguilar*, 344 S.W.3d 41, 55 (Tex. App.—El Paso 2011, orig. proceeding).

## Argument

## I.  Standard for Mandamus Relief

Mandamus relief is warranted to correct a clear abuse of discretion when there is no adequate appellate remedy. *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2018).

When deciding legal principles, a trial court has no discretion to misinterpret or misapply the law. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). Thus a failure to correctly analyze or apply the law constitutes an abuse of discretion. *In re Nationwide Ins.*, 494 S.W.3d 708, 712 (Tex. 2016). A trial court's erroneous legal conclusion is an abuse of discretion even if the law is unsettled. *Huie v. DeShazo*, 922 S.W.2d 920, 927-28 (Tex. 1996).

Determining whether an appellate remedy is adequate involves balancing "practical and prudential" considerations, such as the inevitability of reversal, the impairment of important substantive and procedural rights, the opportunity to give direction and guidance on the law that would otherwise be lost, and the waste of judicial resources on the proceeding. *See In re Essex Ins.*, 450 S.W.3d 524, 528 (Tex. 2014); *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008); *In re Prudential*

*Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004). The adequacy of an appeal depends on the facts of each case. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 469 (Tex. 2008). An appellate remedy is inadequate when the benefits of mandamus review are outweighed by the detriments. *In re Coppola*, 535 S.W.3d 506, 509 (Tex. 2017); *In re Essex*, 450 S.W.3d at 528; *In re Prudential*, 148 S.W.3d at 136.

If a trial court's refusal to grant particular relief renders the subject matter of an appeal illusory, the party seeking relief has no adequate remedy by appeal. *See, e.g.*, *In re AIU Ins.*, 148 S.W.3d 109, 115-17 (Tex. 2014) (granting mandamus to enforce forum-selection clause; to do otherwise would defeat the purpose of the clause); *In re Dickason*, 987 S.W.2d 570, 571 (Tex. 1998) (granting mandamus to prevent retrial because appeal after second trial would be pointless). Appeal following a trial is inadequate if the very act of proceeding to trial would defeat the substantive right at issue. *In re McAllen Med. Ctr.*, 275 S.W.3d at 465.

## II.  Calce has a clear and immediate right to advancement of his defense costs.

Centurion Logistics' Company Agreement requires it to reimburse the defense expenses of "Indemnified Persons" as they are paid or incurred during the course of a "Proceeding." (Company Agreement § 6.2,

MR.357.) Centurion Logistics does not dispute that Calce is an "Indemnified Person" and that this suit is a "Proceeding." (MR.392.)

By his motion, Calce sought only to establish his right to advancement of defense costs, not his right to indemnification. These rights are often conflated, but they are distinct concepts with different standards. At this point in the litigation, Calce does not seek to establish that he is entitled to *indemnification* from Centurion Logistics. However, because Calce's right to advancement of defense costs is clear, and because that right will be irretrievably lost if not enforced *pendente lite*, the trial court was obligated to order Centurion Logistics to reimburse and advance those costs.

**A. The right to advancement of defense costs and the right to indemnification are separate and distinct concepts.**

To adequately demonstrate Calce's entitlement to the relief requested, it is important to contrast the difference between the right to advancement or reimbursement of expenses, on the one hand, and the right to indemnification for such expenses, on the other.

"Advancement" generally refers to the right of a director or officer of a company to receive an advance for expenses that he or she incurs in

a legal proceeding before its final disposition. Richard A. Rossman, et al., *A Primer of Advancement of Defense Costs: The Rights and Duties of Officers and Corporations*, 85 U. Det. Mercy L. Rev. 29, 53 (2007). "Although the right to indemnification and advancement are correlative, they are separate and distinct legal actions." *In re Aguilar*, 344 S.W.3d 46 (Tex. App.—El Paso 2011, orig. proceeding) (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005)). For instance, an individual ultimately determined ineligible for indemnification may still be entitled to advancement of defense costs before the right to indemnification is decided. *See* Rossman, 85 U. Det. Mercy L. Rev. at 53.

These concepts were extensively analyzed in *In re Aguilar*, which is strikingly similar to the present case. In that case, Aguilar and another individual formed Perspectiva Group, Inc. *Aguilar*, 344 S.W.3d at 44. Aguilar was an officer and director of Perspectiva. Perspectiva sued Aguilar alleging that he had breached his fiduciary duties to the company and engaged in a conspiracy. Perspectiva later added claims accusing Aguilar and his daughter of forming a company that competed with Perspectiva, similar to the allegations made here by Centurion Logistics against Calce. As the lawsuit proceeded, Aguilar's attorney—

pursuant to Perspectiva's bylaws[1]—sent Perspectiva's attorney a letter requesting that Perspectiva advance Aguilar's defense costs, including attorneys' fees. *Id.* Perspectiva, like Centurion Logistics, denied Aguilar's advancement[2] request. *See id.* at 45. The trial court denied Aguilar's motion to require Perspectiva to advance or reimburse his defense costs. *Id.* The court of appeals conditionally granted Aguilar's petition for a writ of mandamus, directing the trial court to (1) vacate its order denying Aguilar's motion regarding advancement and (2) enter an order granting the motion. *Id.* at 56.

In analyzing the issue, the *Aguilar* court first noted that Article 2.02-1 of the Texas Business Corporation Act expressly allowed Texas corporations to advance litigation expenses to its directors and that the

[1] The advancement provision in *Aguilar* was contained in the company's bylaws, rather than a contract among the parties, but the distinction makes no difference. "In construing the bylaws, [courts] apply the rules that govern the interpretation of contracts." *Aguilar*, 344 S.W.3d at 49; *see also Arch Ins. Co. v. U.S. Youth Soccer Ass'n*, No. 05-12-00596-CV, 2014 WL 2941372, 2014 Tex. App. LEXIS 5068, at *13 (Tex. App.—Dallas May 12, 2014, no pet.) (mem. op.); *v. Davis*, No. 14-12-01053-CV, 2013 WL 6095723, 2013 Tex. App. LEXIS 14122, at *9 (Tex. App.—Houston [14th Dist.] Nov. 19, 2013, no pet.) (mem. op.).

[2] The *Aguilar* case discusses "advancement" of expenses and the Centurion Logistics Company Agreement uses the term "reimbursement" of expenses as paid or incurred, but in practice the concepts are the same. Both refer to the right of a party to have defense costs paid or reimbursed by another as they are incurred, rather than waiting until the conclusion of litigation.

applicable section of Perspectiva's bylaws was nearly identical to the statutory language. *Id.* at 45-46. Article 2.02-1 of the Business Corporation Act is now Section 8.104 of the Business Organizations Code. *See* Tex. Bus. Orgs. Code § 8.104.[3] As in *Aguilar*, the language of Section 6.2 of Centurion Logistics' Company Agreement is consistent with the language of Section 8.104. *Compare* Company Agreement § 6.2 (MR.357) *with* Tex. Bus. Orgs. Code § 8.104.

The *Aguilar* court discussed the lack of Texas case law addressing the right to advancement or reimbursement of defense costs: "There are no Texas cases concerning advancement under the Business Corporation Act or the Business Organizations Code. But the courts of Delaware have addressed advancement on numerous occasions." *Aguilar*,

---

[3] The prior and current statutes are the same in all material respects. *Compare* Tex. Bus. Corp. Act art. 2.02-1 *with* Tex. Bus. Orgs. Code § 8.104.

344 S.W.3d at 46. It is common for Texas courts to look to Delaware law for guidance regarding unsettled/undeveloped areas of corporate law.[4]

The Delaware Supreme Court has explained that "'[a]dvancement is an especially important corollary to indemnification' because it provides corporate officials with immediate interim relief from the burden of paying for a defense." *See Aguilar*, 344 S.W.3d at 46 (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005)). "Although the right to indemnification and advancement are correlative, they are separate and distinct legal actions." *Id.* (quoting *Homestore*, 888 A.2d at 212). Perhaps most importantly, "[t]he right to advancement is **not dependent** on the right to indemnification." *Id.* (citing *Homestore*, 888 A.2d at 212) (emphasis added).

---

[4] "Delaware has been described as 'the Mother Court of corporate law.'" *Aguilar*, 344 S.W.3d at 47 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1343 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991)). "Courts throughout the country look to Delaware for guidance on matters of corporate law." *Id.* (citing *Neurobehaviorial Assocs., P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 n.12 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (turning to Delaware corporate law for guidance regarding "winding-up" because there were no Texas cases addressing the issue)). "The law of advancement, in particular, is 'a Delaware specialty.'" *Id.* (citing *Int'l Airport Ctrs., LLC v. Citrin*, 455 F.3d 749, 750 (7th Cir. 2006)). "To the limited extent that there is law [regarding advancement] outside Delaware, it is the same as the law in Delaware." *Id.* (quoting Stephen A. Radin, "*Sinners Who Find Religion": Advancement of Litigation Expenses to Corporate Officials Accused of Wrongdoing*, 25 Rev. Litig. 251, 271 (2006)).

The distinction between advancement and indemnification is vitally important to the determination of Calce's immediate right to defense costs because it demonstrates that Calce's alleged conduct, complained of by Centurion Logistics in this case, is irrelevant to his right to immediate reimbursement of defense costs.

## B.    Centurion Logistics cannot rely on its own allegations to deny Calce's right to advancement of defense costs.

In denying Calce's request for reimbursement, Centurion Logistics relied at least in part on its own allegations in this case—specifically that Calce (1) was not acting "within the scope of [his] authority in course of the Company's business" and (2) was engaging in "intentional misconduct" and a "knowing violation of law." (MR.391-92.) These are mere allegations for which Centurion Logistics bears the burden of proof. Centurion Logistics may not simply assume the role of accuser and fact-finder in denying Calce's contractual rights. More importantly, these allegations are *irrelevant* to the determination of whether Calce is entitled to advancement and reimbursement of his defense costs.

In *Aguilar*, Perspectiva similarly denied Aguilar's request for advancement on the basis that Aguilar purportedly had unclean hands due to his alleged breaches of fiduciary duties. *See Aguilar*, 344 S.W.3d

at 46. The *Aguilar* court explained that "[u]nder Delaware law, advancement is allowed even when the official seeking advancement is being sued by the corporation that must advance the litigation expenses"; "Delaware case law is replete with insider trading cases in which executives' expenses are advanced despite allegations of defrauding the corporation or its stockholders of millions of dollars." *Id.* at 47 (citing *James River Mgmt. Co., Inc. v. Kehoe*, 674 F. Supp. 2d 745, 750 (E.D. Va. 2009)). The *Aguilar* court further noted that "[a]dvancement claims are frequently granted when, as in this case, the corporation is suing an official for breach of fiduciary duty." *Id.*

The same situation exists here: Calce is being sued for breach of fiduciary duty. (MR.12-13, 886-87.) As a matter of law, Centurion Logistics "cannot defend against the advancement claim on the ground that it now believes the fiduciary [Calce] to have been unfaithful because ***it is in those very cases that the right to advancement attaches most strongly***." *Aguilar*, 344 S.W.3d at 47 (citing *Kehoe*, 674 F. Supp. 2d at 750) (internal quotations omitted) (emphasis added). As the Delaware Court of Chancery has explained, to rule otherwise would render such protections for corporate officers largely meaningless:

It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty [*i.e.*, exactly what Calce is being sued for here], and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks . . . . Therefore, it is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the suing parties. To do so would be to largely vitiate the protections afforded by [statutory] and contractual advancement rights.

*Reddy v. Elec. Data Sys. Corp.*, C.A. No. 19467, 2002 Del. Ch. LEXIS 69, at *15-16 (Del. Ch. June 18, 2002); *see also Aguilar*, 344 S.W.3d at 48 (rejecting proposition that "the entitlement to advancement hinges on proof that the director did not violate his fiduciary duties").

Calce's alleged conduct is irrelevant for purposes of determining whether Calce is entitled to advancement and reimbursement of his defense costs. *See Aguilar*, 344 S.W.3d at 48 (citing *Reddy*, 2002 Del. Ch. LEXIS 69, at *28-29) (providing that any other result "would turn every advancement case into a trial on the merits of the underlying claims of official misconduct.")). Rather, the determinative question is whether the terms of the Company Agreement afford Calce the right to advancement and reimbursement of his defense costs. The answer is unquestionably "yes."

### C. Calce's contractual right to advancement and reimbursement is unambiguous and mandatory.

#### 1. The terms of the Company Agreement are unambiguous.

The interpretation of an unambiguous contract is a question of law for the court. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). Likewise, "[t]he question of whether a contract is ambiguous is one of law for the court." *Peterson v. Farmers Tex. Cnty. Mut. Ins. Co.*, No. 05-15-00678-CV, 2016 WL 3448067, 2016 Tex. App. LEXIS 6586, at *8 (Tex. App.—Dallas June 22, 2016, no pet.) (mem. op.) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)). A contract is not ambiguous if, like the Company Agreement, "the contract's language can be given a certain or definite meaning." *Id.* (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). The mere fact that the "parties advance different interpretations of a contract does not necessarily mean that the contract is ambiguous." *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 707 (Tex. App.—Dallas 2011, pet. denied).

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties *as expressed in the instrument*." *Moayedi*, 438 S.W.3d at 7 (emphasis added). "Absent a find-

ing of ambiguity, a court must interpret the meaning and intent of a contract from the four corners of the document without the aid of extrinsic evidence." *Peterson*, 2016 Tex. App. LEXIS 6586, at *9; *see also Sacks v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)) (providing that "[o]nly where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument'"). Moreover, "[u]nless the agreement shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning." *Moayedi*, 438 S.W.3d at 7 (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). The relevant terms of the Company Agreement are unambiguous and entitle Calce to advancement and reimbursement of his defense costs.

      **2.    Section 6.2 of the Agreement requires Centurion Logistics to immediately reimburse Calce the expenses he pays or incurs in defending himself.**

It is undisputed that Calce—as a manager of Centurion Logistics—is an "Indemnified Person" under the Company Agreement.

(MR.4, 872.) It is further undisputed that this lawsuit constitutes a "Proceeding" under the Company Agreement. (MR.347, 392, 404.)

Section 6.2 of the Company Agreement provides that "[a]n Indemnified Person's expenses paid or incurred in defending [himself] against any Proceeding *shall* be reimbursed as paid or incurred." (MR. 357 (emphasis added).) There are no qualifications or conditions to Calce's express right to advancement and reimbursement of defense costs.[5]

The *Aguilar* court—after noting that the term "shall" is generally construed to be mandatory—held that Perspectiva had a mandatory duty under the applicable section of its bylaws (which is strikingly similar

---

[5] To the extent any preconditions exist, they have been met. Section 6.3(c) of the Company Agreement provides that "[t]he Company [Centurion Logistics] may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law." (Company Agreement § 6.3(c), MR.357-58.) Calce has already provided the prescribed written affirmation and has agreed in writing to repay any amount that he is reimbursed by Centurion Logistics if it is ultimately determined that he was not entitled to such payments. (MR.389.)

to the language of Section 6.2)[6] to advance Aguilar's defense costs. *See Aguilar*, 344 S.W.3d at 51. Centurion Logistics is likewise required under Section 6.2 of the Company Agreement to reimburse Calce the expenses he pays or incurs in defending himself in this lawsuit **as such expenses are paid or incurred**.

In contrast, Calce's right to *indemnification* is more limited: Calce is only entitled to indemnification for "[d]amages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business." (Company Agreement § 6.2, MR.357.) Section 6.3 of the Company Agreement similarly allows Centurion Logistics to avoid liability and its duty of indemnification if the Indemnified Person is found liable for certain specified wrongs. (*Id.* § 6.3(a).) Such determinations, unlike Calce's right to advancement of defense costs during litigation, are dependent on the ultimate resolution of claims asserted against

---

[6] The pertinent section of Perspectiva's bylaws provided: "Reasonable expenses incurred by a person who was, is, or threatened to be made a named defendant or respondent in a Proceeding shall be paid or reimbursed by the Corporation." *Aguilar*, 344 S.W.3d at 44.

32

Calce. For example, at the conclusion of this case, if it is determined that Calce's alleged actions did not relate to Centurion Logistics' business, he will not be entitled to indemnity and he may be required to repay the amounts advanced to him under Section 6.2. (*Id.* § 6.3(c).)

Requiring a company's director or officer to prove their right to indemnification as a condition for the advancement of legal fees is impractical and imposes burdens that would often thwart the purpose of provisions requiring the advancement of expenses. *Heine v. Bank of Oswego*, 144 F. Supp. 3d 1198, 1207 (D. Or. 2015) (citing Andrew J. Morrow, Jr., *Appendix: Task Force Report, Oregon Revised Model Business Corporation Act*, 30 Willamette L. Rev. 407, 464 (1994)).

### 3. Calce's reimbursable expenses include his attorneys' fees.

The *Aguilar* court rejected the argument that "reasonable expenses" of defense should not include attorneys' fees. *Aguilar*, 344 S.W.3d at 51-52. The *Aguilar* court explained that to exclude attorney's fees "renders [the provision] insignificant and practically useless" because "[t]he purpose of advancement is to relieve corporate officials from the burden of paying the significant on-going expenses involved in litigation" and that "[t]he burden of litigation comes from attorney's fees, not copying

costs." *Id.* at 51-52 (internal quotations and citations omitted). This reasoning is equally applicable here. Moreover, Section 8.001 of the Business Organizations Code defines the term "expenses" to include "reasonable attorney's fees." *See* Tex. Bus. Orgs. Code § 8.001(3)(B). Accordingly, Calce's right to advancement of "expenses" includes the attorneys' fees he pays or incurs in his defense of this lawsuit.

**D.** **Summary judgment was the appropriate vehicle for Calce to establish his right to advancement of defense costs.**

The *Aguilar* court held that summary judgment is the appropriate procedural vehicle to seek advancement of defense costs. *See Aguilar*, 344 S.W.3d at 52-53. As the court explained, "By its very nature, advancement of expenses can occur only during the course of the trial court proceedings." *Id.* at 55 (citing *Morgan v. Grace*, Civ. A. No. 20430, 2003 WL 22461916, 2003 Del. Ch. LEXIS 113, at *4 (Del Ch. Oct. 29, 2003) ("The value of the right to advancement is that it is granted or denied while the underlying action is pending.")). "It is indemnification of expenses that occurs at the conclusion of the case." *Id.* Because Calce only seeks reimbursement of his defense costs as this case progresses, his claim is ripe for adjudication. Indeed, the *only* appropriate time for

such determination is now. Calce's advancement claim will be moot at the conclusion of the case. *See id.*

## III. Mandamus is necessary.

The trial court abused its discretion by refusing to require Centurion Logistics to reimburse Calce's defenses costs as he incurs them. The determination of Calce's right to advancement under the unambiguous terms of the Company Agreement is a pure question of law. As a result, the trial court's error in interpreting the Company Agreement is an abuse of discretion which mandamus may be employed to remedy. *In re Nationwide Ins.*, 494 S.W.3d at 712; *Huie*, 922 S.W.2d at 927-28.

Calce will have no adequate remedy by appeal because, as the *Aguilar* court recognized, his claim will be moot by then. *Aguilar*, 344 S.W.3d at 55 (citing *Reddy*, 2002 Del. Ch. LEXIS 69, 2002 WL 1358761 at *9). As the Texas Supreme Court has explained, the "most frequent use . . . of mandamus relief involves cases in which the very act of proceeding to trial—regardless of the outcome—would defeat the substantive right involved." *In re McAllen Med. Ctr.*, 275 S.W.3d at 465. In such cases, mandamus is not only proper, it is necessary. *In re Prudential*, 148 S.W.3d at 138.

## **Prayer**

For the reasons set forth above, Relator John Calce respectfully prays:

(1)    that the Court grant a writ of mandamus and compel the trial court to (a) vacate its order denying Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC and (b) render an order granting that motion; and

(2)    for such other and further relief to which he may be entitled at law or in equity.

Respectfully submitted,

/s/ *Jadd F. Masso*

P. Michael Jung
Texas Bar No. 11054600
michael.jung@clarkhillstrasburger.com
David N. Kitner
Texas Bar No. 11541500
david.kitner@clarkhillstrasburger.com
Jadd F. Masso
Texas Bar No. 24041411
jadd.masso@clarkhillstrasburger.com
Chase J. Potter
Texas Bar No. 24088245
chase.potter@clarkhillstrasburger.com

CLARK HILL STRASBURGER
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 651-4300
(214) 651-4330 (facsimile)

James D. Shields
Texas Bar No. 18260400
jshields@shieldslegal.com
David A. Shields
Texas Bar No. 24083838
dshields@shieldslegal.com

SHIELDS LEGAL GROUP
16301 Quorum Drive, Suite 250B
Addison, Texas 75001
(972) 788-2040
(972) 788-4332 (facsimile)

*Attorneys for Relator*

## Certification

I hereby certify that I have reviewed this petition and have concluded that every factual statement made in the petition is supported by competent evidence included in the appendix or the record.

/s/ *Jadd F. Masso*
Jadd F. Masso

## Certificate Of Compliance

In accordance with Tex. R. App. P. 9.4, I hereby certify that this document contains 4,995 words.

/s/ *Jadd F. Masso*
Jadd F. Masso

## Certificate of Service

I hereby certify that this document has been served on the following via electronic service through the eFileTexas.gov electronic filing system on June 4, 2018:

Mark E. Torian
mtorian@swtriallaw.com
Darren P. Nicholson
dnicholson@swtriallaw.com

Sayles Werbner, P.C.
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270

/s/ *Jadd F. Masso*
Jadd F. Masso

## <u>Declaration Regarding Evidence</u>

STATE OF TEXAS          §
                                   §

COUNTY OF DALLAS      §

My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202.

I hereby declare under penalty of perjury as follows:

1.     I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator in this proceeding and the trial court.

2.     The factual statements contained within this declaration are within my personal knowledge and are true and correct.

3.     The trial court rendered its order at issue in this Petition for Writ of Mandamus based on the papers on file in this case and the arguments of the attorneys. No testimony was received at any hearing that led to the entry of the orders.

Executed in Dallas County, Texas, on June 4, 2018.

/s/ *Chase J. Potter*
Chase J. Potter
Declarant

9997597.7/SP/38371/0105/060118

No. _____

In the Court of Appeals
Fifth District of Texas at Dallas

**In re JOHN CALCE**
*Relator*

# APPENDIX TO PETITION FOR WRIT OF MANDAMUS

|    | Date     | Document                                                                                                                                          | Record  |
|----|----------|-------------------------------------------------------------------------------------------------------------------------------------------------|---------|
| A. | 6/26/16  | Plaintiff's Original Petition                                                                                                                    | 001-023 |
| B. | 11/22/17 | John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC (excerpt)                               | 173-185 |
| C. | 11/22/17 | John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC                                  | 322-393 |
| D. | 5/2/18   | Plaintiff's Second Amended Petition                                                                                                              | 867-903 |
| E. | 5/21/18  | Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC                    | 904-905 |
| F. |          | Tex. Bus. Orgs. Code § 8.104                                                                                                                     |         |

# Declaration of Chase J. Potter

STATE OF TEXAS         §
                                §

COUNTY OF DALLAS      §

My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202.

I hereby declare under penalty of perjury as follows:

1.     I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator John Calce in this case.

2.     The factual statements contained within this instrument are within my personal knowledge and are true and correct.

3.     The copies of the pleadings, motions, and other documents included in this Appendix to Petition for Writ of Mandamus are true and correct copies of these documents as filed in the trial court.

Executed in Dallas County, Texas, on June 4, 2018.

*/s/ Chase J. Potter*
Chase J. Potter
Declarant

FILED
DALLAS COUNTY
6/27/2016 11:01:53 AM
FELICIA PITRE
DISTRICT CLERK

Freeney Anita

DC-16-07706

CAUSE NO. -_____

| | | |
|---|---|---|
| **CENTURION LOGISTICS LLC,** | § | **IN THE DISTRICT COURT OF** |
| **individually and derivatively on behalf of** | § | |
| **CENTURION PECOS TERMINAL LLC,** | § | |
| **a Texas Limited Liability Company,** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES BALLENGEE, BALLENGEE** | § | |
| **INTERESTS, LLC, JOHN CALCE,** | § | |
| **STAMPEDE TX ENERGY, LLC,** | § | |
| **CENTURION MIDSTREAM GROUP, LLC,** | § | |
| **CENTURION TERMINALS, LLC** | § | |
| | § | |
| **Defendants,** | § | B-44TH |
| | § | _____ **JUDICIAL DISTRICT** |
| **and CENTURION PECOS TERMINAL** | § | |
| **LLC, a Texas Limited Liability Company** | § | |
| | § | |
| **Nominal Defendant.** | § | |

PLAINTIFF'S ORIGINAL PETITION

Plaintiff Centurion Logistics LLC ("Centurion Logistics") files this *Original Petition* individually and derivatively on behalf of Centurion Pecos Terminals LLC ("Centurion Pecos") against James Ballengee ("Ballengee"), Ballengee Interests, LLC ("Ballengee Interests"), John Calce ("Calce"), Stampede TX Energy, LLC ("Stampede"), Centurion Midstream Group, LLC ("Centurion Midstream"), and Centurion Terminals, LLC ("Centurion Terminals"), bringing claims directly and derivatively on behalf of Centurion Pecos LLC for: breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, money had and received (unjust enrichment), fraudulent concealment, aiding and abetting fraudulent concealment, and declaratory judgment. Accordingly, Plaintiff would respectfully show the Court as follows:

**PLAINTIFF'S ORIGINAL PETITION**
307338_1

# I.

## DISCOVERY CONTROL PLAN

1. Pursuant to Texas Rules of Civil Procedure 190.1-190.6, Plaintiff hereby designates that discovery will be conducted under Level 3. Pursuant to Rule 47 of the *Texas Rules of Civil Procedure,* at this time, Plaintiffs seek monetary relief, exclusively in the form of interest, costs, and attorneys' incurred or to be incurred in excess of $1,000,000.

# II.

## PARTIES

2. Plaintiff Centurion Logistics is a Texas limited liability company, with its principal office in Dallas, Texas. Centurion Logistics is a member and manager of Centurion Pecos. The members of Centurion Logistics are: Marc Marrocco ("Marrocco"), Antonio Albanese ("Albanese"), and TXC Energy LLC, an affiliate of Calce.

3. Nominal Defendant Centurion Pecos is a Texas limited liability company, with its principal office in Dallas, Texas. The current member and manager of Centurion Pecos is Centurion Logistics. Stampede was a member and manager of Centurion Pecos until June 13, 2016. Centurion Pecos may be served through service on its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

4. Defendant Ballengee is an individual residing in Dallas County, Texas. He may be personally served at 3838 Oak Lawn Avenue, Suite 1150, Dallas, Texas 75219 or wherever he may be found. Ballengee is a member and manager of Defendant Ballengee Interests.

5. Defendant Ballengee Interests is a Louisiana limited liability company. Ballengee is a managing member of Ballengee Interests. Ballengee Interests may be served by serving its

Texas registered agent, National Registered Agents, Inc., at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

6. Defendant Calce is an individual residing at 5601 Preakness Lane, Plano, TX 75093. He may be served at this residence or wherever he may be found. .

7. Defendant Stampede is a Texas limited liability company, with its principal place of business in Dallas, Texas. Stampede was a manager and member of Centurion Pecos, but was removed as a manager and member on June 13, 2016. Stampede may be served, by serving its registered agent, Blumberg Excelsior Corporate Services, Inc., at 814 San Jacinto Boulevard, Suite 303, Austin, TX 78701.

8. Defendant Centurion Midstream is a Texas limited liability company, formed on October 20, 2015, with its principal place of business in Dallas County, Texas. Calce is the manager of Centurion Midstream. Centurion Midstream may be served, by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

9. Defendant Centurion Terminals is a Texas limited liability company, with a principal place of business in Dallas County, Texas. By information and belief, Centurion Terminals is an entity controlled by Defendant Calce. The manager of Centurion Terminals is 58C, LLC, a Texas limited liability company, whose manager is LV III, LLC, whose manager is Calce.[1] Centurion Terminals may be served, by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, TX 75001.

---

[1] The repeated use of the number 58 in these entities is evidence that they are the creation of Calce: Calce is very proud of having lettered as an offensive lineman on a Football Championship Subdivision team, where his jersey number was 58.

**PLAINTIFF'S ORIGINAL PETITION**
307338_1

MR.003

## III.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this case because the amount in controversy is in excess of the Court's minimum jurisdictional limits. Moreover, Defendants have engaged in sufficient conduct in the State of Texas to confer jurisdiction over them. The Court has jurisdiction over the subject matter of the action because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Dallas County, Texas.

11. Venue is proper in Dallas County, Texas, pursuant to Texas Civil Practice and Remedies Code Sections 15.002-15.007, because it is the county where all or a substantial part of the events or omissions giving rise to the claims occurred as detailed in the following paragraphs.

## IV.

## BACKGROUND FACTS

A.  **Creation of Centurion Logistics and Centurion Pecos**

12. Several years ago, Marrocco and Albanese were looking for ways to use their expertise in real estate to invest in projects related to the booming oil and gas industry. During their investigations, Marrocco became better acquainted with Calce, who worked in the oil and gas industry, and whom Albanese happened to know from outside his business dealings. After some investigation, Marrocco, Albanese and Calce decided to pursue a project to purchase real estate and to develop a railway terminal for the shipping of crude oil. In order to pursue that project, Marrocco, Albanese and Calce formed Centurion Logistics on September 16, 2013. Centurion Logistics is manager-managed and its managers are Marrocco, Albanese and Calce. Under the company agreement of Centurion Logistics, a majority of the managers are required to take any action.

MR.004

13     Calce concluded that the geology in the area surrounding Pecos, Texas made it likely that there would be significant demand for a crude shipping terminal there. Albanese used his connections to obtain the interest of a possible anchor tenant who might want to ship hydraulic-fracturing sand through a terminal in that area, as a way to build Centurion Logistics' credibility with oil companies and the railroad. Marrocco identified, and placed under contract, an approximately 177-acre parcel in Reeves County, Texas (the "First Parcel") to use for the terminal, and obtained a contract for Centurion Logistics to purchase it.

14.     In order to obtain funds to purchase the First Parcel, Calce, Marrocco and Albanese discussed bringing an equity partner into the Pecos project to contribute cash. Calce offered two potential investors from the oil and gas industry with whom he was acquainted. Because Marrocco had already begun to hear rumors that Calce had a reputation for self-dealing, Marrocco proposed that Centurion Logistics work with the investor to whom he believed Calce had fewer ties, namely Ballengee. Additionally, Ballengee's company was already trucking crude oil in the vicinity. Centurion Logistics and a predecessor of Stampede (which was an ostensibly unrelated entity Ballengee used as a conduit for his investment, in order to conceal any activities that might appear to compete with his current business) formed Centurion Pecos, on September 11, 2014, and Centurion Logistics assigned to Centurion Pecos the contract to purchase the First Parcel.

15.     Ballengee agreed to contribute cash to Centurion Pecos, in order to purchase the First Parcel without any liens or encumbrances. Shortly before the closing of the sale of the First Parcel, however, Ballengee announced to Centurion Logistics that he would not simply contribute cash, as he had represented, but would require that Centurion Pecos grant a deed of trust to Texas Capital Bank ("TCB"), to secure payment of the loan that Ballengee would use to

MR.005

fund his contribution. Because Centurion Logistics had no other way to fund the purchase of the First Parcel before the required closing date, and because the seller was already threatening to sell to another purchaser, Centurion Logistics had no choice but to grant the deed of trust Ballengee demanded, and the proceeds of the loan by TCB to Ballengee Interests were contributed by Ballengee, through Stampede's predecessor, and used to purchase the First Parcel on September 19, 2014.

16. Centurion Logistics has since learned that Ballengee's purpose in having Centurion Pecos grant a deed of trust to TCB, was to create a mechanism by which Ballengee could cause the property to be removed from Centurion Pecos through foreclosure; Ballengee had more than adequate cash to fund the purchase of the First Parcel without taking a loan from TCB.

17. Centurion Logistics determined that the terminal project could be expanded by acquiring an approximately 300-acre parcel adjacent to the First Parcel (the "Second Parcel"). Marrocco obtained a contract for an entity he controlled, in order to purchase the Second Parcel. Marrocco was increasingly concerned about Calce's reputation for underhandedness, and, as a condition to assigning the purchase agreement to Centurion Pecos, insisted that Centurion Logistics and Stampede amend and restate the company agreement of Centurion Pecos, in order to remove Calce as the sole manager of Centurion Pecos, as of November, 2014.

18. Under the amended and restated company agreement of Centurion Pecos, Centurion Logistics and Stampede were the members and managers of Centurion Pecos. Centurion Pecos is manager-managed, and, under the amended and restated company agreement, any action requires the consent of all managers.

19.     Again, at the closing of the Second Parcel, Ballengee insisted that Centurion Pecos grant a deed of trust to the Second Parcel to TCB to secure a loan to Ballengee, rather than fulfilling his representation to make a contribution of cash to purchase the Second Parcel without liens or encumbrances.  Again, Ballengee's purpose, in causing Centurion Pecos to grant a deed of trust, was to create a mechanism to remove the Second Parcel from Centurion Pecos.  The purchase of the Second Parcel closed on August 21, 2015. The First Parcel and the Second Parcel are collectively referred to as the "Reeves County Property".

20.     Again, Ballengee did not provide the funds for the Second Parcel directly to Centurion Pecos.  Rather, he funneled the funds through Stampede because his participation in the Centurion Pecos venture was circumscribed by a non-compete agreement related to one of his previous businesses.

21.     Both deeds of trust, granted at the closings of the Reeves County Property, contain a cross-collateralization clause pledging the Reeves County Property as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. Purportedly, Calce signed both deeds of trust in his capacity as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time he signed the deed of trust to the Second Parcel, and had no other authority to sign the second deed of trust for Centurion Pecos.

B.     **Defendants' Fraudulent Scheme Unfolds**

22.     In late 2015, Calce began communicating to Marrocco that Calce and Ballengee wanted to bring other participants into the project, and wanted Marrocco and Albanese to take a more passive role and a reduced share of the profits.  In particular, Calce expressed a desire to force Albanese out as a manager of Centurion Logistics, and to require Albanese to sell his membership interest in Centurion Logistics for less than its fair value.  Calce threatened that if

MR.007

Marrocco did not cooperate in removing Albanese from Centurion Logistics, Calce and Ballengee would conspire to exclude Marrocco from participation in the terminal project, as well; namely by removing the Reeves County Property from Centurion Pecos through foreclosure. Marrocco refused to participate in removing Albanese from Centurion Logistics. Calce and Ballengee subsequently asked for a meeting with Marrocco to negotiate a fair price for Marrocco's interest in Centurion Logistics, but the proposal proved to be a ruse to trick Marrocco into attending an uncalled meeting of the managers of Centurion Pecos to approve an "assignment and assumption agreement" with Ballengee Interests. Marrocco refused to attend the meeting.

23.     The actions of Ballengee and Calce demonstrate a scheme to move the Reeves County Property out of Centurion Pecos and into an entity in which Marrocco and Albanese have no interest, in order to deprive Marrocco and Albanese of their interests in the terminal project. In addition to his affiliation with Centurion Logistics, Calce is President of Centurion Midstream, an entity unrelated to either Centurion Logistics or Centurion Pecos. Centurion Midstream, or another entity affiliated with Calce, has attempted to negotiate directly with Union Pacific Railroad ("Union Pacific") for the establishment of rail service to the Reeves County Property, initially holding itself out as owning or representing the owner of the property and, after Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos, by telling Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property "within a few weeks." On its website, Centurion Midstream claims to own the property purchased by Centurion Pecos and purports to be creating a terminal at Pecos, Texas. Calce, as President of Centurion Midstream, receives a salary and other benefits.

24.    In furtherance of this scheme, Calce, Ballengee and/or Stampede have, in addition to the deeds of trust executed at the closings of the Reeves County Property, created a number of unauthorized and/or fraudulent documents purporting to pledge the Reeves County Property or create obligations of Centurion Pecos.  These unauthorized transactions and documents were not only concealed from Plaintiff, but, on information and belief have been created recently and backdated.

25.    In a transaction unrelated to the purchase of the Reeves County Property, Ballengee Interests granted a promissory note to TCB dated January 6, 2015 for a line of credit in the amount of $750,000.  In order to secure the note, Calce executed a deed of trust to the First Parcel, purportedly on behalf of Centurion Pecos as its manager.  The January 6, 2015 deed of trust also contained a cross-collateralization clause pledging the First Parcel as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos.  Calce was not a manager of Centurion Pecos in January, 2015, and had no other authority to sign the January 6, 2015 deed of trust.  The proceeds of the line of credit were not used for any purpose related to the business of Centurion Pecos.  Upon information and belief, they were largely used to fund a different terminal project in Brownsville, Texas, owned by Calce.  Centurion Logistics was unaware of the January 6, 2015 deed of trust, and only discovered it during a record search of Reeves County conducted in May 2016.

26.    In October, 2015, around the time Calce began expressing a desire to remove Albanese from Centurion Logistics, and shortly after Centurion Midstream was formed, Ballengee Interests extended the term of the note to TCB, and filed an extension of the deed of trust on the First Parcel to secure the note.  Again, that extension was signed by Calce, as manager of Centurion Pecos, although he was not a manager of Centurion Pecos at the time, and

MR.009

had no other authority to act on behalf of Centurion Pecos. Centurion Logistics and Centurion Pecos were not aware of the extension of the deed of trust on the First Parcel, and only discovered it during a record search of Reeves County conducted in May 2016. Ballengee's and Calce's purpose in extending the deed of trust was to preserve the Ballengee Interests note as a means to remove the First Parcel from Centurion Pecos.

27.    In April 2016, without authority to act for Centurion Pecos, Stampede and Calce created documents that purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interests to TCB used to obtain the funds contributed to purchase the Reeves County Property, and to grant Ballengee Interests a deed of trust to secure the assumption. Centurion Pecos was unaware of these documents or the purported unauthorized assumption until it received a "notice of default" dated April 28, 2016 from Ballengee Interests for its purported failure to make interest payments under the assumption agreement. Neither Centurion Pecos nor Centurion Logistics has ever been provided with copies of the purported assumption agreement and deed of trust.

28.    In addition, Calce created a note, dated on or about November 15, 2015, purporting to obligate Centurion Pecos to make payments to Centurion Terminals, another entity controlled by Calce. Centurion Pecos first learned of this note in a demand letter dated May 27, 2016. No note of this description was ever authorized by Centurion Pecos, and neither Centurion Logistics nor Centurion Pecos has ever seen this purported note.

29.    Ballengee Interests and Calce also created fraudulent notes by Centurion Pecos to Ballengee Interests, dated September 16, 2014 and August 17, 2015. Centurion Pecos first learned of these notes in demand letters dated May 25, 2016. Neither Centurion Logistics nor Centurion Pecos has ever seen these purported notes.

30. In furtherance of their scheme, Defendants are now threatening to use the unauthorized and fraudulent documents to foreclose on the Reeves County Property. Centurion Pecos has received letters from Ballengee Interests and Centurion Terminals demanding payment of purported obligations that Centurion Pecos never, in fact, agreed to assume.

## C. Stampede's Violations of the Company Agreement

31. Section 10 of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC ("Company Agreement") sets forth the conditions under which a member may transfer its membership interest. Section 10.4 states that a transfer shall not be permitted unless:

> [t]he transferor and transferee have delivered to the Company any documents that the Board of Managers request to confirm that the transfer satisfies the requirements of this Agreement to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as Assignee.

32. Pursuant to Section 10.1(a) of the Company Agreement, "transfer" includes "a transfer by merger or other business combination." Stampede's predecessor, Stampede Energy, LLC, a Louisiana limited liability company ("Stampede Louisiana") was a member of Centurion Pecos at the time that the Company Agreement was adopted. On January 20, 2016, Stampede Louisiana was converted to Stampede. Stampede then engaged in mergers with Stampede Energy, LLC, a Delaware limited liability company on March 2, 2016, and with Centurion Brownsville Terminal, LLC, a Texas limited liability company, on February 4, 2016.

33. On April 30, 2016 and again on May 4, 2016, Centurion Logistics expressly requested that Stampede and Centurion Brownsville Terminal, LLC provide the information required by Section 10.4 of the Company Agreement. Stampede and Centurion Brownsville Terminal, LLC failed and refused to provide the information required by the Company Agreement.

307338_1

**D.      Centurion Pecos Votes to Expel Stampede as Member and Manager**

34.      In order to address Stampede's violations of the Company Agreement, Centurion Logistics, on behalf of Centurion Pecos, on May 31, 2016, called a meeting of managers and members of Centurion Pecos, which was held on June 13, 2016.  At the meeting, Centurion Logistics moved to remove Stampede as a member of Centurion Pecos based on Stampede's prohibited transfer of its membership interest.  Because the motion involved removing Stampede as a member, Stampede was an interested manager and not eligible to vote.  Centurion Logistics, the only manager eligible to vote on the motion, voted to remove Stampede as a member.

35.      Subsequently, a meeting of the members of Centurion Pecos met to determine whether Stampede should be removed as a manager because it had transferred its membership interest in a prohibited transfer and engaged in other wrongful conduct that materially affected the business of Centurion Pecos and its members, and had also engaged in conduct that had made it not reasonably practicable to carry on the company business with Stampede.  Centurion Logistics, the only remaining member, voted to remove Stampede as a manager of Centurion Pecos.

**V.**

**CAUSES OF ACTION**

**A.      First Cause of Action:  Breach of Fiduciary Duty as to Calce**

36.      Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

37.     As a manager of Centurion Logistics, Calce had a duty of loyalty to the company. The duty of loyalty requires Calce to act in good faith and not allow personal interests to take precedence over the interests of Centurion Logistics.

38.     Calce also had a duty to disclose all important information concerning any transaction, including any matters that might influence them to act in a manner prejudicial to Centurion Logistics.

39.     In violation of his fiduciary duties, Calce colluded with Stampede, Ballengee and Ballengee Interests to engage in a series of fraudulent transactions which were contrary to the interests of Centurion Pecos and Centurion Logistics. This pattern of misconduct is intended to further Defendants' plan, namely, to remove the Reeves County Property from Centurion Pecos for use in their competing development, and to deprive Centurion Logistics of its share of any profits from the terminal project. The entire scheme is an egregious breach of Calce's duty of loyalty and full disclosure.

40.     By secretly encumbering Centurion Pecos' assets, Calce has damaged the ability of Centurion Logistics to conduct business and impaired the value of those assets.

41.     Calce's breaches of fiduciary duty proximately caused Centurion Logistics to suffered damage and Calce has obtained benefits, which Calce should be required to forfeit. The benefits Calce should be required to forfeit also include any remuneration he has received from Centurion Midstream.

42.     Calce's breaches of fiduciary duty were intentional and, accordingly, Centurion Logistics seeks, and should recover, exemplary damages against Calce.

**B.      Second Cause of Action:  Breach of Fiduciary Duty as to Stampede**

43.      Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

44,      As a manager of Centurion Pecos, Stampede owed Centurion Pecos a duty of loyalty.  Further, Stampede owed Centurion Pecos a duty of candor, including a duty to disclose information concerning its role in any transaction that would prejudice the interests of Centurion Pecos.

45.      Stampede violated its fiduciary duty by covertly engaging in a pattern of transactions designed to deprive Centurion Pecos of the Reeves County Property, as well as Centurion Pecos' interest in the terminal project.

46.      By secretly encumbering Centurion Pecos' assets, Stampede has damaged the ability of Centurion Pecos to conduct business and has impaired the value of those assets.

47.      Stampede's breaches of fiduciary duty have proximately caused Centurion Pecos to suffer damage and Stampede has obtained benefits which Stampede should be required to forfeit.

48.      Stampede's breaches of fiduciary duty were intentional and, accordingly, Centurion Pecos seeks, and should recover, exemplary damages against Stampede.

**C.      Third Cause of Action:  Aiding and Abetting Breach of Fiduciary Duty**

49.      Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

50.      Centurion Midstream and Centurion Terminals assisted with, encouraged and participated in breaches of fiduciary duty by Calce and Stampede.  As set forth above, Calce and Stampede had fiduciary duties of loyalty to Centurion Logistics and to Centurion Pecos and

fiduciary duties to disclose any transactions that would be prejudicial to the chief objectives of Centurion Logistics and Centurion Pecos.

51. Centurion Logistics and Centurion Pecos were created chiefly to purchase the Reeves County Property and to develop a railway terminal in order to transport petroleum and petroleum products. Rather than pursue these objectives with loyalty fiduciaries owe, Calce assisted in the creation of Centurion Midstream to thwart the efforts of Centurion Logistics and Centurion Pecos and to compete with these companies. Based on the content of the Centurion Midstream website, Centurion Midstream is covertly assisting Calce in his plan to take over the Reeves County Property, and to build the railway terminal for his own benefit and for the benefit of Centurion Midstream.

52. Based on its affiliation with Calce, Centurion Terminals was aware that Calce was not authorized to undertake any obligation to Centurion Terminals on behalf of Centurion Pecos. Nonetheless, Centurion Terminals entered into the note and has threatened to enforce it.

53. The breaches of fiduciary duty of Calce and Stampede, committed with the assistance of Centurion Midstream and Centurion Terminals, proximately caused Plaintiff to suffer actual damages in an amount exceeding the minimum jurisdiction of the Court.

54. As Centurion Midstream's and Centurion Terminals' participation in the breaches of fiduciary duty were intentional and exemplary damages are recoverable for the breaches of fiduciary duty, Plaintiff prays for exemplary damages against Centurion Midstream and Centurion Terminals.

## D. Fourth Cause of Action: Money Had and Received (Unjust Enrichment)

55. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     A claim for money had and received arises when the defendant obtains money or a benefit that in equity and good conscience belongs to the plaintiff.  It is an equitable doctrine applied to prevent unjust enrichment.  A cause of action for money had and received is not based on wrongdoing but, instead, looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another.  A claim for money had and received is based upon the doctrine of unjust enrichment.

57.     Further, where a defendant obtains a benefit from the plaintiff by fraud, duress, or taking undue advantage, the plaintiff may recover money or property under the theory of unjust enrichment.

58.     Ballengee and Ballengee Interests colluded with Calce to encumber property of Centurion Pecos to secure debts of Ballengee Interests, including the notes to purchase the Reeves County Property and the $750,000 line of credit.

59.     Ballengee and Ballengee Interests have, therefore, been unjustly enriched by pledges of property to secure Ballengee Interests' debt, including the $750,000 line of credit, and unauthorized assumption of the Ballengee Interests' obligations to TCB.  Indeed, pursuant to the cross-collateralization clauses, the deeds of trust pledged the Reeves County Property to secure all Ballengee Interests' debts to TCB, not merely those related to Centurion Pecos.  Defendants Ballengee and Ballengee Interests should be required to disgorge and to turn over to Centurion Pecos any benefits obtained through these transactions.

60.      By information and belief, Calce has received a salary and other benefits from Centurion Midstream, in exchange for effectuating his and Ballengee's plan, namely, to fraudulently obtain ownership of the Reeves County Property.  This remuneration constitutes unjust enrichment.

61. Centurion Midstream has developed, or plans to develop, a railway terminal in competition with the terminal planned by Centurion Pecos. In so doing, Centurion Midstream, through its aiding and abetting of breaches of fiduciary duty, has obtained, or will obtain in the future, money that rightfully belongs to Centurion Pecos. These funds should be disgorged and transferred to Centurion Pecos.

62. Centurion Midstream has been—and will be—unjustly enriched by its interference with Plaintiff's efforts to secure the Reeves County Property and develop the Pecos terminal.

63. In obtaining these benefits, Defendants have acted with fraud and malice. Accordingly, Plaintiff prays that these Defendants be found liable for exemplary damages.

**E.    Fourth Cause of Action:  <u>Fraudulent Concealment</u>**

64. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

65. Ballengee and Ballengee Interests represented to Centurion Pecos that it would make a capital contribution by purchasing the Reeves County Property on behalf of Centurion Pecos. At the 11th hour, Ballengee and Ballengee Interests demanded that Centurion Pecos agree to deeds of trust on the Reeves County Property. Ballengee and Ballengee Interests did not disclose that the purpose of this demand was to eventually force a foreclosure on the Reeves County Property in order to cut off Centurion Pecos' interest in the terminal project.

66. Centurion Pecos justifiably relied on Ballengee's and Ballengee Interests' professions that their purpose was to invest in, and to promote, the Centurion Pecos terminal project.

67. Ballengee's and Ballengee Interests' failure to disclose their true intentions has injured Centurion Logistics and Centurion Pecos, in that Defendants are now attempting to use the TCB deeds of trust, as well as false and unauthorized documents, to complete their scheme to obtain the Reeves County Property for the competing entity, Centurion Midstream.

68. The wrongful fraudulent acts and omissions have proximately caused Centurion Logistics and Centurion Pecos to suffer damages. Because Defendants' wrongful fraudulent acts and omissions were conducted with intent, Plaintiff seeks both actual and exemplary damages.

**F.     Fifth Cause of Action:  Aiding and Abetting Fraudulent Concealment**

69. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

70. Defendants Calce and Stampede provided knowing and intentional assistance to the fraud committed by Ballengee and Ballengee Interests. Calce and Stampede were aware of the fraudulent scheme and Stampede allowed itself to be used as a conduit through which Ballengee Interests made its payments for the Reeves County Property. As fiduciaries, Calce and Stampede had a heightened duty to disclose Ballengee's true intent, but they remained silent. Indeed, they actively furthered the scheme through their participation in the creation of false and unauthorized transactions and the creation of fraudulent documents.

71. Calce's and Stampede's assistance and encouragement constituted a substantial factor in causing the fraud. Without their participation, it is unlikely that Ballengee and Ballengee Interests could have attempted the scheme, given the limitations imposed on Ballengee by the non-compete agreement. Moreover, these Defendants, through a series of threatening communications, continue to push the fraudulent plan.

MR.018

72.     Calce's and Stampede's participation in the fraudulent scheme has proximately caused Centurion Logistics and Centurion Pecos to suffer damages. Because these Defendants' participation in the wrongful fraudulent scheme was conducted with knowledge and intent, Plaintiff seeks both actual and exemplary damages.

**G.     Sixth Cause of Action:  <u>Declaratory Judgment</u>**

73.     Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

74.     A justiciable controversy exists between Centurion Pecos and Stampede regarding the status, rights, obligations and legal relations between Centurion Pecos and Stampede in connection with the Company Agreement. The justiciable controversy concerns the right of members and managers of Centurion Pecos to expel Stampede as a member and manager.

75.     Pursuant to the terms of the Company Agreement, transfer of membership interests is prohibited unless certain conditions were met. Among the conditions is the obligation of the transferor and transferee to provide information to assure that the transfer comported with the Company Agreement and the transferee agreed to be bound by the Company Agreement. Transfer of a membership interest includes any transfer by merger or business combination.

76.     Stampede or its predecessor transferred of its membership interest within the definitions of the Company Agreement through one or more of three business transactions. First, Stampede Energy, LLC, a Louisiana limited liability company, converted to Stampede. Second, Stampede merged with Stampede Energy, LLC, a Delaware limited liability company. Third, Stampede divided into two entities, Stampede and Centurion Brownsville Terminal, LLC, a Texas limited liability company.

77.    Subsequently, both the transferor and transferee companies expressly refused to provide information about the transactions, as required by the Company Agreement, for any transfer of a membership interest to be permitted.  Centurion Pecos duly called a meeting of the managers and members of Centurion Pecos in order to discuss Stampede's violations and its removal as a member and manager.

78.    At the June 13, 2016 meeting, Centurion Logistics, as manager of Centurion Pecos, voted to remove Stampede as a member of Centurion Pecos.  As the party whose removal was at issue, Stampede was an interested manager excluded from voting.  Accordingly, Stampede was removed as a member of Centurion Pecos.

79.    Following the June 13, 2016 managers meeting, a meeting of members was held to determine whether Stampede should be removed as a manager of Centurion Pecos for cause. Centurion Logistics, the only remaining member, voted to expel Stampede, based on its prohibited transfer of membership interest, as well as its other misconduct, as set forth in this Petition.

80.    In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiff seeks a declaratory judgment against Defendant Stampede, wherein the Court declares that following:

(a)    The June 13, 2016 meeting was a valid meeting under the Company Agreement;

(b)    The removal of Stampede as a member of Centurion Pecos was a valid, binding and enforceable action of the managers of Centurion Pecos;

(c)    The removal of Stampede as a manager of Centurion Pecos was a valid, binding and enforceable action of the members of Centurion Pecos.

81.    In addition, there is a real and justiciable controversy between Centurion Pecos, on the one hand, and Ballengee, Ballengee Interests, and Centurion Terminals, on the other hand, concerning the enforceability of certain financial obligations that Defendants purport were

MR.020

entered into on behalf of Centurion Pecos. As set forth above, Calce, without authority to act for Centurion Pecos, and in violation of his fiduciary duties, created documents purporting to obligate Centurion Pecos to pay the notes that Ballengee Interests entered into with TCB and to make other payments to Ballengee Interests. Similarly, Calce, again without the authority to act for Centurion Pecos, and in violation of his fiduciary duties, apparently created a promissory note in favor of Centurion Terminals, purportedly obligating Centurion Pecos to make certain payments to Centurion Terminals.

82. In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiff seeks a declaratory judgment against Defendants Ballengee, Ballengee Interests, and Centurion Terminals, wherein the Court declares the following:

(a) Any assumption agreement purported to exist between Ballengee Interests and Centurion Pecos is invalid, void and unenforceable;

(b) Any agreement that purports to create an obligation of Centurion Pecos to Ballengee Interests is invalid, void and unenforceable;

(c) Any promissory note or other documents purported to create obligations between Centurion Pecos to Centurion Terminals is invalid, void and unenforceable.

83. In addition and cumulative of other relief sought herein, Plaintiff is entitled to declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without authority, and in violation of his fiduciary duties, purported to create on behalf of Centurion Pecos.

## VI.

## ATTORNEYS' FEES AND COSTS

84. Plaintiff hereby restates and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.     As a result of Defendants' actions, Plaintiff was forced to retain the legal counsel of Shamoun & Norman, LLP ("S&N") to bring this lawsuit. Plaintiff retained the services of S&N to prosecute these claims and agreed to pay S&N its usual, customary and reasonable attorneys' fees. Such action and payment is necessary for the enforcement of Plaintiff's rights.

86.     Plaintiff seeks the recovery of attorneys' fees and costs that it incurs in prosecuting the above-stated claims pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, or any other applicable law.

## VII.

## CONDITIONS PRECEDENT

87.     All conditions precedent to Plaintiff's right to obtain the relief requested herein have been performed or have occurred.

## VIII.

## PRAYER

WHEREFORE, Plaintiff Centurion Logistics LLC, individually and on behalf of Centurion Pecos Terminal LLC, respectfully requests that upon final trial of this cause the Court enter judgment against James Ballengee, Ballengee Interests, LLC, John Calce, Stampede TX Energy, LLC, Centurion Midstream Group, LLC and Centurion Terminals, LLC as follows:

A.     Against all Defendants and in favor of Plaintiff for the amount of actual damages sustained by Plaintiff;

B.     Against all Defendants and in favor of Plaintiff for the disgorgement of unjust enrichment and money had and received;

C.     Entering a declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without

MR.022

authority, and in violation of his fiduciary duties, purported to enter into on behalf of Centurion Pecos;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper, at law or in equity.

Respectfully Submitted,

_____/s/ C. Gregory Shamoun_____
**C. GREGORY SHAMOUN**
State Bar No. 18089650
**J. BLAIR NORRIS**
State Bar No. 24014515
**SHAMOUN & NORMAN, LLP**
1755 Wittington Place, Suite 200
Dallas, Texas  75234
Phone: (214) 987-1745
Fax:    (214) 521-9033
Email:  g@snlegal.com
Email:  bn@snlegal.com

**ATTORNEYS FOR PLAINTIFF**

MR.023

FILED
DALLAS COUNTY
11/22/2017 1:55 PM
FELICIA PITRE
DISTRICT CLERK

Marissa Pittman

## CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

### DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC

John Calce ("Counter-Plaintiff" or "Calce") files his First Amended Counterclaim complaining of Centurion Logistics LLC ("Centurion Logistics") and Centurion Pecos Terminal LLC ("Centurion Pecos") (collectively, "Counter-Defendants") and, in support thereof, would respectfully show the Court as follows:

## I.
## DISCOVERY LEVEL

1. Discovery in this matter is to be conducted under Texas Rule of Civil Procedure 190.4 (Level 3).

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC** **PAGE 1**
9513752.1/SP/38371/0105/112217

MR.173

## II.
## MONETARY RELIEF

2. Calce seeks both monetary and non-monetary relief. The monetary relief sought by Calce is, at this time, over $100,000 but not more than $200,000. But the monetary relief sought by Calce continues to increase as he is required to incur additional expenses in defending himself against the claims brought against him in this lawsuit.

## III.
## PARTIES

3. Plaintiff Calce is an individual residing in Collin County, Texas.

4. Counter-Defendant Centurion Logistics is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas. Centurion Logistics has made an appearance in this matter.

5. Counter-Defendant Centurion Pecos is a limited liability company organized under the laws of the State of Texas with its principal place of business in Dallas, Dallas County, Texas. Centurion Pecos has made an appearance in this matter through Centurion Logistics bringing claims against Calce and the other Defendants derivatively on behalf of Centurion Pecos.

## IV.
## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

7. Calce asserts that Dallas County is not a proper venue for this lawsuit pursuant to Section 15.011 of the Texas Civil Practice and Remedies Code. The bases for such assertion are set forth in Calce's Motion to Transfer Venue. The Motion to Transfer Venue has been denied and is an interlocutory order.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 2**
9513752.1/SP/38371/0105/112217

MR.174

8. On June 27, 2016, Centurion Logistics, individually and derivatively on behalf of Centurion Pecos, filed its Original Petition complaining of Calce and the other Defendants. Centurion Logistics has brought claims against Calce for (1) breach of fiduciary duty; (2) unjust enrichment; and (3) aiding and abetting fraudulent concealment.

9. Plaintiff generally claims that Calce and the other Defendants carried out a scheme that resulted in Centurion Pecos and Centurion Logistics losing their interest in the Reeves County Property, thereby allegedly depriving such entities of the opportunity to construct a railway terminal for the shipping of crude oil on the Reeves County Property.[1] Among other things, Plaintiff alleges that Calce breached the fiduciary duties that he allegedly owed Centurion Logistics as a manager of the company. *See* Pl.'s Orig. Pet. ¶¶ 36 – 42. Plaintiff further claims that Calce took various allegedly unauthorized acts on behalf of Centurion Pecos. *See id.* ¶ 24.

10. On September 20, 2016, Calce filed his Motion to Transfer Venue and Brief in Support Thereof and, Subject Thereto, Original Answer (the "Original Answer"). Since the time of filing his Original Answer, Calce has incurred significant expenses in defending against the claims that have been brought against him in the lawsuit.

## CALCE'S RIGHT TO INDEMNIFICATION/IMMEDIATE REIMBURSEMENT OF EXPENSES FROM CENTURION LOGISTICS

11. Calce is a manager of Centurion Logistics. Section 1.1 of the Company Agreement of Centurion Logistics (the "Logistics Agreement") defines an "Indemnified Person" as follows:

---

[1] The term "Reeves County Property," when used herein, should be understood to have the same meaning as the term is used and defined in Plaintiff's Original Petition.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**    **PAGE 3**
9513752.1/SP/38371/0105/112217

MR.175

"Indemnified Person" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

*See* Section 1.1 of the Logistics Agreement (emphasis added). A true and correct copy of the Logistics Agreement is attached hereto as Exhibit A. Calce, as a manager of the company, is therefore an "Indemnified Person" under the Agreement. *See id.*

12.     Section 6.2 of the Logistics Agreement is entitled "Indemnification by Company" and provides as follows:

To the fullest extent permitted by applicable law, and subject to Section 6.3, [Centurion Logistics] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Logistics]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

*See* Ex. A § 6.2 (emphasis added). Accordingly, pursuant to Section 6.2, Calce—as an Indemnified Person—is entitled to immediate reimbursement of "expenses paid or incurred in defending [himself] against any Proceeding." *See id.*

13.     Section 1.1 of the Agreement defines "Proceeding" as follows: "(a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding, and (c) any

MR.176

inquiry or investigation that could lead to any such proceeding." *See* Ex. A § 1.1. This Lawsuit clearly constitutes a "Proceeding" under the Logistics Agreement.

14. Under the terms of the Logistics Agreement, Centurion Logistics is required to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit—*as such expenses are paid or incurred*. If it is ultimately determined that Calce is not entitled to such payments, the Logistics Agreement expressly provides Centurion Logistics with an appropriate remedy. *See* Ex. A § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Logistics].").

**CENTURION LOGISTICS' REFUSAL TO REIMBURSE CALCE'S DEFENSE COSTS**

15. On August 22, 2017, Calce—through his counsel—requested that Centurion Logistics, pursuant to Section 6.2 of the Agreement, (1) reimburse Calce the full amount of expenses that he had been invoiced as of July 31, 2017, plus an additional $50,000 to be applied to future expenses as they are incurred; and (2) agree to reimburse Calce the additional expenses, in excess of such $50,000 advancement, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred (referred to hereinafter as the "Reimbursement Request").

16. The Reimbursement Request provides that, "[p]ursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3." The Reimbursement Request also provides that "Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law."

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 5**
9513752.1/SP/38371/0105/112217

MR.177

17.     Centurion Logistics denied Calce's request for reimbursement.  To date, Centurion Logistics has not reimbursed Calce any amount for the expenses he has paid and incurred in defending himself against the claims brought against him in the Lawsuit.

## CALCE'S RIGHT TO INDEMNIFICATION/IMMEDIATE REIMBURSEMENT OF EXPENSES FROM CENTURION PECOS

18.     When Centurion Pecos was initially formed, Calce was the sole manager of the company.  *See* the Company Agreement of Centurion Pecos (the "Pecos Original Agreement"), which is dated effective September 12, 2014, a true and correct copy of which is attached hereto as Exhibit B.  Calce was also appointed as the president of Centurion Pecos.  Such appointment was effective as of September 11, 2014.

19.     In November 2014, the First Amended and Restated Company Agreement of Centurion Pecos (the "Pecos Amended Agreement") was executed.  A true and correct copy of the Pecos Amended Agreement is attached hereto as Exhibit C.  The First Amended and Restated Company Agreement removed Calce as a manager of Centurion Pecos, but Calce remained the duly appointed president of the company.

20.     Section 1.1 of both the Pecos Original Agreement and the Pecos Amended Agreement defines an "Indemnified Person" as follows:

> "Indemnified Person" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) *any governing person, officer, employee, agent, or owner of the [Centurion Pecos]*, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing.  A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

*See* Ex. B § 1.1 (emphasis added); *see also* Ex. C § 1.1 (emphasis added).

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 6**
9513752.1/SP/38371/0105/112217

MR.178

21.     Moreover, Section 6.2 of both the Pecos Original Agreement and the Pecos Amended Agreement is entitled "Indemnification by Company" and provides as follows:

> To the fullest extent permitted by applicable law and subject to Section 6.3, [Centurion Pecos] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Pecos'] business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of [Centurion Pecos'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Pecos]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, vote of Members, or otherwise.

*See* Ex. B § 6.2 (emphasis added); *see also* Ex. C § 6.2 (emphasis added).

22.     Like the Logistics Agreement, the terms of the Pecos Original Agreement and the Pecos Amended Agreement require Centurion Pecos to reimburse Calce for any and all expenses paid or incurred by Calce in defending himself in this lawsuit, ***as such expenses are paid or incurred***. Furthermore, also like the Logistics Agreement, both the Pecos Original Agreement and the Pecos Amended Agreement provide Centurion Pecos with an adequate remedy if it is ultimately determined that Calce is not entitled to such payments. *See* Exs. B and C § 6.3(c) (providing that "[a]ny payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to [Centurion Pecos].").

23.     To date, Centurion Pecos has not reimbursed Calce any amount for the expenses that he has paid and incurred in defending himself against the claims brought against him in this lawsuit.

24.     The Pecos Amended Agreement identifies Centurion Logistics and Defendant Stampede TX Energy, LLC ("Stampede") as the only members of Centurion Pecos. Pursuant to the Pecos Amended Agreement, Stampede is the majority-in-interest member holding a 60%

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 7**
9513752.1/SP/38371/0105/112217

MR.179

membership interest in Centurion Pecos, and Centurion Logistics holds the remaining 40% membership interest.

25. Stampede—on behalf of Centurion Pecos—has already agreed that Centurion Pecos will reimburse Calce for the amount of expenses that he has paid or incurred (or will pay and incur) in defending himself against the claims brought against him in this lawsuit. But Centurion Logistics claims that Stampede was removed as a manager of Centurion Pecos on June 13, 2016. Stampede disputes the propriety of the alleged removal and does not recognize same. Accordingly, Calce's claim for contractual indemnification and reimbursement/advancement of defense costs against Centurion Pecos is significantly intertwined with and dependent upon the outcome of the competing declaratory judgment claims of Stampede and Centurion Logistics regarding which entity has control of Centurion Pecos.

## VI.
## CAUSES OF ACTION

## COUNT 1: DECLARATORY JUDGMENT

26. Calce restates and incorporates the allegations contained in the preceding paragraphs.

27. As shown by the facts set forth above, Calce is entitled to indemnification from Centurion Logistics and Centurion Pecos pursuant to the terms of such entities' own company agreements. Calce is further entitled to reimbursement of the expenses he has paid and incurred (and those that he will pay and incur in the future), as such expenses are paid and incurred, in defending himself against the claims brought against him in this lawsuit.

28. Calce therefore seeks a judicial determination that:

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC** **PAGE 8**
9513752.1/SP/38371/0105/112217

MR.180

(a)     Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

(b)     Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

(c)     In the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

(d)     Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

(e)     Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit; and

(f)     In the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**          **PAGE 9**
9513752.1/SP/38371/0105/112217

MR.181

set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement).

## COUNT 2: BREACH OF CONTRACT (CENTURION LOGISTICS)

29. Calce restates and incorporates the allegations contained in the preceding paragraphs.

30. The Logistics Agreement constitutes a valid and enforceable contract. Centurion Logistics breached the Logistics Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit. Calce performed, tendered performance of, or was excused from performing any of his obligations under the Logistics Agreement.

31. As a result of Centurion Logistics' breach, Calce has suffered actual damages. Calce is entitled to recover such damages from Centurion Logistics.

## COUNT 3: BREACH OF CONTRACT (CENTURION PECOS)

32. Calce restates and incorporates the allegations contained in the preceding paragraphs.

33. The Pecos Original Agreement and the Pecos Amended Agreement constitute valid and enforceable contracts. Centurion Pecos breached the Pecos Original Agreement and the Pecos Amended Agreement by failing to reimburse Calce the amount of expenses he has paid and incurred in defending himself against the claims brought against him in this lawsuit. Calce performed, tendered performance of, or was excused from performing any of his obligations under the Pecos Original Agreement and the Pecos Amended Agreement.

34. As a result of Centurion Pecos' breach, Calce has suffered actual damages. Calce is entitled to recover such damages from Centurion Pecos.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**  **PAGE 10**
9513752.1/SP/38371/0105/112217

MR.182

## VII.
## ATTORNEYS' FEES

35.    Calce restates and incorporates the allegations contained in the preceding paragraphs.

36.    Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, Calce seeks an award of his reasonable and necessary attorneys' fees and costs incurred in prosecuting his declaratory judgment claim and for any appeal.

37.    Calce is further entitled to and hereby requests judgment for his reasonable and necessary attorneys' fees incurred in bringing this counterclaim and for any appeal pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code. Calce either has or will present his claim to Plaintiff or to a duly authorized agent of Plaintiff in accordance with Section 38.002 of the Texas Civil Practice and Remedies Code.

## VIII.
## CONDITIONS PRECEDENT

38.    All conditions precedent to maintaining this action have occurred and been satisfied or have been excused or waived.

## IX.
## PRAYER

Counter-Plaintiff John Calce requests that, upon final hearing, Calce have judgment against Counter-Defendants Centurion Logistics LLC and Centurion Pecos Terminal LLC as follows:

1.    A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**    **PAGE 11**
9513752.1/SP/38371/0105/112217

MR.183

2. A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

3. A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Logistics is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Logistics and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Logistics (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Logistics Agreement);

4. A declaration that Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in this lawsuit;

5. A declaration that Centurion Pecos is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in this lawsuit;

6. A declaration that, in the unlikely event that any liability be found on the part of Calce, Centurion Pecos is required to indemnify Calce and hold him harmless from any damages that relate to either (i) the business of Centurion Pecos and/or (ii) any alleged acts or omissions that were purportedly taken or made by Calce in his capacity as a manager of Centurion Pecos (not including any damages arising from any conduct set forth in Section 6.3(a)(i)-(iv) of the Pecos Original Agreement and Pecos Amended Agreement);

7. Judgment against Centurion Logistics for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit;

8. Judgment against Centurion Pecos for the amount of expenses, including attorneys' fees, paid or incurred by Calce in defending himself against the claims brought against him in this lawsuit;

9. Judgment against Counter-Defendants for Calce's reasonable and necessary attorneys' fees incurred in pursuing this counterclaim;

10. Judgment against Counter-Defendants for pre- and post-judgment interest as provided by law;

11. Judgment against Counter-Defendants for Calce's costs of suit; and

12. Such other and further relief to which Calce may be justly entitled.

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM**
**AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**      **PAGE 12**
9513752.1/SP/38371/0105/112217

MR.184

Respectfully submitted,

_/s/ David N. Kitner_

**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR DEFENDANTS
JOHN CALCE, CENTURION MIDSTREAM
GROUP, LLC, CENTURION TERMINALS,
LLC, AND STAMPEDE TX ENERGY, LLC**

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 22nd day of November, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

_/s/ Chase J. Potter_

Chase J. Potter

**DEFENDANT/COUNTER-PLAINTIFF JOHN CALCE'S FIRST AMENDED COUNTERCLAIM
AGAINST CENTURION LOGISTICS LLC AND CENTURION PECOS TERMINAL LLC**      **PAGE 13**
9513752.1/SP/38371/0105/112217

MR.185

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

### JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC

TO THE HONORABLE COURT:

Defendant/Counter-Plaintiff John Calce ("Calce") files this Amended Motion for Summary Judgment regarding his Counterclaim against Plaintiff/Counter-Defendant Centurion Logistics LLC ("Centurion Logistics") and, in support thereof, would respectfully show the Court as follows:[1]

### BASIS FOR MOTION

Calce is a manager of Centurion Logistics. Calce is therefore contractually entitled—pursuant to Section 6.2 of the Company Agreement of Centurion Logistics (the "Agreement")—

---

[1] This Motion amends and replaces Calce's previously filed motion for partial summary judgment entitled "John Calce's Motion for Partial Summary Judgment Regarding Indemnification Claim Against Centurion Logistics LLC," which was filed on October 6, 2017.

---

MR.322

to advancement/reimbursement from the company of any expenses he pays or incurs in defending himself in this lawsuit (as such expenses are paid or incurred).[2] Importantly, Calce's right to advancement/reimbursement of defense costs, which is the sole issue addressed by this Motion, is separate and distinct from any right to indemnification. Calce's right to reimbursement is supported by the Agreement, Texas case law, and the Texas Business & Organizations Code (the "TBOC"). For these reasons, and as more fully set forth below, Calce is entitled—as a matter of law—to the relief requested herein.[3]

## STATEMENT OF FACTS

### The Lawsuit

1. On June 27, 2016, Centurion Logistics, individually and derivatively on behalf of Centurion Pecos Terminal LLC ("Centurion Pecos"), filed its Original Petition complaining of Calce and the other Defendants (the "Lawsuit"). *See generally* Pl.'s Orig. Pet. Centurion Logistics brought claims against Calce for (1) breach of fiduciary duty; (2) unjust enrichment; and (3) aiding and abetting fraudulent concealment. *See id.* ¶¶ 36 – 42, 60, 69 – 72.[4]

2. Centurion Logistics claims that Calce and the other Defendants carried out a scheme that resulted in Centurion Pecos and Centurion Logistics losing their interest in the

---

[2] A true and correct copy of the Agreement is attached hereto as Exhibit A-1.

[3] In this Motion, Calce only seeks a declaration that he is entitled to advancement/reimbursement from Centurion Logistics for his past and future defense costs and a judgment that Centurion Logistics breached the Agreement. Calce will move for a judgment for his actual defense costs at a later date.

[4] Centurion Logistics has sought leave to file its First Amended Petition. As of the date of this filing, leave has not been granted. Centurion Logistics' First Amended Petition includes the following causes of action against Calce: (1) breach of fiduciary duty; (2) unjust enrichment; (3) aiding and abetting fraud/fraudulent inducement; (4) violation of the Texas Theft Liability Act; (5) tortious interference with contract; (6) fraudulent inducement; and (7) promissory estoppel. *See* Plaintiff's Motion for Leave to File Amended Petition.

MR.323

Reeves County Property[5], thereby allegedly depriving such entities of the opportunity to construct a railway terminal for the shipping of crude oil from such property. *See generally* Pl.'s Orig. Pet. Among other things, Plaintiff alleges that Calce breached the fiduciary duties that he owed Centurion Logistics as a manager of the company. *See id.* ¶¶ 36 – 42.[6]

3. On September 20, 2016, Calce filed his Motion to Transfer Venue and Brief in Support Thereof and, Subject Thereto, Original Answer (the "Original Answer"). Since the filing of his Original Answer, Calce has incurred, and continues to incur, significant expenses in defending against the claims that have been brought against him in the Lawsuit.

**Calce's Contractual Right to Immediate Reimbursement of Defense Costs**

4. Calce is a manager of Centurion Logistics. *See* Pl.'s Orig. Pet. ¶ 12. Section 1.1 of the Company Agreement of Centurion Logistics (the "Agreement") defines an "Indemnified Person" as follows:

> "Indemnified Person" means (a) a Member or Assignee; (b) *a Manager*; (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

*See* Ex. A-1 § 1.1 (emphasis added). Calce, as a manager of the company, is therefore an "Indemnified Person" under the Agreement. *See id.*

5. Section 6.2 of the Agreement provides as follows:

---

[5] The term "Reeves County Property," when used herein, should be understood to have the same meaning as the term is used and defined in Plaintiff's Original Petition.

[6] Centurion Logistics makes the same allegations in the First Amended Petition that it has sought leave to file. *See* Plaintiff's Motion for Leave to File Amended Petition, Ex. A, ¶¶ 52 – 58.

**JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**     **PAGE 3**
9516179.1/SP/38371/0105/112217

MR.324

To the fullest extent permitted by applicable law, and subject to Section 6.3, [Centurion Logistics] indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business or for any misconduct or negligence on the part of any other person that is an employee or agent of [Centurion Logistics]. ***An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.*** The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

*See* Ex. A-1 § 6.2 (emphasis added). Accordingly, pursuant to Section 6.2, Calce—as an Indemnified Person—is entitled to immediate reimbursement of "expenses paid or incurred in defending [himself] against any Proceeding." *See id.*

6. Section 1.1 of the Agreement defines "Proceeding" as follows: "(a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding, and (c) any inquiry or investigation that could lead to any such proceeding." *See* Ex. A-1 § 1.1. This Lawsuit clearly constitutes a "Proceeding" under the Agreement, which Plaintiff does not dispute. *See infra.*

7. Section 6.3(c) of the Agreement provides the following remedy for Centurion Logistics if it is ultimately determined—pursuant to a final judgment of a court of competent jurisdiction—that Calce is not entitled to advancement/reimbursement under Section 6.2:

Any payments made to or on behalf of a person ***who is later determined not to be entitled to such payments shall be repaid by the person to the Company***. The Company may require as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified

MR.325

Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

*See* Ex. A-1 § 6.3(c) (emphasis added).

**Centurion Logistics' Refusal to Reimburse Calce's Defense Costs**

8.     On August 22, 2017, Calce—through his counsel—requested that Centurion Logistics, pursuant to Section 6.2 of the Agreement, (1) reimburse Calce the full amount of expenses that he had been invoiced as of July 31, 2017, plus an additional $50,000 to be applied to future expenses as they are incurred; and (2) agree to reimburse Calce the additional expenses, in excess of such $50,000 advancement, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred. *See* the August 22, 2017, letter, a true and correct copy of which is attached hereto as Exhibit B (referred to hereinafter as the "Reimbursement Request").[7]

9.     The Reimbursement Request provides that, "[p]ursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3." *See* Ex. B at 2. The Reimbursement Request also provides that "Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law." *See id.*

10.     Centurion Logistics denied Calce's request for reimbursement. *See* letter of September 5, 2017, a true and correct copy of which is attached hereto as Exhibit C (referred to hereinafter as the "Reimbursement Denial"). Despite denying the request, Centurion Logistics conceded that Calce is an "Indemnified Person" and that this litigation is a "Proceeding" as those

---

[7] The Agreement was attached as Exhibit A to the Reimbursement Request. The Agreement has been omitted as an attachment to the Reimbursement Request since it is attached as Exhibit A-1 to this Motion.

MR.326

terms are defined in the Agreement. *See* Ex. C at 2. To date, Centurion Logistics has not reimbursed Calce any amount for the expenses he has paid and incurred in defending himself against the claims brought against him in the Lawsuit. *See* the Declaration of John Calce, a true and correct copy of which is attached hereto as Exhibit A, ¶ 4.

## ARGUMENT AND AUTHORITIES

This Motion only addresses Calce's right to advancement/reimbursement of defense costs—not his right to indemnification. These rights are often improperly conflated, but they are distinct concepts with completely different standards. Calce does not contend that he is entitled to indemnification—as a matter of law—from Centurion Logistics at this point in the litigation. However, his right to advancement/reimbursement of defense costs is clear and appropriate for determination at the summary judgment stage. In order to adequately demonstrate Calce's entitlement to the relief requested herein, it is important to first contrast the difference between the right to advancement/reimbursement and the right to indemnification. These concepts are extensively analyzed in *In re Aguilar*, 344 S.W.3d 41 (Tex. App.—El Paso 2011, orig. proceeding) (referred to herein as "*Aguilar*").

**A.    The right to advancement/reimbursement of expenses and the right to indemnification are separate and distinct legal concepts.**

*Aguilar* is strikingly similar to the present case. Aguilar and another individual formed Perspectiva Group, Inc. ("Perspectiva"). *See Aguilar*, 344 S.W.3d at 44. Aguilar was an officer and director of Perspectiva. *See id.* Perspectiva filed suit against Aguilar and certain Perspectiva employees alleging that Aguilar had breached his fiduciary duties to the company and engaged in a conspiracy. *See id.* Perspectiva later filed a second suit against Aguilar and others, which was eventually consolidated with the first suit into one cause, accusing Aguilar and his daughter of forming a company that competed with Perspectiva (similar to the allegations in the current

MR.327

case). *See id.* During the pendency of the consolidated lawsuit, Aguilar's attorney—pursuant to Perspectiva's bylaws—sent Perspectiva's attorney a letter requesting that Perspectiva advance Aguilar's defense costs, including attorneys' fees (which is exactly what Calce has requested here). *See id.* Perspectiva—like Centurion Logistics—denied Aguilar's advancement/reimbursement request. *See id.* at 45. The trial court denied Aguilar's motion requesting advancement/reimbursement of defense costs. *See id.* The appellate court conditionally granted Aguilar's petition for a writ of mandamus and provided that the writ would issue if the trial court refused to (1) vacate its order denying Aguilar's motion regarding advancement; and (2) enter an order granting the motion. *See id.* at 56.

In analyzing the issue, the *Aguilar* appellate court first stated that Article 2.02-1 of the Texas Business Corporation Act expressly allowed Texas corporations to advance litigation expenses to its directors. *See id.* at 45. The *Aguilar* court further noted that the applicable section of Perspectiva's bylaws was nearly identical to the statutory language regarding advancement/reimbursement of expenses. *See id.* at 45 – 46. Article 2.02-1 of the Texas Business Corporation Act is the predecessor to Section 8.104 of the TBOC. *See* TEX. BUS. ORGS. CODE § 8.104.[8] Similarly, here, Section 6.2 is consistent with the statutory language set forth in Section 8.104 of the TBOC. *See* Ex. A-1 § 6.2; *see also* TEX. BUS. ORGS. CODE § 8.104.

The *Aguilar* court next turned to the lack of Texas case law addressing the right to advancement/reimbursement of defense costs: "There are no Texas cases concerning advancement under the Business Corporation Act or the Business Organizations Code. But the courts of Delaware have addressed advancement on numerous occasions." *Aguilar*, 344 S.W.3d at 46. It is common for Texas courts to look to Delaware law for guidance regarding

---

[8] The prior and current statutes are essentially the same in all material respects. *Compare* TEX. BUS. CORP. ACT ART. 2.02-1 *with* TEX. BUS. ORGS. CODE § 8.104.

unsettled/undeveloped areas of corporate law.[9] The Delaware Supreme Court has explained that "'[a]dvancement is an especially important corollary to indemnification' because it provides corporate officials with immediate interim relief from the burden of paying for a defense." *See Aguilar*, 344 S.W.3d at 46 (quoting *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. Supr. 2005)). "Although the right to indemnification and advancement are correlative, they are separate and distinct legal actions." *Id.* (quoting *Homestore*, 888 A.2d at 212). Perhaps most importantly, "[t]he right to advancement is ***not dependent*** on the right to indemnification." *Id.* (citing *Homestore*, 888 A.2d at 212) (emphasis added). This concept is vitally important to the determination of this Motion, because it demonstrates that Calce's alleged conduct is completely irrelevant to his right to immediate advancement/reimbursement of his defense costs.

**B.  Centurion Logistics cannot rely on its own allegations to deny Calce's right to advancement/reimbursement of defense costs.**

The Reimbursement Denial states that Centurion Logistics denied Calce's request for reimbursement/advancement, at least in part, on the basis of Centurion Logistics' allegations in the Lawsuit—specifically that Calce (1) was not acting "within the scope of [his] authority in course of the Company's business"; and (2) was engaging in "intentional misconduct" and a "knowing violation of law." *See* Ex. C. These are mere allegations for which Centurion Logistics has the burden of proof. Centurion Logistics does not get to assume the role of accuser

---

[9] "Delaware has been described as 'the Mother Court of corporate law.'" *Aguilar*, 344 S.W.3d at 47 (citing *Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1343 (7th Cir. 1990), *rev'd on other grounds*, 500 U.S. 90 (1991)). "Courts throughout the country look to Delaware for guidance on matters of corporate law." *Id.* (citing *Neurobehaviorial Assocs., P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 n. 12 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (turning to Delaware corporate law for guidance regarding "winding-up" because there was no Texas cases addressing the issue)). "The law of advancement, in particular, is 'a Delaware specialty.'" *Id.* (citing *Int'l Airport Ctrs., LLC v. Citrin*, 455 F.3d 749, 750 (7th Cir. 2006)). "To the limited extent that there is law [regarding advancement] outside Delaware, it is the same as the law in Delaware." *Id.* (quoting Stephen A. Radin, "*Sinners Who Find Religion*": *Advancement of Litigation Expenses to Corporate Officials Accused of Wrongdoing*, 25 Rev. Litig. 251, 271 (2006)).

and fact-finder. More importantly, these allegations are irrelevant to the determination of whether Calce is entitled to advancement/reimbursement of his defense costs.

In *Aguilar*, Perspectiva similarly denied Aguilar's request for advancement on the basis that Aguilar purportedly had unclean hands due to the alleged breaches of his fiduciary duties. *See Aguilar*, 344 S.W.3d at 46. The *Aguilar* court stated that "[u]nder Delaware law, advancement is allowed even when the official seeking advancement is being sued by the corporation that must advance the litigation expenses" as "Delaware case law is replete with insider trading cases in which executives' expenses are advanced despite allegations of defrauding the corporation or its stockholders of millions of dollars." *Id.* at 47 (citing *James River Mgmt. Co., Inc. v. Kehoe*, 674 F. Supp. 2d 745, 750 (E.D. Va. 2009)). The *Aguilar* court further provided that "[a]dvancement claims are frequently granted when, as in this case, the corporation is suing an official for breach of fiduciary duty." *Id.* That is the exact situation here—*i.e.*, Calce is being sued for breach of fiduciary duty. *See* Pl.'s Orig. Pet. ¶¶ 36 – 42. "The corporation [Centurion Logistics] cannot defend against the advancement claim on the ground that it now believes the fiduciary [Calce] to have been unfaithful because ***it is in those very cases that the right to advancement attaches most strongly***." *Id.* (citing *Kehoe*, 674 F. Supp. 2d at 750) (internal quotations omitted) (emphasis added). The Delaware Court of Chancery perhaps put it best stating:

> It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty [exactly what Calce is being sued for here], and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks . . . . Therefore, it is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the suing parties. To do so would be to largely vitiate the protections afforded by [statutory] and contractual advancement rights.

MR.330

*Reddy v. Elec. Data Sys. Corp.*, No. CIV.A.19467, 2002 Del. Ch. LEXIS 69, at \*15 – 16 (Del. Ch. June 18, 2002); *see also Aguilar*, 344 S.W.3d at 48 (expressly rejecting proposition that "the entitlement to advancement hinges on proof that the director did not violate his fiduciary duties.").

Calce's alleged conduct is completely irrelevant for purposes of this Motion and the determination of whether Calce is entitled to advancement/reimbursement of his defense costs. *See Aguilar*, 344 S.W.3d at 48 (citing *Reddy*, 2002 Del. Ch. LEXIS 69, at \*28 – 29) (providing that any other result "would turn every advancement case into a trial on the merits of the underlying claims of official misconduct.")). Rather, the determinative question is whether the terms of the Agreement afford Calce the right to advancement/reimbursement of his defense costs. The answer is unquestionably yes.

**C.    Calce's contractual right to advancement/reimbursement is unambiguous and mandatory.**

**1.    The terms of the Agreement are unambiguous and its interpretation is a question of law for the Court.**

The interpretation of an unambiguous contract is a question of law for the court. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999)). Likewise, "[t]he question of whether a contract is ambiguous is one of law for the court." *Peterson v. Farmers Tex. Cnty. Mut. Ins. Co.*, No. 05-15-00678-CV, 2016 Tex. App. LEXIS 6586, at \*8 (Tex. App.—Dallas June 22, 2016, no pet.) (mem. op.) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)). A contract is not ambiguous if, like the Agreement here, "the contract's language can be given a certain or definite meaning." *Id.* (citing *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). The mere fact that the "parties advance different interpretations

**JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING**
**COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**                                    **PAGE 10**
9516179.1/SP/38371/0105/112217

MR.331

of a contract does not necessarily mean that the contract is ambiguous." *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 707 (Tex. App.—Dallas 2011, pet. denied).

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties *as expressed in the instrument*." *Moayedi*, 438 S.W.3d at 7 (emphasis added). "Absent a finding of ambiguity, a court must interpret the meaning and intent of a contract from the four corners of the document without the aid of extrinsic evidence." *Peterson*, 2016 Tex. App. LEXIS 6586, at *9; *see also Sacks v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)) (providing that "[o]nly where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument'"). Moreover, "[u]nless the agreement shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning." *Moayedi*, 438 S.W.3d at 7 (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). The relevant terms of the Agreement are unambiguous and entitle Calce to indemnification.

2. **Section 6.2 of the Agreement clearly requires Centurion Logistics to immediately reimburse Calce the expenses he pays or incurs in defending himself in the Lawsuit.**

It is undisputed that Calce—as a manager of Centurion Logistics—is an "Indemnified Person" under the Agreement. *See* Pl.'s Orig. Pet. ¶ 12; *see also* Ex. A-1 § 1.1; Ex. C at 2. It is further undisputed that the Lawsuit constitutes a "Proceeding" as defined in Section 1.1 of the Agreement. *See* Ex. A-1 § 1.1; *see also* Ex. C at 2. Section 6.2 of the Agreement provides that "[a]n Indemnified Person's [*e.g.*, Calce] expenses paid or incurred in defending [himself] against any Proceeding [*e.g.*, this Lawsuit] *shall* be reimbursed as paid or incurred." *See* Ex. A-1 § 6.2

JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC                    PAGE 11
9516179.1/SP/38371/0105/112217

MR.332

(emphasis added). There are no qualifications and/or conditions to Calce's express right to advancement/reimbursement of defense costs.[10]

The *Aguilar* court—after noting that the term "shall" is generally construed to be mandatory—held that Perspectiva had a mandatory duty, under the applicable section of its bylaws (which is strikingly similar to the language of Section 6.2), to advance Aguilar's defense costs. *See Aguilar*, 344 S.W.3d at 51.[11] Similarly, Centurion Logistics is required, pursuant to Section 6.2 of the Agreement, to reimburse Calce the expenses he pays or incurs in defending himself in the Lawsuit—*as such expenses are paid or incurred*.

### 3. Calce's reimbursable expenses include his attorneys' fees.

The *Aguilar* court expressly rejected Perspectiva's argument that the undefined term "reasonable expenses" does not include attorneys' fees. *See Aguilar*, 344 S.W.3d at 51 – 52. In support of its holding, the *Aguilar* court stated that "Perspectiva's interpretation renders [the relevant section of Perspectiva's bylaws] insignificant and practically useless." *Id.* at 51. The *Aguilar* court further provided that "[t]he purpose of advancement is to relieve corporate officials from the burden of paying the significant on-going expenses involved in litigation" and that "[t]he burden of litigation comes from attorney's fees, not copying costs." *Id.* at 51 – 52 (internal quotations and citations omitted). This reasoning is equally applicable here. Moreover,

---

[10] Section 6.3(c) of the Agreement does provide that "[t]he Company [Centurion Logistics] may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law." *See* Ex. A-1 § 6.3. Calce has already agreed in writing to repay any amount that he is reimbursed by Centurion Logistics if it is ultimately determined that he was not entitled to such payments. *See* Ex. B at 2.

[11] The pertinent section of Perspectiva's bylaws provided as follows: "[r]easonable expenses incurred by a person who was, is, or threatened to be made a named defendant or respondent in a Proceeding shall be paid or reimbursed by the Corporation . . . ." *See Aguilar*, 344 S.W.3d at 44.

---

MR.333

Section 8.001 of the TBOC defines the term "expenses" to include "reasonable attorney's fees." *See* TEX. BUS. ORGS. CODE § 8.001(3)(B). It is therefore clear that Calce's right to advancement/reimbursement of "expenses" includes the attorneys' fees he pays or incurs in his defense of this Lawsuit.

**D.** **Summary Judgment is the appropriate—and only meaningful—mechanism for Calce to exercise his right to advancement/reimbursement of defense costs.**

The *Aguilar* court made clear that a summary judgment motion is an appropriate procedural vehicle for seeking advancement/reimbursement of defense costs. *See Aguilar*, 344 S.W.3d at 52 – 53. More importantly, the *Aguilar* court stated that "[b]y its very nature, advancement of expenses can occur only during the course of the trial court proceedings." *Id.* at 55 (citing *Morgan v. Grace*, No. Civ.A. 20430, 2003 Del. Ch. LEXIS 113, at \*4 (Del Ch. Oct. 29, 2003) (providing that "[t]he value of the right to advancement is that it is granted or denied while the underlying action is pending.")). "It is indemnification of expenses that occurs at the conclusion of the case." *Id.* Therefore, Calce's right to advancement/reimbursement of defense costs is ripe. The only appropriate time for such determination is now. Calce's advancement/reimbursement claim will be effectively moot at the conclusion of the case. *See id.*

CONCLUSION

For these reasons, Calce requests that the Court grant his Motion for Partial Summary Judgment against Centurion Logistics and enter the following judgment:

a)  A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in the Lawsuit;

b)  A declaration that Centurion Logistics is required to reimburse Calce the expenses, including but not limited to attorneys' fees, that he pays or incurs in the future in defending himself against the claims brought against him in the Lawsuit within ten (10) days of Calce submitting such expenses to Centurion Logistics;

MR.334

c)   Judgment that Centurion Logistics breached the Agreement by failing to reimburse Calce the amount of expenses, including but not limited to attorneys' fees, that he has paid or incurred to date in defending himself against the claims brought against him in the Lawsuit;[12] and

d)   Such other and further relief to which Calce may be justly entitled.

Respectfully submitted,

*/s/ David N. Kitner*

**DAVID N. KITNER**
State Bar No. 11541500
david.kitner@strasburger.com
**CHASE J. POTTER**
State Bar No. 24088245
chase.potter@strasburger.com
**STRASBURGER & PRICE, LLP**
901 Main Street, Suite 6000
Dallas, TX 75202-3794
(214) 651-4300
(214) 651-4330 Fax

**ATTORNEYS FOR JOHN CALCE,
CENTURION MIDSTREAM GROUP, LLC,
CENTURION TERMINALS, LLC, AND
STAMPEDE TX ENERGY, LLC**

---

[12] Calce's First Amended Counterclaim against Centurion Logistics—like his Original Counterclaim— includes claims for declaratory relief and breach of contract. *See* Calce's First Am. Counterclaim. For the reasons set forth herein, Calce is entitled to summary judgment on his breach of contract claim, in addition to his claim for declaratory relief. To succeed on a breach of contract claim, a plaintiff must show: "(1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 813 – 814 (Tex. App.—Dallas 2013, no pet.). The arguments set forth above and summary judgment evidence conclusively establish all such elements as a matter of law: (1) the Agreement is a valid contract; (2) Calce submitted his written undertaking (without even being requested to do so by Centurion Logistics); (3) Centurion Logistics breached Section 6.2 of the Agreement by denying Calce's request for advancement/reimbursement of defense costs; and (4) Calce has suffered and continues to suffer the harm of significant, unreimbursed defense costs.

**JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**                    **PAGE 14**
9516179.1/SP/38371/0105/112217

MR.335

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on the 22nd day of November, 2017, a true and correct copy of the foregoing was forwarded to all known counsel in compliance with the Texas Rules of Civil Procedure.

/s/ Chase J. Potter

Chase J. Potter

**JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC**      **PAGE 15**
9516179.1/SP/38371/0105/112217

MR.336

# EXHIBIT A

MR.337

CAUSE NO. DC-16-07706

| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES BALLENGEE, BALLENGEE | § | |
| INTERESTS, LLC, JOHN CALCE, | § | DALLAS COUNTY, TEXAS |
| STAMPEDE TX ENERGY, LLC, | § | |
| CENTURION MIDSTREAM GROUP, | § | |
| LLC, CENTURION TERMINALS, LLC | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| Nominal Defendant. | § | 44th JUDICIAL DISTRICT |

## DECLARATION OF JOHN CALCE

1. My name is John Calce. I have personal knowledge of every statement made herein, and they are all true and correct.

2. I am a manager of Centurion Logistics LLC ("Centurion Logistics"). I have been a manager of Centurion Logistics since the date the company was formed.

3. Attached hereto as Exhibit A-1 is a true and correct copy of the Company Agreement of Centurion Logistics.

4. To date, Centurion Logistics has not reimbursed me any amount for the expenses that I have paid or incurred in defending myself against the claims that have been brought against me in the above-entitled lawsuit.

---

My date of birth is January 29, 1972.  My business address is 15851 Dallas Parkway, Suite 650, Addison, Texas 75001.  I declare under penalty of perjury that the foregoing is true and correct.

Executed in <u>Dallas</u> County, State of Texas, on October 5, 2017.

JOHN CALCE

MR.339

# EXHIBIT A-1

MR.340

COMPANY AGREEMENT

OF

Centurion Logistics LLC

a Texas Limited Liability Company

Effective September 16, 2013

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY ARTICLE X OF THIS AGREEMENT.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ........................................................................................... 1
    1.1.     Defined Terms ....................................................................................... 1
    1.2.     Usage ..................................................................................................... 4

ARTICLE II ORGANIZATIONAL MATTERS .......................................................... 5
    2.1.     Formation .............................................................................................. 5
    2.2.     Name ..................................................................................................... 5
    2.3.     Registered Office and Agent; Principal Office ..................................... 5
    2.4.     Term ...................................................................................................... 5
    2.5.     Purposes ................................................................................................ 5
    2.6.     Powers .................................................................................................. 5
    2.7.     Company Property ................................................................................ 5
    2.8.     Initial Members .................................................................................... 6
    2.9      Options to Acquire Additional Units ................................................... 6
    2.10     Consent of Managers ........................................................................... 6
    2.11.    Status of Managers and Members ........................................................ 6
    2.12.    Unit Certificates .................................................................................. 6
    2.13.    No State Law Partnership .................................................................... 6

ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ................ 6
    3.1.     Initial Capital Contributions ................................................................ 6
    3.2.     Additional Capital Contributions ........................................................ 6
    3.3.     Capital Accounts .................................................................................. 7
    3.4.     No Right to Return of or Interest on Capital Account ......................... 7
    3.5.     Member Loans ...................................................................................... 7
    3.6.     Member Notes ...................................................................................... 7

ARTICLE IV ALLOCATIONS AND DISTRIBUTIONS ......................................... 8
    4.1.     Allocation of Profit or Loss ................................................................. 8
    4.2.     Distributions of Distributable Cash ..................................................... 8
    4.3.     Withholding .......................................................................................... 8
    4.4.     Limitation on Distributions ................................................................. 8
    4.5.     No Right to Partition or Distributions in Kind .................................... 9

ARTICLE V MANAGEMENT ..................................................................................... 9
    5.1.     Management and Control of Company Business .................................. 9
    5.2.     Delegation of Authority ..................................................................... 10
    5.3.     Limitations on Manager Authority .................................................... 10
    5.4.     Reliance .............................................................................................. 10
    5.5.     Compensation and Expenses of Members and Managers ................... 10
    5.6.     Standards of Manager and Member Conduct ..................................... 10

1150848v2 2/12/2014

MR.342

| 5.7. | Resignation, Removal, and Replacement of Manager | 11 |
| --- | --- | --- |

**ARTICLE VI  LIABILITY AND INDEMNIFICATION** .......... 13
| 6.1. | Limitation of Liability | 13 |
| 6.2. | Indemnification by Company | 13 |
| 6.3. | Conduct Not Protected | 13 |
| 6.4. | Insurance | 14 |
| 6.5. | Survival | 14 |

**ARTICLE VII  BOOKS AND RECORDS; REPORTS** .......... 14
| 7.1. | Maintenance of and Access to Books and Records | 14 |
| 7.2. | Fiscal Year | 14 |
| 7.3. | Financial and Operating Reports | 14 |
| 7.4. | Tax Reports | 15 |
| 7.5. | Transmission of Communications | 15 |

**ARTICLE VIII  TAX MATTERS** .......... 15
| 8.1. | Tax Classification | 15 |
| 8.2. | Company Returns | 15 |
| 8.3. | Tax Elections | 15 |
| 8.4. | Consistent Reporting | 16 |
| 8.5. | Tax Proceedings | 16 |
| 8.6. | Information and Documents to Company | 16 |

**ARTICLE IX  MEETINGS AND VOTING OF MEMBERS** .......... 17
| 9.1. | Meetings | 17 |
| 9.2. | Voting | 17 |

**ARTICLE X  TRANSFER OF MEMBERSHIP INTERESTS** .......... 17
| 10.1. | Limitation on Transfers | 17 |
| 10.2. | Permitted Transfer of Membership Interest | 18 |
| 10.3. | Conditions to Permitted Transfers of Membership Interests | 19 |
| 10.4. | Effective Date; Distributions | 19 |
| 10.5. | Transferor's Obligations | 20 |
| 10.6. | Assignee's Rights and Obligations | 20 |
| 10.7. | Effect and Consequences of Prohibited Transfer | 20 |
| 10.8. | Agreements of Spouse; Sole Management Community Property | 21 |

**ARTICLE XI  ADMISSION OF NEW MEMBERS** .......... 21
| 11.1. | Substituted Members | 21 |
| 11.2. | Additional Members | 22 |

**ARTICLE XII  WITHDRAWAL OR REMOVAL OF MEMBERS** .......... 22
| 12.1. | Withdrawal of Members | 22 |
| 12.2. | Removal of Members | 23 |

1150848v2 2/12/2014

MR.343

| 12.3. | Optional Redemption of Membership Interest | 24 |
| 12.4. | Status of Former Member | 24 |

**ARTICLE XIII  WINDING UP AND TERMINATION** .............................................. **24**
| 13.1. | Events Requiring Winding Up | 24 |
| 13.2. | Winding Up Procedures | 24 |
| 13.3. | Continuation Without Winding Up | 25 |
| 13.4. | Liquidation of Assets and Application and Distribution of Proceeds | 25 |
| 13.5. | Certificate of Termination | 26 |
| 13.6. | Reinstatement | 26 |

**ARTICLE XIV  VALUATION** ........................................................................................ **26**
| 14.1. | Fair Value of Company Property | 26 |
| 14.2. | Fair Value of Membership Interest | 27 |

**ARTICLE XV  GENERAL PROVISIONS** ...................................................................... **28**
| 15.1. | Amendments | 28 |
| 15.2. | Notice | 28 |
| 15.3. | Governing Law; Consent to Jurisdiction | 29 |
| 15.4. | Waiver | 29 |
| 15.5. | Entire Agreement | 29 |
| 15.6. | Successors and Assigns | 29 |
| 15.7. | Third-Parties | 29 |
| 15.8. | Severability | 29 |
| 15.9. | Construction | 29 |
| 15.10. | Execution of Agreement | 30 |
| 15.11. | Further Assurances | 30 |
| 15.12. | Power of Attorney | 30 |

**EXHIBIT A  MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS** ........ **32**

**EXHIBIT B  SPOUSAL JOINDER AND CONSENT** ...................................................... **1**

**APPENDIX A  PRINCIPLES OF ALLOCATION** ...................................................... **A-1**
| A.1 | Introduction | A-1 |
| A.2 | Definitions | A-1 |
| A.3 | Capital Accounts | A-4 |
| A.4 | Allocations of Net Profit and Net Loss | A-5 |
| A.5 | Tax Allocations | A-8 |

1150848v2 2/12/2014

MR.344

# COMPANY AGREEMENT
# OF
# CENTURION LOGISTICS LLC

This agreement ("Agreement") is entered into effective as of September 18, 2013 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

A.    The Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas effective as of September 16, 2013.

B.    The parties desire to provide for the regulation and management of the affairs of the Company according to this Agreement and the Code.

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Defined Terms.

The following definitions and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly controls, is controlled by, or is under common control with the person in question.

"Agreement" means this Agreement, as it may be amended, supplemented or restated from time to time.

"Assignee" means a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

MR.345

"Certificate of Formation" means the certificate of formation filed with respect to the Company as provided in Section 2.1, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing each Member's Membership Interest in a form approved by the Managers.

"Code" means the Texas Business Organizations Code, as amended from time to time, and any successor law.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

"Damages" means any expense or loss (including any court costs, judgment, or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Party with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company (determined in accordance with its accounting policies for reporting cash flows), less any amount of such cash that the Managers determine should be retained for the reasonable current and future needs of the Company business.

"Effective Date" means the effective date of this Agreement as set forth in the introduction to this Agreement.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Article XIV.

"Formation Date" means the effective date of the original Certificate of Formation of the Company.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1.

"Index Rate" means the rate specified in section 302.002 of the Texas Finance Code.

MR.346

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A or determined pursuant to Section 11.2.

"Initial Members" is defined in Section 2.8.

"I.R.C." means the Internal Revenue Code of 1986, as amended, or any successor thereto.

"Liquidator" is defined in Section 13.2(b).

"Manager" means the person designated as manager of the Company in the Certificate of Formation, any person who becomes a Manager hereunder, including a replacement Manager, and the Members when they are acting pursuant to Section 5.7(e), in each case in such person's capacity as Manager and for the period that such person has such capacity. "Managers" means all persons that are designated as a Manager, collectively.

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Member Notes" is defined in Section 3.6.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Percentage Interest" means, as to any Member or Assignee, the Membership Interest of the Member or Assignee expressed as a percentage, which percentage shall be determined from time to time by dividing the number of Units held by such Member or Assignee by the Units held by all Members and Assignees.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

MR.347

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Requisite Percentage" means one or more Members owning more than seventy five percent (75.0%) of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Substituted Member" means a person who is admitted as a Member to the Company pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Units" means units of Membership Interest in the Company.

1.2.    Usage.

In this Agreement, unless a clear contrary intention appears:

(a)    the singular number includes the plural number and vice versa;

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

MR.348

(j)     references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.    Formation. The Company was formed pursuant to the Certificate of Formation of the Company filed with the Texas Secretary of State effective as of the Formation Date.

2.2.    Name. The Company's name is as set forth in the Certification of Formation. The Managers may change the Company name at any time without the approval of any Member by filing a Certificate of Amendment. The Managers shall provide notice of the change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Managers. The Managers shall cause to be executed and filed of record all assumed or fictitious name certificates required by law.

2.3.    Registered Office and Agent; Principal Office.

(a)     The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Managers may change the Company's registered office or registered agent at any time by filing a Change of Registered Agent and/or Registered Office as provided in the Code. The Managers shall provide notice of the change to all Members.

(b)     The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Managers. The Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.    Term. The Company will exist perpetually and will continue until terminated in accordance with Article XIII.

2.5.    Purposes. The purposes of the Company are to engage in any activities that are permitted under applicable laws.

2.6.    Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.    Company Property.

(a)     All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

MR.349

(b)     The Managers shall deposit or invest all funds of the Company in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Managers.

2.8.    Initial Members.  In connection with the formation of the Company, the persons executing this Agreement as of the Effective Date ("Initial Members") are admitted to the Company as Members. The number of Units held by each of the Initial Members as of the Effective Date are set forth next to the Initial Members' names on Exhibit "A."

2.9.    Consent of Members.  Each person executing this Agreement consents to the admission as members in the Company all of the Initial Members and all other persons who are Members as of the date such person executes this Agreement and further consents to the issuance of additional Units as provided in Section 2.9.

2.10.   Status of Managers and Members.  Except as otherwise provided by this Agreement, the Managers have the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.11.   Unit Certificates.  Each Member's Units may be represented by a Unit Certificate. If Unit Certificates are issued, each Unit Certificate shall be numbered and registered in the records of the Company as they are issued, and signed by any of the Managers. The holder of any Unit Certificate shall promptly notify the Company of any loss or destruction of the certificate, and the Managers shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions.

2.12.   No State Law Partnership.  The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1.    Initial Capital Contributions.  Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2.    Additional Capital Contributions.  A Member is not required to make Additional Capital Contributions to the Company. No Member has the right or is permitted to make Additional Capital Contributions unless (a) all of the Managers and a Requisite Percentage approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made and (ii) other material information relevant to the

MR.350

proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution in accordance with their relative Percentage Interests.

3.3.     Capital Accounts.  The Company shall establish a separate Capital Account for each Member and Assignee.   The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4.     No Right to Return of or Interest on Capital Account.  No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code.  The Managers do not have any personal liability for the repayment of any Capital Contributions of any Member.  No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5.     Member Loans.  Subject to the approval of all of the Managers, the Company may borrow money from one or more Members to the extent the Managers deem appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.6(c) (relating to related party transactions).  The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

3.6.     Member Notes.  In connection with the execution of this Agreement, the Company expects to issue promissory notes to certain Members in connection with assets that the Members have transferred to the Company or expenses that the Members have incurred on behalf of the Company ("Member Notes").  For federal income tax purposes, the Members intend that each Member Note be characterized as a preferred membership interest (equity) in the Company, that a holder's right to any interest or original issue discount on the Member Note be characterized as a right to a distributive share of Company income and not as a guaranteed payment under I.R.C. Section 707(c), and that all payments with respect to the Member Note be characterized as a distribution with respect to a membership interest.  Allocations of profit or loss and tax items as provided in Section 4.1 and Section A.5 of Appendix A shall be adjusted as necessary, as determined by the Managers, to reflect the preferred membership interest deemed to be held by the holders of the Member Notes.  For this purpose, the Members intend that only net profit or net loss, and only net taxable income or loss (rather than items thereof), for any allocation period will be allocated with respect to the Member Notes.  For example, if there is net taxable income for the period from the issue date of the Member Notes through the end of 2009, it is intended that such net taxable income will be allocated to the Member Notes holders to the extent of any accrued interest or original issue discount on the Member Notes, and if there is a net taxable loss for such period, it is intended that such net taxable loss will be allocated first to the Members to the extent of their Capital Contributions and then to the holders of the Member Notes.

MR.351

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1.    Allocation of Profit or Loss.  Subject to Section 3.6, Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A or as is determined by the Managers.  The Members are aware of the income tax consequences of the allocations.

4.2.    Distributions of Distributable Cash.

(a)    Except as otherwise provided in Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or Section 13.4 (relating to liquidating distributions), any Distributable Cash shall be distributed not later than the 30th day after the end of each fiscal quarter to the Members and Assignees according to their Percentage Interests unless otherwise determined by the Managers.  The Managers may provide for a record date with respect to distributions.

(b)    To the extent it may lawfully do so, the Company shall make distributions to Members and Assignees in accordance with Section 4.2(a) and Section 13.4(a)(iii) at such times and in such amounts as the Managers determine is sufficient to enable Members and Assignees to make payments of tax due (including any applicable interest and penalties) with respect to their allocable shares of the Company's taxable income.  Unless the Managers determine otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved.

4.3.    Withholding.  The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Managers determine the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding).  All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld.  To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee.  Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

(a)    The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code.  A Member or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b)    The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or

MR.352

discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5.     No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

## ARTICLE V
## MANAGEMENT

5.1.     Management and Control of Company Business.

(a)     Subject to the limitations set forth in this Agreement, the Managers have exclusive authority to manage and conduct the Company's business. The Managers shall do all things appropriate to carry out the Company's purpose. Except as otherwise provided in this Agreement, all actions that the Managers may take and all determinations that the Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Managers.

(b)     The initial Managers of the Company are: John Calce, Antonio Albanese, and Marc Marrocco. Each Manager will serve as a Manager until his successor is appointed pursuant to Section 5.7(f).

(c)     The Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. A Member may have the status of a Manager or governing person of a Manager or the Company and may possess and exercise the powers and authority associated with such status.

(d)     Meetings of the Managers shall be held from time to time as determined by the Manages. Managers may participate in any meeting by means of video or audio conferencing or similar communications equipment whereby all Managers can hear each other. No notice of any meeting of the Managers is required to be given. At all meetings of Managers, the presence of a majority of the Managers shall be necessary and sufficient to constitute a quorum for the transaction of business unless a greater number is required by this Agreement, law or the Certificate of Formation. Each Manager will have one vote. Except as otherwise provided in this Agreement, the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum shall not be present at any meeting of Managers, the Managers present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(e)     Any action required by the Code to be taken at any annual or special meeting of Managers, or any action which may be taken at any annual or special meeting of Managers, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in

MR.353

writing, setting forth the action so taken, shall be signed by Managers having not fewer than the minimum number of votes required to approve such action under the Code, the Certificate or this Agreement. A facsimile or similar reproduction of a writing signed by a Manager, shall be regarded as signed by the Managers for purposes of this Section 5.1(e).

5.2. Delegation of Authority.

(a) The Managers may cause the Company to hire employees and agents, and may delegate to such persons any of its authority hereunder, as the Managers deems appropriate for the conduct of the Company's business.

(b) The Managers may appoint officers of the Company as the Managers deem appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Managers. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. Any officer elected or appointed by the Managers may be removed, with or without cause, at any time by the Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Managers. An officer has the same fiduciary duties as a Manager as described in Section 5.6.

5.3. Reliance. Persons dealing with the Company may rely conclusively on the authority of the Managers as set forth in this Agreement. Every document executed by a Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding upon the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.4. Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that the Managers are entitled to reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.5 does not limit or enlarge the Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.6(c).

5.5. Standards of Manager and Member Conduct.

(a) In General. Each Manager shall manage and conduct the Company's business in good faith and in a manner the Manager reasonably believes to be in the Company's best

MR.354

interest. A Manager does not violate its obligations under this Section 5.6(a) or the Code unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b)      Outside Activities of Managers and Members. Each Manager shall devote to the Company's affairs only such time and resources as the Managers deem necessary for the conduct and winding up of the Company business. The Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company. Neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture.

(c)      Related Party Transactions. Except as otherwise provided in this Agreement, the Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

5.6.      Resignation, Removal, and Replacement of Manager.

(a)      Resignation. A Manager may resign as manager of the Company only upon notice to all Members. If there is no resignation date specified in the notice, or if the specified date is earlier than 90 days following the date the notice is given to Members ("notice date"), the Manager's resignation is effective on the 90th day following the notice date. If the specified resignation date is later than 180 days after the notice date, the Manager's resignation is effective on the 180th day following the notice date. A Manager is deemed to have resigned as manager of the Company upon the following events:

(i)      any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii)      if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii)      if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

(b)    Removal for Cause.  A Manager may be removed as manager of the Company only upon the affirmative vote of a Requisite Percentage if there is cause for removal as specified in Section 5.7(c) and the Company has received a written opinion of counsel that:

(i)    cause for removal as specified in Section 5.7(c) exists; and

(ii)    the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(c)    Definition of Cause.  Cause for removal exists only if one or more of the following conditions has occurred:

(i)    there has been a change in Control of the Manager;

(ii)    a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute.

(d)    Status of Former Manager.  A Manager who has resigned in violation of this Agreement or who has been removed has the status of an Assignee with respect to any Membership Interest held by the former Manager.

(e)    Interim Management.  During the period that the Members may elect a replacement Manager as provided in Section 5.7(f) and prior to such election (or an election to wind up the Company), the Members may by vote of a Requisite Percentage appoint an interim manager having authority to manage and conduct the Company's business as the Manager as provided herein.  If an interim Manager is not appointed, the authority to manage and conduct the Company's business is vested in the Members who may act by vote of a Requisite Percentage, and who may by vote of a Requisite Percentage appoint a committee of one or more persons to exercise the authority of the Manager until such time as a replacement Manager is elected or the Company commences winding up.  The Members shall file any required amendments to this Agreement or the Certificate of Formation to reflect the resignation or removal of the former Manager and the appointment of the interim Manager or the conversion of the Company to a member-managed limited liability company, and all Members approve any such amendments.

(f)    Election of Replacement Manager.  If a Manager dies, is disabled, resigns, or is removed as the manager of the Company, within 90 days following such death, disablement, resignation or removal a Requisite Percentage may elect a replacement Manager of the Company effective as of the date of the former Manager's death, disablement, resignation, or removal.  The Managers shall file any required amendments to this Agreement to reflect the death, disablement, resignation, or removal of the former Manager and the election of the replacement Manager.

MR.356

# ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1.    Limitation of Liability.    No Member or Manager is liable for any debts, obligations, or liabilities of the Company.  Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business, including any breach of any fiduciary duties, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.  To the fullest extent permitted by applicable law, and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company.  An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred.  The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.7(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

(b)    No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)    Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company.  The Company may

require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section 6.3; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4.    Insurance. The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5.    Survival. The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1.    Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2.    Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes.

7.3.    Financial and Operating Reports. As soon as practicable after the end of each fiscal year, but in any event not later than 90 days after the end of the fiscal year, the Managers shall deliver to each Member an annual report containing the following:

(a)    a Company balance sheet as of the end of such fiscal year, and Company statements of income, cash flows, and changes in Members' equity for such fiscal year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b)    a general description of the Company's activities during such fiscal year and business plans for the succeeding year; and

(c)    a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the fiscal year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

MR.358

7.4. Tax Reports.

(a)     Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)     Upon the written request of any Member or Assignee, the Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5. Transmission of Communications. Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

## ARTICLE VIII
## TAX MATTERS

8.1. Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Managers shall take all actions as are or may be reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2. Company Returns. The Managers shall cause the Company to file such tax returns as may be required by law.

8.3. Tax Elections.

(a)     General. Except as otherwise provided in this Agreement, the Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company and to maximize the tax benefits to the Members. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction.

(b)     Section 754 Election. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest.

(c)     Safe Harbor Election for Compensatory Membership Interests. If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member

(including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4. Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5. Tax Proceedings.

(a) The Managers shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all examinations of the Company's tax returns by tax authorities, including administrative and judicial proceedings to contest any proposed adjustments. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct Proceedings relating to Company taxes and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. The tax matters partner shall keep the Members informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b) The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c) Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and. if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

(d) This Section 8.5 and Section 8.6 survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for a period of time necessary to resolve all tax matters with applicable taxing authorities.

8.6. Information and Documents to Company. Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional

information and documents as the Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

## ARTICLE IX
## MEETINGS AND VOTING OF MEMBERS

9.1.    Meetings.

(a)    Meetings of the Members may be called at any time by the Managers or by one or more Members holding at least 75.0% of the Percentage Interest held by Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)    Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the Requisite Percentage interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)    Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Managers are solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)    Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

9.2.    Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1.    Limitation on Transfers.

(a)    The term "transfer," when used in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and

whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, or death, and any pledge, hypothecation, or other encumbrance. A redemption of a Member's or Assignee's Membership Interest pursuant to Section 12.3 is not a transfer of the Membership Interest. A transfer does not include a transfer of a community property or other interest in a Membership Interest from a former spouse of a Member to the Member pursuant to the death of the former spouse or in connection with the termination of the marital relationship.

(b) No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

(c) A change of Control of any Member constitutes a transfer of the Membership Interest held by such Member.

10.2. Permitted Transfer of Membership Interest.

(a) A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.3 and is described in one of more of the following paragraphs of this Section:

(i) the transfer is approved by all of the Managers;

(ii) if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iii) if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(iv) if the Member is an individual, the transfer is to the Member's estate, testamentary trust, or legal representative as a result of the Member's death or adjudication of incapacity in managing its person or affairs, or the transfer is to a member of the Member's family, directly or in trust.

(b) Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.4.

(c) For purposes of Section 10.2(a)(iv), a Member's family means the Member's spouse (excluding a former spouse), children, grandchildren, parents, and grandparents. A person's legally adopted child is treated as his child.

MR.362

10.3. Conditions to Permitted Transfers of Membership Interests. Without limiting the Managers' authority to withhold approval for the transfer of a Membership Interest, a transfer shall not be a Permitted Transfer unless the Managers determine that all of the following conditions are satisfied:

(a)     The transfer complies with all applicable laws, including any applicable securities laws.

(b)     The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c)     The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940, as amended.

(d)     The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e)     The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Managers determine that such termination will not have an adverse impact on the Members.

(f)     The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Managers determine that such rules will not have an adverse impact on the Members.

(g)     The transferor and transferee have delivered to the Company any documents that the Managers request to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h)     If requested by the Managers, the Company has received a transfer fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.4. Effective Date; Distributions.

(a)     A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Managers receive notice of such transfer (in such form and manner as the Managers may require) unless the Managers determine that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

MR.363

(b)     Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c)     Effective as of the effective date of a transfer of a Membership Interest, the Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d)     Neither the Company nor the Managers have any liability for making allocations and distributions to the Members determined in accordance with this Section 10.4, whether or not the Company or the Managers have knowledge of any transfer of any Membership Interest.

10.5.     Transferor's Obligations.  The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.6.     Assignee's Rights and Obligations.

Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member, other than the rights to receive allocations of profits and losses and distributions as if such Assignee were a Member, to transfer the Assignee's Membership Interest (subject to the conditions of this Article X), and to receive reports and information as specified in Article VII.  An Assignee of a Membership Interest shall succeed to the Capital Contribution of the transferor to the extent of the Membership Interest transferred.  An Assignee is bound by this Agreement irrespective of whether the Assignee has signed or otherwise adopted this Agreement. An Assignee's Membership Interest may be redeemed at the option of the Managers as provided in Section 12.3.

10.7.     Effect and Consequences of Prohibited Transfer.

(a)     Except as otherwise required by law, the Company and the Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred.  If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b)     The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c)     The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.7(c).

10.8. Agreements of Spouse; Sole Management Community Property.

(a) Execution of Spousal Joinder and Consent. The spouse of each Member shall execute and deliver to the Company a Spousal Joinder and Consent in the form of Exhibit B.

(b) Agreements of Spouse. The spouse of each Member agrees that:

(i) this Agreement is entirely fair, just and equitable and in his or her best interest;

(ii) the covenants made in this Agreement are binding on such spouse individually and that such spouse is bound by this Agreement, including insofar as any interest such spouse may have now or hereafter in any Membership Interest by reason of the community property laws of the State of Texas or any other state, or otherwise;

(iii) whenever, pursuant to the terms of this Agreement, such Member does, or is required to, in any manner transfer, pledge, or encumber his or her Membership Interest, or any interest in such Membership Interest, to the Company or any other person, such transfer, pledge, or encumbrance shall include the community property interest, if any, of such spouse in such Membership Interest so transferred, pledged, or encumbered; and

(iv) in the event of the death of such spouse, any interest such spouse may have now or hereafter in any Membership Interest which constitutes community property should pass to such Member and, accordingly, such spouse shall will and bequeath such spouse's entire community property interest, if any, in such Membership Interest to such Member.

(c) Sole Management Community Property. Each Member who is a natural person and his or her spouse agree that such Member's Membership Interest, whether presently owned or hereafter acquired, is, if such Membership Interest is community property, community property subject to the sole management, control, and disposition of such Member.

# ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1. Substituted Members. An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a) The Managers have approved in writing the admission of the Substituted Member.

(b) The Assignee has delivered to the Company any agreements and other documents that the Managers request to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c)     If requested by the Managers, the Company has received an admission fee in an amount determined by the Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2.   Additional Members.

(a)     In General. The Managers may cause the Company to admit a person as an Additional Member and issue Additional Units to such Additional Member upon satisfaction of all of the following conditions.

(i)     A Requisite Percentage has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Partner's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(ii)    The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.3.

(iii)   The proposed Additional Member has delivered to the Company any agreements and other documents that the Managers request to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1.   Withdrawal of Members.

(a)     No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i)     receipt by the Company of a notice of such Member's withdrawal from the Company;

(ii)    a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

(iii)   removal of the Member as a Member as provided in this Agreement.

(b)     A Member shall be deemed to withdraw from the Company upon the following events:

(i)     an event specified in Section 12.1(a);

(ii)     an event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Member were a general partner;

(iii)     if a Member is an individual, the Member's death, the appointment of a guardian or general conservator for the Member, or a judicial determination that the Member is incapable of performing the Member's duties under this Agreement; or

(iv)     if the Member is an entity, an event requiring the Member's winding up or causing the termination of the Member's existence or suspension of the Member's right to do business.

(c)     If a Member ceases to be a Member in violation of Section 12.1(a), the Company may recover damages from the former Member for breach of this Agreement.

12.2.     Removal of Members.

(a)     A Member may be removed as a Member by the unanimous written consent of the Managers under the following circumstances:

(i)     the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)     in the case of any Member who is also a Manager or an Affiliate of a Manager, the Member or its Affiliate has ceased to be a Manager in violation of Section 5.7(a) or has been removed as a Manager in accordance with Section 5.7(b);

(iii)     the Managers determine, in their sole discretion, that it is in the best interest of the Company to remove a Member;

(iv)     the Member has materially breached the terms of this Agreement or any other material agreement with the Company; or

(v)     the Managers determine that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)     If the Managers propose to remove a Member pursuant to this Section 12.2, the Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

MR.367

12.3.  Optional Redemption of Membership Interest.  Subject to Section 4.4 (relating to limitations on distributions), the Managers, or, if there is no Manager, a Requisite Percentage, may cause the Company to redeem the Membership Interest of an Assignee by paying the Assignee the Fair Value of its Membership Interest as of the redemption date or the actual value of the Members Capital Account.  Interest will accrue at the Index Rate on the amount owed under this Section 12.3 from the 30th day after the redemption date to the date the payment is made.  The redemption date shall be fixed by the Managers in accordance with the principles of Section 10.4.  Except as otherwise required by the I.R.C., amounts paid in redemption of an Assignee's Membership Interest shall be treated as made in exchange for the interest of the Assignee in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Assignee in Company goodwill.

12.4.  Status of Former Member.  A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member.  Except as provided in Section 12.3 (relating to optional redemption of a Member's Membership Interest) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1.  Events Requiring Winding Up.  The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of any of the following events:

(a)  a Requisite Percentage vote to wind up and terminate the Company;

(b)  a decree by a court requiring the winding up of the Company;

(c)  the termination of membership of the last remaining Member; or

(d)  the resignation or removal of all Managers if the Members fail to elect a replacement Manager as provided in Section 5.7(f).

13.2.  Winding Up Procedures.

(a)  On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with Section 13.3, the Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in Section 13.4) and terminate the Company in accordance with this Agreement and the Code.  The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the

MR.368

property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)     If the Managers have wrongfully caused the winding up of the Company or if there is no Manager, (i) a Requisite Percentage may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "Liquidator."

(c)     The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in Article VI.

(d)     The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

13.3.     Continuation Without Winding Up.

(a)     If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)     If there is a termination of the continued membership of the last remaining Member as described in Section 13.1(c), then prior to completion of the winding up process but not later than 90 days after the event of termination, the Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section 13.3(b) must approve the admission of the Additional Member.

13.4.     Liquidation of Assets and Application and Distribution of Proceeds.

(a)     In General. On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

MR.369

(i)     to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii)     to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii)     to Members and Assignees as provided in Section 4.2.

(b)     No Member Deficit Restoration Obligation.  No Member is liable to the Company, to another Member, or to a third party, for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c)     Reserves.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d)     Payments and Distributions to Members in Kind.  The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind.  The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e)     Character of Liquidating Distributions.  Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

13.5.     Certificate of Termination.  The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6.     Reinstatement.  If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1.     Fair Value of Company Property.  The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution.  In all

other cases, the Fair Value of an asset as of any date is its fair market value as determined by the Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Managers or a majority in interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. Fair Value of Membership Interest.

(a) For purposes of any redemption of a Membership Interest pursuant to Section 12.3, the Fair Value of the Membership Interest is its fair market value as determined by the Managers (or, if there are no Managers, by the Liquidator) in good faith based on the net proceeds that would be received with respect to the Membership Interest in a winding up of the Company, taking into account all expenses associated with such winding up and any damages or other amounts recoverable by the Company from the Assignee or with respect to the Assignee's Membership Interest. In connection with the payment in redemption of the Membership Interest, the Managers or Liquidator shall provide a notice to the Assignee setting forth the Fair Value of the Membership Interest, including information relevant to the determination of such Fair Value.

(b) If the Assignee does not agree with the Fair Value of the Membership Interest as determined by the Managers or Liquidator, the Member may submit to the Company a notice of objection within 30 days of the Member's receipt of the valuation notice. Within 15 days following receipt of the Assignee's notice of objection, the Company shall appoint a qualified appraiser, and inform the Assignee of the name and business address of the appraiser. The appraiser shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The appraiser shall give the Assignee and the Managers an opportunity to meet with him prior to completing his appraisal. Except as provided in Section 14.2(c), the appraiser's determination of the Fair Value of the asset(s) in dispute shall be made within 30 days of his appointment (or such longer period as is reasonably required to complete the appraisal), and is final and binding on all concerned, absent manifest error.

(c) If the Assignee does not approve the appraiser selected by the Company, within 15 days following notification of such selection pursuant to Section 14.2(b) the Assignee may appoint a qualified appraiser of the Assignee's choice, and inform the Company in writing of the name and business address of the appraiser. In such event, the appraisers appointed by the Company and the Assignee shall appoint a third qualified appraiser. Each of the three appraisers shall determine the Fair Value of the Membership Interest in accordance with the principles of Section 14.2(a). The average of the two valuations that are closest to each other shall be determined to be the Fair Value of the Membership Interest and such determination shall be final and binding on all concerned, absent manifest error.

(d) The cost of each appraisal shall be shared equally by the Company and the Assignee.

(e)    The Company shall pay the Assignee any excess of (i) the recomputed Fair Value of the Membership Interest over (ii) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d). The Assignee shall pay the Company any excess of (i) the sum of any amount previously paid to the Assignee in redemption of his Membership Interest plus any costs charged to the Assignee as provided in paragraph (d), over (ii) the recomputed Fair Value of the Membership Interest.

(f)    Interest shall be paid at the Index Rate on any amount determined under Section 14.2(e) for the period from the 30th day after the redemption date to the date the amount is paid.

## ARTICLE XV
## GENERAL PROVISIONS

15.1.    Amendments.

(a)    In General.   Subject to the following exceptions and limitations set forth in Section 15.1(b), this Agreement may be amended only with the approval of a Requisited Percentage.

(b)    Exceptions and Limitations.   The Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. The Managers may use the power of attorney granted in Section 15.12 to make non-substantive amendments that do not adversely impact the rights or obligations of any Manager or Member. No amendment of the Agreement may adversely affect any Member's rights or obligations under this Agreement (determined without taking into account the right of other Members to amend the Agreement) without the adversely affected Member's approval. No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's approval. No amendment of this Agreement may change the requirements under this Agreement for approving any action without the approval of the Members holding an aggregate Percentage Interest required to approve the action.

15.2.    Notice.   Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission. Any communication to the Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

MR.372

15.3. <u>Governing Law; Consent to Jurisdiction</u>. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of the County where the Company's principal office is located, or, if it has or can acquire jurisdiction, in the United States District Court for the District in which the Company's principal office is located. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this section may be served on any party anywhere in the world.

15.4. <u>Waiver</u>. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof.

15.5. <u>Entire Agreement</u>. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6. <u>Successors and Assigns</u>. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7. <u>Third-Parties</u>. Other than as provided in <u>Section 5.4</u> (relating to reliance on authority of the Managers), <u>Section 3.6</u> (relating to Member Notes), <u>Section 11.2(b)</u> (relating to the Cotham/Merritt Note Equity Kicker), and <u>Article VI</u> (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with <u>Section 15.6</u>.

15.8. <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

15.9. <u>Construction</u>. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the

MR.373

Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10. Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

15.11. Further Assurances. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

15.12. Power of Attorney.

(a)     Each Member appoints the Managers and the Liquidator severally with full power of substitution, as the true and lawful attorney-in-fact for such Member, and in the name, place, and stead of such Member, to execute, certify, acknowledge, swear to, file, publish, and record:

(i)     any certificate or other document that may be required to be filed by the Company or the Members in order to qualify the Company to do business in any jurisdiction, except that no such filing shall include a consent by any Member to service of process in any jurisdiction without the Member's approval;

(ii)     any amendment to the Certificate of Formation, to this Agreement, or to any other agreement or document as required or permitted by this Agreement;

(iii)     any certificate of termination and other documents that may be required to effectuate the termination of the Company pursuant to the provisions of this Agreement; and

(iv)     any document required of the Company to carry out the actions that the Managers are authorized to take under this Agreement.

(b)     The foregoing appointment of the Managers and Liquidator as a Member's attorney-in-fact does not grant such attorney-in-fact any power or authority to approve, consent, or agree to the substantive terms of any agreement or other document on behalf of such Member.

(c)     The power of attorney granted pursuant to this Section 15.12 (i) is a special power of attorney coupled with an interest and is irrevocable, and (ii) survives the withdrawal or removal of a Member or the assignment of its Membership Interest.

**[This Page Intentionally Left Blank. Signature Page Follows.]**

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

TXC ENERGY LLC

BY: _____
John V. Calce, Its President

Marc Marrocco, an individual

_____

Antonio Albanese, an individual

_____

## EXHIBIT A

### Effective as of September 18, 2013

| MEMBER NAME AND ADDRESS | Number of Units | Initial Capital Contribution |
|---|---|---|
| **TXC Energy LLC** 5601 Preakness Ln Plano, Texas 75093 | 300 | $300.00 |
| **Marc Marrocco** 3602 Binkley Ave Dallas, Texas 75205 | 300 | $300.00 |
| **Antonio Albanese** 6605 Gentle Wind Ln Dallas, Texas 75248 | 300 | $300.00 |

MR.376

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

## EXHIBIT B

### SPOUSAL JOINDER AND CONSENT

I ACKNOWLEDGE (i) THAT I HAVE READ THE FOREGOING COMPANY AGREEMENT OF CENTURION LOGISTICS LLC (THE "AGREEMENT"), (ii) FULLY UNDERSTAND ITS CONTENTS, AND (iii) I HAVE BEEN GIVEN THE OPPORTUNITY TO ASK QUESTIONS AND TO SEEK AND OBTAIN THE ADVICE OF LEGAL COUNSEL CONCERNING MY RIGHTS, AND THE LIMITATIONS ON THOSE RIGHTS, THAT ARE CONTAINED IN THE AGREEMENT. I agree to be bound by all of the terms of the Agreement, including, without limitation, the provisions of Section 10.8. I am aware that, by the provisions of the Agreement, my spouse agrees to hold his or her Membership Interest (as such term is defined in the Agreement) including any portion of such Membership Interest comprising my community property, subject to the specific restrictions on the transfer of such Membership Interests set forth in the Agreement. I agree that I will not make any transfer of, or otherwise deal with, such Membership Interest or my community property interest therein, if any, during my lifetime except as expressly permitted by the Agreement. As provided in Section 10.8 of the Agreement, I agree that, in the event of my death, any Membership Interest that constitutes my community property should pass to my spouse, and I agree to will and bequeath my entire community property interest, if any, in such Membership Interest to my spouse.

Signature: _____

Printed Name: _____

Date: _____

MR.377

# COMPANY AGREEMENT
## OF
## CENTURION LOGISTICS LLC

### APPENDIX A

### PRINCIPLES OF ALLOCATION

A.1    Introduction. This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members. This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations. For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2    Definitions. Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

(i)    Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

(ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis. If the adjusted basis for federal income tax purposes of an asset at the

1150848v2 2/12/2014

MR.378

beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Managers and as set forth on Exhibit A.

(ii) The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Managers, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member. Adjustments pursuant to clauses (A), (B) and (C) above are required only if the Managers determine that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii) The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Managers.

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of

MR.379

income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

        (i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

        (ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

        (iii)   If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

        (iv)   Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

        (v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

        (vi)   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

11508-8v2 2/12/2014

MR.380

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3     Capital Accounts. The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)     The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit, and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)     The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)     Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     In determining the amount of any liability for purposes of Sections A.3.1(a) and A.3.1(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)     Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax

1150848v2 2/12/2014

MR.381

treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)     The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managers determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)     The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4     Allocations of Net Profit and Net Loss

A.4.1   In General.  Subject to Section 3.6, Company Net Profit and Net Loss shall be allocated to the Members as follows:

(a)     Net Profit.  Net Profit for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)     First, Net Profit shall be allocated to the Members to the extent of and in proportion to the excess, if any, of (i) the cumulative Net Loss allocated pursuant to Section A.4.1(b) for all prior periods, over (ii) the cumulative Net Profit allocated pursuant to this Section A4.1(a) for all prior periods.

(ii)    Second, any remaining Net Profit shall be allocated to the Members pro rata in accordance with their respective Percentage Interests.

(b)     Net Loss.  Net Loss for any period (excluding tax items allocated pursuant to Sections A.4.2 and A.4.3) shall be allocated as follows:

(i)     Net Loss shall be allocated to the Members pro rata in accordance with their respective Percentage Interests, subject to the limitation in Section A.4.1(b)(ii).

MR.382

(ii)      No Member may receive an allocation of Net Loss that would cause the Member to have an Adjusted Capital Account Deficit at the end of the taxable year. Net Loss not allocated to a Member pursuant to this subparagraph (ii) shall be allocated to other Members according to their relative positive Capital Account balances (calculated taking into account the adjustments described in the definition of Adjusted Capital Account Deficit).

A.4.2    Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)      Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding anything to the contrary in this Section A.4, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)      Partner Nonrecourse Debt Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding anything to the contrary in this Section, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)      Qualified Income Offset.   If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would

MR.383

have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)     Gross Income Allocation.  In the event a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)     Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     Basis Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3  Curative Allocations.  The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3.  Therefore, notwithstanding any other provisions of this Section A.4 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Managers determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1.  In exercising their discretion under this Section A.4.3, the Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are

11508482 2/12/2014
MR.384

likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4  Other Allocation Rules

(a)     Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)     If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Managers.

(c)     All allocations pursuant to this Appendix shall, except as otherwise provided in this Agreement, be divided among the Members in proportion to the Percentage Interests held by each.

(d)     For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(e)     To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5     Tax Allocations

(a)     In General.  Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b)     Contributed or Revalued Property.  In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value. If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions

MR.385

with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits. Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations. Allocations pursuant to this Section are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

1150848v2 2 12 2011

MR.386

# EXHIBIT B

MR.387



August 22, 2017

CHASE J. POTTER
Direct Phone: 214.651.2026
Direct Fax: 214.659.4145
chase.potter@strasburger.com

**Via Email Only: bkn@snlegal.com**

Brian K. Norman
Shamoun & Norman, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, Texas 75234

RE:    Cause No. DC-16-07706; *Centurion Logistics LLC, individually and derivatively on behalf of Centurion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Lawsuit").

Dear Mr. Norman:

As you know, we represent John Calce in the Lawsuit. Mr. Calce has been named as a defendant in the Lawsuit by Centurion Logistics LLC ("Centurion Logistics"). Mr. Calce is a manager of Centurion Logistics and, therefore, is entitled to indemnification from Centurion Logistics pursuant to Section 6.2 of the Company Agreement of Centurion Logistics (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

The Agreement specifically provides that Centurion Logistics "indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of [Centurion Logistics'] business or to any act or omission by such Indemnified Person within the scope of the Indemnified Person's authority in the course of [Centurion Logistics'] business . . . ." *See* Ex. A § 6.2. The Agreement further provides that "[a]n Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred." *See id.*

Mr. Calce is an Indemnified Person under the Agreement. *See* Ex. A § 1.1. Moreover, the Lawsuit constitutes a Proceeding under the Agreement. *See id.* Centurion Logistics is therefore required to reimburse Mr. Calce the expenses he pays or incurs in defending himself in the Lawsuit, including attorneys' fees, as such expenses are paid or incurred.

As of July 31, 2017, Mr. Calce had been billed a total of $114,440.99 in expenses related to his defense of the Lawsuit. Mr. Calce hereby demands that, on or before August 28, 2017, Centurion Logistics (1) reimburse him the full amount of expenses that he has been invoiced ($114,440.99) plus an additional $50,000 that will be applied to future expenses as they are incurred; and (2) agree to reimburse Mr. Calce the additional expenses, in excess of the

9253092.2/SP/38371/0105/082217

**Strasburger & Price, LLP**

901 Main Street, Suite 4400 | Dallas, Texas 75202.3794 | 214.651.4300 tel | 214.651.4330 fax | www.strasburger.com

Austin | Collin County | Dallas | Houston | San Antonio | New York, N.Y. | Washington, D.C. | Mexico City - Strasburger & Price, SC

MR.388



additional $50,000 referenced above, that he pays or incurs in his defense of the Lawsuit as such expenses are paid or incurred.

Pursuant to Section 6.3 of the Agreement, Mr. Calce hereby affirms that it is his good faith belief that he has met the standard of conduct necessary for indemnification under Section 6.3. Mr. Calce further agrees to repay any amount that is paid or reimbursed by Centurion Logistics, pursuant to Section 6.2, if it is determined by a court of competent jurisdiction that Mr. Calce did not meet the aforementioned standard or if indemnification is otherwise determined to be prohibited by law.

If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Chase J. Potter

# EXHIBIT C



GREGORY SHAMOUN
g@snlegal.com

Member of the State Bar of
Texas | New York

September 5, 2017

**VIA ELECTRONIC MAIL (DAVID.KITNER@STRASBURGER.COM):**
David N. Kitner
STRASBURGER & PRICE, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel. (214) 651-4618
Fax. (214) 659-4079

> Re: John Calce's Request for Indemnification for claims related to Cause No. DC-16-07706; *Centuirion Logistics LLC, individually and derivatively on behalf of Centruion Pecos Terminal LLC v. James Ballengee, et al.* in the 44th Judicial District Court of Dallas County (the "Litigation") from Centurion Logistics pursuant to the Company Agreement of Centurion Logsitics (the "Company Agreement").

Dear Mr. Kitner:

Centurion Logistics, LLC ("Centurion Logistics") is in receipt of your August 22, 2017 correspondence (the "Indemnification Request"), sent on behalf of John Calce ("Calce") claiming that Mr. Calce is entitled to indemnification from Centurion Logistics based on his status as a manager of Centurion Logistics pursuant to Section 6.2 of the Company Agreement.

Although the Company Agreement grants Calce indemnification for "any act or omission . . . . within the scope of [his] authority in the course of the Company's business. . ."[1] the Company does not indemnify Calce from any act or omission that is not within the scope of his authority or in the course of the Company's business. Moreover, the Company Agreement specifically excludes "intentional misconduct, or a knowing violation of law" from the scope of Centurion Logistics' indemnification obligations.[2]

In the present case, as stated in *Plaintiff's Original Petition*, (the "Petition"), the active pleading on file in the Litigation, Centurion Logistics alleges that Calce signed a deed of trust in his capacity as manager of Centurion Pecos to secure a promissory note for Ballenge Interests, LLC and later signed an extension of that same note as a manager of Centurion Pecos.[3] Obviously, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business," and was engaging in "intentional misconduct" and "knowing

---

[1] Company Agreement Section 6.2
[2] Company Agreement Section 6.3(a)(1).
[3] Petition ¶¶25-26.

violation of law."[4] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

The Petition also alleges that Calce, along with Stampede, "purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes from Ballengee Interessts to TCB . . ."[5] Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[6] and was engaging in "intentional misconduct" and "knowing violation of law."[7] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Further, the Petition alleges that "Calce created a note . . . purporting to obligate Centurion Pecos to make payments to Centrion Terminals."[8] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[9] and was engaged in "intentional misconduct" and a "knowing violation of law."[10] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Finally, the Petition alleges that Calce, along with Ballengee Interests, "created fraudulent notes by Centurrion Pecos to Ballengee Interests . . ."[11] As before, Calce was neither acting nor purporting to act "within the scope of [his] authority in course of the Company's business,"[12] and was engaging in "intentional misconduct" and "knowing violation of law."[13] Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

Your contentions that Mr. Calce is an "Indemnified Person"[14] and that the referenced Litigation is a "Proceeding"[15] under the Company Agreement are not contested by Centurion Logistics. However, the claims and factual allegations raised in the Litigation are unrelated to Calce's conduct as a manager of Centurion Logistics. Centurion Logistics' claims for breach of fiduciary duty and aiding and abetting fraudulent concealment are based upon intentional misconduct and knowing violations of law by Calce, where he was purporting to act with the authority of Centurion Pecos. Accordingly, Centurion Logistics must deny Calce's indemnification request as to liability arising from this conduct.

---

[4] Company Agreement Section 6.3(a)(1).
[5] Petition ¶ 27.
[6] Company Agreement Section 6.2.
[7] Company Agreement Section 6.3(a)(1).
[8] Petition ¶ 28.
[9] Company Agreement Section 6.2.
[10] Company Agreement Section 6.3(a)(1).
[11] Petition ¶ 29.
[12] Company Agreement Section 6.2.
[13] Company Agreement Section 6.3(a)(1).
[14] Company Agreement Section 1.1.
[15] Company Agreement Section 1.1.

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200 | Farmers Branch, TX 75234
Phone 214.987.1745 | Fax 214.521.9033 | www.snlegal.com

MR.392

For the reasons set forth above, we believe that your request for indemnification from Centurion Logistics on behalf of Calce is improper, and that no indemnification is owed to Calce pursuant to the terms of the Company Agreement.

If you have any questions regarding this letter, please telephone me at (214) 987-1745.

Sincerely,

*/s/ C. Gregory Shamoun*
C. GREGORY SHAMOUN

SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200 | Farmers Branch, TX 75234
Phone 214.987.1745 | Fax 214.521.9033 | www.snlegal.com

MR.393

CAUSE NO. DC-16-07706

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, | § | IN THE DISTRICT COURT OF |
| individually and derivatively on behalf of | § | |
| CENTURION PECOS TERMINAL LLC, | § | |
| a Texas Limited Liability Company; and | § | |
| MARC MARROCCO and ANTONIO | § | |
| ALBANESE, individually and derivatively | § | |
| on behalf of CENTURION LOGISTICS, LLC | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JAMES BALLENGEE; BALLENGEE | § | |
| INTERESTS, LLC; JOHN CALCE, | § | |
| CHRIS A. MOTT; TOM RAMSEY, | § | |
| STAMPEDE TX ENERGY, LLC; | § | |
| CENTURION MIDSTREAM GROUP, LLC; | § | |
| CENTURION TERMINALS, LLC; | § | |
| CENTURION BROWNSVILLE | § | |
| TERMINAL, LLC; JAMES HOCK; VISPI | § | |
| JILLA; and JUPITERMLP, LLC | § | |
| | § | |
| **Defendants,** | § | |
| | § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL | § | |
| LLC, a Texas Limited Liability Company | § | |
| | § | |
| **Nominal Defendant.** | § | |

**PLAINTIFF'S SECOND AMENDED PETITION**

Plaintiffs Centurion Logistics LLC ("Centurion Logistics") individually and derivatively on behalf of Centurion Pecos Terminal LLC ("Centurion Pecos"); and Marc Marrocco and Antonio Albanese, individually and derivatively on behalf of Centurion Logistics, file this *Second Amended Petition* against James Ballengee ("Ballengee"), Ballengee Interests, LLC ("Ballengee Interests"), John Calce ("Calce"), Chris A. Mott ("Mott"), Stampede TX Energy, LLC ("Stampede"), Tom Ramsey ("Ramsey"), Centurion Midstream Group, LLC ("Centurion Midstream"), Centurion Terminals, LLC ("Centurion Terminals"), Centurion Brownsville

**PLAINTIFFS' SECOND AMENDED PETITION**        **Page 1**

MR.867

Terminal, LLC ("Centurion Brownsville"), James Hock ("Hock"), Vispi Jilla ("Jilla"), and JupiterMLP, LLC ("JupiterMLP"), bringing claims directly and derivatively on behalf of Centurion Pecos and directly and derivatively on behalf of Centurion Logistics for: breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, money had and received (unjust enrichment), fraudulent concealment, aiding and abetting fraudulent concealment, violation of the Theft Liability Act, Tex. Civ. Code §§ 134.001-134.005, tortious interference with contract, fraudulent inducement, promissory estoppel, declaratory judgment and fraudulent transfer. Accordingly, Plaintiffs would respectfully show the Court as follows:

## I.
## DISCOVERY CONTROL PLAN

1. Pursuant to Texas Rules of Civil Procedure 190.1-190.6, Plaintiffs hereby designate that discovery will be conducted under Level 3. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, at this time, Plaintiffs seeks monetary relief in excess of $1,000,000.

## II.
## PARTIES

2. Plaintiff Centurion Logistics is a Texas limited liability company, with its principal office in Dallas, Texas. Centurion Logistics is the sole member and the sole manager of Centurion Pecos. The members of Centurion Logistics are: Marc Marrocco ("Marrocco"), Antonio Albanese ("Albanese"), and TXC Energy LLC ("TXC Energy"), an affiliate of Calce.

3. Nominal Defendant Centurion Pecos is a Texas limited liability company, with its principal office in Dallas, Texas. The current member and manager of Centurion Pecos is Centurion Logistics. Stampede was a member and manager of Centurion Pecos until June 13, 2016.

4. Plaintiff Marrocco is an individual residing in Dallas County, Texas.

5.      Plaintiff Albanese is an individual residing in Dallas County, Texas.

6.      Defendant Ballengee is an individual residing in Dallas County, Texas. Ballengee has already entered an appearance in this matter. Ballengee is a member and manager of Defendant Ballengee Interests. Ballengee has already entered an appearance in this matter.

7.      Defendant Ballengee Interests is a Louisiana limited liability company. Ballengee is a managing member of Ballengee Interests. Ballengee Interests has already entered an appearance in this matter.

8.      Defendant Calce is an individual residing at 5601 Preakness Lane, Plano, TX 75093. Calce has already entered an appearance in this matter.

9.      Defendant Stampede is a Texas limited liability company, with its principal place of business in Dallas, Texas. Stampede was a manager and member of Centurion Pecos, but was removed as a manager and member on June 13, 2016. Mott is the managing member of Stampede. Stampede has already entered an appearance in this matter.

10.     Defendant Mott is an individual residing at 631 Milam Street, Shreveport Louisiana 71101. Mott (as detailed below), engages in business in Texas, but does not maintain a regular place of business in the State or a designated agent for service of process. Hence, the Texas Secretary of State is an agent for service of process for Mott, and service of process can be made pursuant to Texas Civil Practice and Remedies Code § 17.044.

11.     Defendant Ramsey resides in the Houston, Texas area. He may be served at his residence or wherever he may be found. Ramsey is the Chief Executive Officer of Centurion Midstream, Centurion Terminals, and JupiterMLP. Ramsey has already entered an appearance in this matter.

MR.869

12. Defendant Centurion Midstream is a Texas limited liability company, formed on October 20, 2015, with its principal place of business in Dallas, Texas. Calce is the manager of Centurion Midstream. Centurion Midstream has already entered an appearance in this matter.

13. Defendant Centurion Terminals is a Texas limited liability company, with a principal place of business in Dallas, Texas. On information and belief, Centurion Terminals is an entity controlled by Defendant Calce. The manager of Centurion Terminals is 58C, LLC, a Texas limited liability company, whose manager is LV III, LLC, whose manager is Calce. Centurion Terminals has already entered an appearance in this matter.

14. Defendant Centurion Brownsville is a Texas limited liability company, with its principal place of business in Dallas, TX. The manager of Centurion Brownsville is Centurion Terminals. Centurion Brownsville may be served by serving its registered agent, John Calce, at 15851 Dallas North Parkway, Suite 650, Addison, Texas 75001. Centurion Brownsville has already entered an appearance in this matter.

15. Defendant Hock resides in the Houston, Texas area. He may be served at his residence or wherever he may be found. Hock is the former President of Stampede Louisiana and Stampede. Hock has already entered an appearance in this matter.

16. Defendant Jilla is an individual residing at 5719 Twin Brooks, Drive, Dallas, Texas 75252. He may be served at his residence or wherever he may be found. Jilla is the former designated representative of Stampede Louisiana and Stampede. Jilla has already entered an appearance in this matter.

17. Defendant JupiterMLP is a Delaware limited liability company, with its principal place of business in Dallas, Texas. Jupiter MLP may be served by serving its registered agent,

MR.870

Capitol Services, Inc., 1675 S. State Street, Suite B, Delaware 19901. JupiterMLP has already entered an appearance in this matter.

### III.
### JURISDICTION AND VENUE

18.     This Court has jurisdiction over this case because the amount in controversy is in excess of the Court's minimum jurisdictional limits. Moreover, Defendants have engaged in sufficient conduct in the State of Texas to confer jurisdiction over them. The Court has jurisdiction over the subject matter of the action because a substantial portion of the events giving rise to Plaintiffs' claims occurred in Dallas County, Texas.

19.     Venue is proper in Dallas County, Texas, pursuant to Texas Civil Practice and Remedies Code Sections 15.002-15.007, because it is the county where all or a substantial part of the events or omissions giving rise to the claims occurred as detailed in the following paragraphs.

### IV.
### BACKGROUND

20.     Who can you trust? Apparently, when large potential profits are at issue, trust and honesty are in short supply. Here, a project to create a rail terminal in Pecos, Texas to service the oil and gas industry became the lynchpin of a grand scheme to steal the ideas, capital, business and opportunities of Centurion Logistics and Centurion Pecos, by any means necessary. Moreover, Defendants, by means of fraudulent activity and use of corrupt insiders, stole and fraudulently utilized Centurion Pecos' looted assets to pursue a much-expanded grand scheme – creating a complex project stretching at least from the oilfields of West Texas all the way to the Port of Brownsville, while cutting Centurion Logistics and Centurion Pecos out of the entire operation.

MR.871

## A.    Creation of Centurion Logistics and Centurion Pecos

21.    Several years ago, Marrocco and Albanese were looking for ways to use their expertise in real estate to invest in projects related to the booming oil and gas industry. During their investigations, Marrocco became better acquainted with Calce, who worked in the oil and gas industry, and whom Albanese happened to know from outside his business dealings. After some investigation, Marrocco, Albanese and Calce decided to pursue a project to purchase real estate and to develop a railway terminal for the shipping of crude oil and related materials. In order to pursue that project, Marrocco, Albanese and Calce formed Centurion Logistics on September 16, 2013. Centurion Logistics is manager-managed and its managers are Marrocco, Albanese and Calce. Under the company agreement of Centurion Logistics, a majority of the managers are required to take any action.

22.    Initially, the Centurion Logistics managers utilized their skills to the benefit of the company. Albanese used his connections to obtain the interest of a possible anchor tenant who might want to ship hydraulic-fracturing sand through a terminal in that area, as a way to build Centurion Logistics' credibility with oil companies and the railroad. Marrocco identified, and placed under contract, an approximately 177-acre parcel in Reeves County, Texas (the "First Parcel") to use for the terminal, and obtained a contract for Centurion Logistics to purchase it.

23.    In order to obtain funds to purchase the First Parcel, Calce, Marrocco and Albanese discussed bringing an equity partner into the Pecos project to contribute cash. Calce offered two potential investors from the oil and gas industry with whom he was acquainted. Because Marrocco had already begun to hear rumors that Calce had a reputation for self-dealing, Marrocco proposed that Centurion Logistics work with the investor to whom he believed Calce had fewer ties, namely Ballengee. Additionally, Ballengee was already involved with a company

MR.872

that was trucking crude oil in the vicinity, Bridger Logistics. Ballengee agreed to contribute cash to the project, in order to purchase the First Parcel without any liens or encumbrances. However, unbeknownst to Marrocco and Albanese, Ballengee was in the process of selling his interest in Bridger Logistics and would then be subject to a non-compete agreement, which would not allow his personal involvement with this type of endeavor. Therefore, in order to conceal his activities, Ballengee insisted on using an ostensibly unrelated entity, CAM Oil and Natural Gas, LLC ("CAM") as the funnel for his cash contributions. This came as a surprise to Marrocco and Albanese, who had believed that Ballengee would use Bridger Logistics as the entity for his cash contributions. Hence, Centurion Logistics and CAM formed Centurion Pecos, on September 12, 2014, with Calce as the sole manager, and Centurion Logistics assigned the contract to purchase the First Parcel to Centurion Pecos on September 15, 2014.

24. Shortly before the closing of the sale of the First Parcel, Ballengee announced to Centurion Logistics and (and Marrocco and Albanese) that he would not simply contribute cash (through CAM), as he had represented, even though he had more than adequate cash to fund the purchase of the First Parcel. Instead, Ballengee announced that he would use his existing line of credit at Texas Capital Bank ("TCB"). Then, less than 48 hours before the closing of the First Parcel purchase, Ballengee informed Marrocco and Albanese that TCB was requiring a deed of trust on the property to secure the extension of credit to Ballengee. Because of the last-minute nature of this announcement, Centurion Logistics (and Centurion Pecos) had no other way to fund the purchase of the First Parcel before the required closing date, it being too late to look for other funding sources. Moreover, there was a real risk that Centurion Logistics (and Centurion Pecos) would lose the ability to purchase the First Parcel, since the seller was already threatening to sell to another purchaser. Having no other choice, Centurion Pecos acceded to Ballinger's

MR.873

demands and granted the deed of trust to TCB. The proceeds of the loan by TCB to Ballengee Interests were then contributed by Ballengee, through CAM Oil and Natural Gas, and used to purchase the First Parcel on September 19, 2014.

25.     What Centurion Logistics, Marrocco and Albanese did not know at that time, was that Calce and Ballengee had a plan to create a mechanism by which they could cause control of the property to be involuntarily removed from Centurion Pecos through foreclosure, with the first step of the plan being to force Centurion Pecos to grant the deed of trust to TCB, thereby encumbering the First Parcel.

26.     Centurion Logistics next determined that the terminal project could be expanded by acquiring an approximately 300-acre parcel adjacent to the First Parcel (the "Second Parcel"). Marrocco obtained a contract for an entity he controlled, in order to purchase the Second Parcel. Marrocco was increasingly concerned about Calce's reputation for underhandedness, and, as a condition to assigning the purchase agreement to Centurion Pecos, insisted that the company agreement of Centurion Pecos be amended in order to remove Calce as the sole manager of Centurion Pecos, as of November 2014. By this time, unbeknownst to Marrocco or Albanese, Ballengee had sold his interest in Bridger Logistics, and had become subject to a non-compete agreement which would prohibit his involvement in Centurion Pecos. Since CAM was too closely associated with Ballengee, and its continued participation in Centurion Pecos could cause Bridger Logistics to discover Ballengee's violation of his non-compete agreement, Ballengee or Calce caused CAM Oil and Natural Gas to be removed as a member of Centurion Pecos, and be replaced by Stampede Energy, LLC ("Stampede Louisiana" – a predecessor Stampede TX Energy, LLC), a company unlikely to be identified by Bridger Logistics as being associated with Ballengee.

MR.874

27.     Under the amended and restated company agreement of Centurion Pecos, Centurion Logistics and Stampede Louisiana were the members and managers of Centurion Pecos. Centurion Pecos is manager-managed, and, under the amended and restated company agreement, any action requires the consent of all managers.

28.     At the closing of the Second Parcel, Ballengee again insisted that rather than fulfilling his representation to contribute his cash to fund the purchase of the Second Parcel free of any liens or encumbrances, he would instead take out another loan from TCB. Once again, Ballengee insisted that Centurion Pecos grant a deed of trust to the Second Parcel to TCB to secure this second loan. As with Ballengee's First Parcel scam, his pattern here was part of his plan to create a mechanism to remove control of the Second Parcel from Centurion Pecos through foreclosure, making sure it was encumbered by the deed of trust. The purchase of the Second Parcel closed on August 21, 2015. The First Parcel and the Second Parcel are collectively referred to as the "Reeves County Property."

29.     As with the purchase of the First Parcel, Ballengee did not provide the funds for the Second Parcel directly to Centurion Pecos. Rather, he funneled the funds through Stampede Louisiana because his participation in the Centurion Pecos venture was circumscribed by his non-compete.

30.     Both deeds of trust, granted at the closings of the Reeves County Property, contain a cross-collateralization clause pledging the Reeves County Property as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. Calce signed both deeds of trust, purportedly in his capacity as manager of Centurion Pecos, although he was no longer a manager of Centurion Pecos at the time he signed the deed of trust

MR.875

to the Second Parcel, and had no other authority to sign the second deed of trust for Centurion Pecos.

**B.     Calce and Ballengee Hatch Their Grand Scheme**

31.     While Centurion Pecos was purchasing the parcels for the Pecos railroad terminal, Calce and Ballengee realized that the Pecos terminal idea was an incredible idea, and could be the nexus of an extremely profitable and much more extensive project. They began using the planned Pecos terminal (and its assets) as the focus point of a connection to the Port of Brownsville. This would involve building a terminal at the Port of Brownsville, along with storage facilities and fractioning towers for processing condensate. They realized that the Pecos terminal in Reeves County was the key to a huge money-making opportunity, but first, they needed absolute control over Centurion Pecos and its Reeves County Property. Since Calce and Ballengee had already set up a way to steal Centurion Pecos' assets, they realized that they had the opportunity to cut Marrocco, Albanese and Centurion Logistics (and Centurion Pecos) completely out of this opportunity if they chose. To conceal activities related to this incredible opportunity from Marrocco and Albanese, Calce created a new entity, Centurion Terminals (and designated himself manager) on August 27, 2015. By September 11, 2015, Centurion Terminals was breaking ground on a Brownsville terminal.

**C.     Defendants' Fraudulent Scheme Begins to Unfold**

32.     As Calce and Ballengee's grand scheme began to progress in late 2015, Calce began communicating to Marrocco that Calce and Ballengee wanted to bring other participants into the project, and wanted Marrocco and Albanese to take a more passive role and a reduced share of the profits. Calce then had a private meeting with Marrocco, expressing his desire to force Albanese out as a manager of Centurion Logistics, and to require Albanese to sell his

MR.876

membership interest in Centurion Logistics for less than its fair value. Calce claimed that the Pecos terminal was just a small part of an overall project that Ballengee was putting together. Calce threatened that if Marrocco did not cooperate in removing Albanese from Centurion Logistics and agree to turn over the Pecos terminal project to Calce and Ballengee for a very small percentage of the "new" project, Calce and Ballengee would exclude Marrocco from participation in the entire project, including the Pecos terminal. Calce told Marrocco that they could do this by removing the Reeves County Property from Centurion Pecos through the foreclosure scheme Ballengee and Calce had set up during the two purchases constituting the Reeves County Property. However, if Calce could get Albanese out, his plans could go forward unhindered, since without Albanese, Marrocco could not outvote Calce, and would have no way to stop Calce and Ballengee from taking complete control of the Reeves County Property – without the necessity of foreclosure. Although Marrocco agreed to consider taking a smaller percentage in the grand scheme, he refused to participate in removing Albanese from Centurion Logistics.

33. Ballengee subsequently met with Marrocco and Albanese, again trying to induce them into agreeing to take a small percentage of the much larger project, and agreeing that it was Centurion Logistics that had the original idea. At that meeting, Marrocco informed Ballengee that Calce had threatened to foreclose on the Reeves County Property and take it from Centurion Pecos if Marrocco did not agree to cut Albanese out. Ballengee then indicated that they were willing to buy Marrocco and Albanese out if they did not agree to trade control of the Pecos terminal for a very small piece of the larger project.

34. Calce and Ballengee then demanded a meeting with Marrocco to negotiate a fair price for Marrocco's interest in Centurion Logistics. However, this proposal was actually a ruse

MR.877

to trick Marrocco into attending an uncalled meeting of the managers of Centurion Pecos to approve an "assignment and assumption agreement," handing the Reeves County Property over to Ballengee Interests. Marrocco refused to attend the meeting.

35. Before Marrocco could give an answer as to whether he and Albanese were willing to agree to a significantly reduced percentage of the "new" opportunity or to take a buy-out of their interest, Calce and Ballengee decided to go forward with the "new" opportunity and began to execute on their plan to strip Centurion Pecos of its assets.

36. The actions of Ballengee and Calce were a part of their grand scheme to move the Reeves County Property out of Centurion Pecos and into an entity in which Marrocco and Albanese have no interest, depriving Marrocco and Albanese of their entire interests in the terminal project. To these ends, Calce and Ballengee began negotiating with Union Pacific to establish rail service to the Reeves County Property through Centurion Midstream, an entity unrelated to Centurion Logistics or Centurion Pecos – an entity with Calce as President and Ramsey as CEO. Centurion Midstream represented to Union Pacific that it was the owner of the Reeves County Property. After Centurion Logistics notified Union Pacific that Centurion Midstream had no affiliation with Centurion Pecos, Calce, Ballengee and Ramsey told Union Pacific that Marrocco and Centurion Logistics were no longer involved in the project, and that Centurion Midstream would own the Reeves County Property "within a few weeks." On its website at this time, Centurion Midstream claimed to own the property purchased by Centurion Pecos and purported to be creating a terminal at Pecos, Texas.

37. In furtherance of this grand scheme, Calce, Ballengee and/or Mott and Stampede (or its predecessor, Stampede Louisiana), created a number of unauthorized and/or fraudulent documents purporting to pledge the Reeves County Property or create unauthorized obligations

MR.878

of Centurion Pecos. These unauthorized transactions and documents were not only concealed from Plaintiffs, but, on information and belief, were actually backdated.

38. As noted above, the grand scheme to cut Marrocco, Albanese, Centurion Logistics and Centurion Pecos out of the "new" opportunity went far beyond just the Reeves County Property, and had begun months before. In a transaction unrelated to the purchase of the Reeves County Property, Ballengee Interests granted a promissory note to TCB dated January 6, 2015 for a line of credit in the amount of $750,000. Unbeknownst to Marrocco and Albanese, in order to secure the Ballengee Interests line of credit, Calce executed a deed of trust to the First Parcel, purportedly on behalf of Centurion Pecos as its manager – this was at a time when Calce was no longer a manager of Centurion Pecos. The January 6, 2015 deed of trust also contained a cross-collateralization clause pledging the First Parcel as collateral for all obligations of Ballengee Interests to TCB, even obligations not involving Centurion Pecos. The proceeds of the line of credit were not used for any purpose related to the business of Centurion Pecos. Rather, Calce, Ballengee and Ramsey used the proceeds from the unauthorized loan and deed of trust to fund other projects, including the Brownsville terminal. That is, the $750,000 was either spent directly on other projects, or allowed Defendants to divert other resources to those projects. Centurion Logistics was unaware of the January 6, 2015 deed of trust, and only discovered it during a record search of Reeves County conducted in May 2016.

39. On October 30, 2015, after Calce had openly expressed the desire to remove Albanese from Centurion Logistics, and shortly after Centurion Midstream was formed, Ballengee Interests extended the term of the First Parcel note to TCB, and filed an extension of the deed of trust on the First Parcel to secure that note. Again, that extension was surreptitiously signed by Calce, as "manager of Centurion Pecos," although he was not a manager of Centurion

MR.879

Pecos at the time, and had no other authority to act on behalf of Centurion Pecos. Again, Marrocco, Albanese, Centurion Logistics and Centurion Pecos were not aware of the extension of the deed of trust on the First Parcel, and only discovered it during a record search of Reeves County conducted in May 2016. Ballengee's and Calce's purpose in extending the deed of trust was to support their grand scheme and their fraudulent efforts to preserve the Ballengee Interests note as a means of removing the First Parcel from Centurion Pecos.

40. In April 2016, without authority to act for Centurion Pecos, Stampede[1] and Calce forged documents that purported to obligate Centurion Pecos to assume Ballengee Interests' obligations under the notes Ballengee Interests owed TCB (which had been used to obtain the funds contributed to purchase the Reeves County Property), and to grant Ballengee Interests a deed of trust to secure the assumption. Marrocco, Albanese, Centurion Logistics and Centurion Pecos were unaware of these documents or the unauthorized assumption until Centurion Pecos received a "notice of default" dated April 28, 2016 from Ballengee Interests for its purported failure to make interest payments under the assumption agreement. Neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese were provided with copies of the purported assumption agreement and deed of trust until after the *Original Petition* was filed in this matter.

41. In addition, Calce and Ramsey created a note, dated on or about November 15, 2015, purporting to obligate Centurion Pecos to make payments to Centurion Terminals, which was controlled by Calce and Ramsey. Centurion Pecos first learned of this note in a demand letter dated May 27, 2016. No note of this description was ever authorized by Centurion Pecos, and to date, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese have ever seen this purported note.

---

[1] By this time, Stampede Louisiana had become Stampede, as detailed in Section F, below.

MR.880

42.     Ballengee Interests and Calce also created fraudulent notes ostensibly by Centurion Pecos to Ballengee Interests, dated September 16, 2014 and August 17, 2015. Centurion Pecos first learned of these notes in demand letters dated May 25, 2016. Again, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese had ever seen these purported notes until after the filing of the *Original Petition.* When Centurion Logistics originally agreed to providing the Reeves County Property as collateral for the Ballengee Loans, it did not realize that such could be parlayed into circumstances that would obligate Centurion Pecos (as opposed to Ballengee) to repay the purchase price.

43.     In furtherance of their grand scheme and their fraudulent plans, Defendants threatened to use the unauthorized, forged and fraudulent documents to foreclose on the Reeves County Property. Centurion Pecos received letters from Ballengee Interests and Centurion Terminals demanding payment of purported obligations that Centurion Pecos never, in fact, agreed to assume.

**D.     The Grand Scheme Begins to Come Together: Calce "Transfers" the Reeves County Property to Ballengee Interests**

44.     On May 26, 2016, Calce signed Special Warranty Deeds purporting to transfer both parcels of the Reeves County Property to Ballengee Interests. However, those purported transfers were legally invalid, as they were done without the authorization of Centurion Pecos. According to documents executed by Calce and Ballengee, the purported transfer of the Reeves County Property was made because Centurion Pecos was unable to make payments under the unauthorized financial obligations fraudulently entered into by Calce and Ballengee. The transfer of the Reeves County Property was an invalid and illegitimate transaction, fraudulently made as a part of the grand scheme of cutting Marrocco and Albanese out of the Pecos terminal project, and excluding them from additional opportunities (as explained below).

MR.881

**E.** **Calce, Ballengee and Ramsey Expand the Grand Scheme Using Centurion Pecos Funds and Property**

45.     As set forth above, Calce fraudulently granted a deed of trust in Centurion Pecos' name to TCB to procure a $750,000 loan to Ballengee Interests – a transaction made without any authorization from Centurion Pecos. Calce, Ballengee and Ramsey, together with their related entity Defendants, used this $750,000 as seed capital to fund and expand their grand scheme by constructing other projects in Reeves County, Texas and in Brownsville, Texas. The $750,000 was either spent directly on these projects or the influx of the $750,000 allowed Defendants to use other resources on these projects.

46.     For example, Centurion Midstream and Centurion Terminals used these funds to begin constructing their own railway terminal next door to the site of the original proposed Centurion Pecos terminal. Calce, Ballengee and Ramsey also used the funds as seed capital to begin construction of the related railway terminal and refinery in Brownsville, Texas. Eventually, the grand scheme involved every aspect from West Texas to the Gulf Coast, gathering and transporting crude oil from the Delaware Basin, through the Pecos Terminal, and then on to Brownsville, where it would be stored, processed, and blended, and subsequently be sold or exported.

47.     In a further attempt to conceal their fraudulent scheme, Defendants created JupiterMLP (with Tom Ramsey as CEO, in addition to his CEO duties for Centurion Midstream and Centurion Terminals), and transferred some or all of these projects to that entity. JupiterMLP continues pursuit of this grand scheme to this day.

48.     While Defendants used the wrongfully-obtained funds to commence and pursue these projects, Centurion Logistics and Centurion Pecos have not only been defrauded of their assets and excluded from participation in the original project, but have also been deprived of the

MR.882

lucrative business opportunity to participate in the broader Brownsville terminal, storage, and refining project and the profits flowing therefrom – even though it was Centurion Logistics and Centurion Pecos' own assets that helped fund and construct these additional projects. In other words the Defendants formulated and executed this fraudulent method of financing the broader project for a huge payoff, using Centurion Logistics and Centurion Pecos as the source of financing and funds since they had the only hard asset, the Reeves County Property), all the while cutting them off from any participation or profits therefrom.

## F.      Stampede Violates the Company Agreement

49.     Section 10 of the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC ("Company Agreement") sets forth the conditions under which a member may transfer its membership interest.  Section 10.4 states that a transfer shall not be permitted unless:

> [t]he transferor and transferee have delivered to the Company [Centurion Pecos] any documents that the Board of Managers request to confirm that the transfer satisfies the requirements of this Agreement to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as Assignee.

50.     Pursuant to Section 10.1(a) of the Company Agreement, "transfer" includes "a transfer by merger or other business combination."  Stampede Louisiana (a Louisiana limited liability company) was a member of Centurion Pecos at the time that the Company Agreement was adopted, and was bound thereby.  On January 20, 2016, Stampede Louisiana was converted to Stampede. Stampede then engaged in a series of mergers, first with Centurion Brownsville Terminal, LLC, a Texas limited liability company, on February 4, 2016, and then with Stampede Energy, LLC, a Delaware limited liability company on March 2, 2016.

51.     On April 30, 2016 and again on May 4, 2016, Centurion Logistics expressly requested that Stampede and Centurion Brownsville provide the information required by Section

MR.883

10.4 of the Company Agreement. Stampede, at Mott's direction, and Centurion Brownsville failed and refused to provide the information required by the Company Agreement.

**G.      Centurion Pecos Expels Stampede as Member and Manager**

52.      In response to Stampede's blatant violations of the Company Agreement, Centurion Logistics, on behalf of Centurion Pecos, on May 31, 2016, called a meeting of managers and members of Centurion Pecos, which was held on June 13, 2016. At the meeting, Centurion Logistics moved to remove Stampede as a member of Centurion Pecos based on Stampede's prohibited transfers of its membership interest and refusal to provide related and required information. Because the motion involved removing Stampede as a member, Stampede was an interested manager and not eligible to vote. Centurion Logistics, the only manager eligible to vote on the motion, voted to remove Stampede as a member. This left Centurion Logistics as the sole member of Centurion Pecos.

53.      Subsequently, the remaining member of Centurion Pecos called a meeting to determine whether Stampede should be removed as a manager because it had transferred its membership interest in a prohibited transfer and engaged in other wrongful conduct that materially affected the business of Centurion Pecos and its members, and had also engaged in conduct that had made it not reasonably practicable to carry on the company business with Stampede. Centurion Logistics, the only remaining member, voted to remove Stampede as a manager of Centurion Pecos. This left Centurion Logistics as the sole manager of Centurion Pecos.

**V.**
**THE CENTURION PECOS COMPANY AGREEMENT**

54.      Article X of the Company Agreement for Centurion Pecos provides for removal of a Member under certain conditions, including when a Member makes a "Prohibited Transfer"

MR.884

of all or any part of its Membership Interest. Article I of the Company Agreement provides that the Board of Managers is comprised of Centurion Logistics and "Stampede", and further defines "Stampede" as "Stampede Energy, LLC, a Louisiana limited liability company." Although the Company Agreement does not specify what Managers are eligible to vote on removal of a Member that violates the Company Agreement, allowing a designated Manager to be a voting member of the Board for purposes of determining whether it should be removed as a Member for violations of the Company Agreement would lead to an absurd result, and render large portions of the Company Agreement superfluous and meaningless, specifically including all of Article X, all references to a "Permitted Transfer" or a "Prohibited Transfer", and the provisions of Article 12 regarding removal of a Member.

55. Article V of the Company Agreement provides for removal of a Manager under certain conditions, including when the Manager has (1) engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business of the Members, and (2) engaged in conduct relating to Company business that has made it not reasonably practicable to carry on the Company business with the Manager. Although the Company Agreement does not specify whether a Manager which is subject to removal pursuant the terms of the Company Agreement has a right to vote concerning its own removal, allowing a designated Manager to be a voting member of the Board for purposes of determining whether it should be removed as a Manager for engaging in such wrongful conduct (including any act or omission that involves gross negligence, intentional misconduct or knowing violation of law, transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, of a willful or reckless breach of the Company Agreement) would lead to an absurd

MR.885

result, and render large portions of the Company Agreement superfluous and meaningless, specifically including, but not limited to, all of Section 5.2(b), 5.5 and 5.9(a).

56.     To the extent that the Company Agreement does not specifically provide for the ineligibility of a Manager to vote on removal of a Member, the Company Agreement is vague and ambiguous. Moreover, a fair reading of the Company Agreement demonstrates that the real intention of the parties thereto was to actually have an effective method to remove Members and the only way to effectuate such an intention is to imply a covenant that a Member is ineligible to participate as a Manager for purposes of voting as to whether to remove itself as a Member.

57.     To the extent that the Company Agreement does not specifically provide for the ineligibility of a Manager to vote on his own removal for cause, the Company Agreement is vague and ambiguous. Moreover, a fair reading of the Company Agreement demonstrates that the real intention of the parties thereto was to actually have an effective method to remove Managers and the only way to effectuate such an intention is to imply a covenant that a Manager is ineligible to participate as a Manager for purposes of voting as to whether to remove itself as a Manager.

## VI.
## CAUSES OF ACTION

A.      **First Cause of Action:  <u>Breach of Fiduciary Duty as to Calce</u>**

58.     Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

59.     As a manager of Centurion Logistics, Calce had a duty of loyalty to the company. The duty of loyalty requires Calce to act in good faith and not allow personal interests to take precedence over the interests of Centurion Logistics.

MR.886

60.    Calce also had a duty to disclose all important information concerning any transaction, including any matters that might influence him to act in a manner prejudicial to Centurion Logistics.

61.    In violation of his fiduciary duties, Calce colluded with the other Defendants to engage in a series of fraudulent transactions which were contrary to the interests of Centurion Logistics and Centurion Pecos.  This pattern of misconduct is intended to further Defendants' grand scheme, namely, to remove the Reeves County Property from Centurion Pecos and pursue a competing development as well as use the resources of Centurion Pecos and Centurion Logistics to deprive Centurion Logistics of its share of any profits from the Pecos terminal project and other projects funded through Centurion Pecos assets.  The entire scheme is an egregious breach of Calce's duty of loyalty and full disclosure.

62.    By secretly encumbering Centurion Pecos' assets and misusing the company's assets, Calce has damaged the ability of Centurion Logistics to conduct business and impaired the value of those assets.

63.    Calce's breaches of fiduciary duty proximately caused Centurion Logistics (and Marrocco and Albanese) to suffer damage and Calce has obtained benefits, which Calce should be required to forfeit.  The benefits Calce should be required to forfeit also include any remuneration he has received from Defendants Centurion Midstream, Centurion Terminals, Centurion Brownsville and JupiterMLP.

64.    Calce's breaches of fiduciary duty were intentional and, accordingly, Centurion Logistics, Marrocco and Albanese seek, and should recover, exemplary damages against Calce.

MR.887

**B.** **Second Cause of Action: <u>Breach of Fiduciary Duty as to Stampede</u>**

65.     Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

66.     As a manager of Centurion Pecos, Stampede owed Centurion Pecos a duty of loyalty.  Further, Stampede owed Centurion Pecos a duty of candor, including a duty to disclose information concerning its role in any transaction that would prejudice the interests of Centurion Pecos.

67.     Stampede violated its fiduciary duty by covertly engaging in a pattern of transactions designed to deprive Centurion Pecos of the Reeves County Property, as well as Centurion Pecos' interest in the terminal project.  Stampede has also breached its fiduciary duty by using Centurion Pecos' resources and assets, without authorization, to develop other projects, while excluding Centurion Pecos from any share in the profits of those projects.

68.     By secretly encumbering Centurion Pecos' assets and misusing Centurion Pecos' assets, Stampede has damaged the ability of Centurion Pecos to conduct business, impaired the value of those assets, and deprived the company of returns which should rightfully belong to the company.

69.     Stampede's breaches of fiduciary duty have proximately caused Centurion Pecos to suffer damage and Stampede has obtained benefits which Stampede should be required to forfeit.

70.     Stampede's breaches of fiduciary duty were intentional and, accordingly, Centurion Pecos seeks, and should recover, exemplary damages against Stampede.

**C.** **Third Cause of Action: <u>Aiding and Abetting Breach of Fiduciary Duty</u>**

MR.888

71.     Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

72.     Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and Jupiter MLP assisted with, encouraged and participated in breaches of fiduciary duty by Calce and Stampede.  As set forth above, Calce and Stampede had fiduciary duties of loyalty to Centurion Logistics and to Centurion Pecos and fiduciary duties to disclose any transactions that would be prejudicial to the chief objectives of Centurion Logistics and Centurion Pecos.

73.     Ballengee, Ballengee Interests, Mott, Hock and Jilla assisted Calce and Stampede to breach their fiduciary duties by participating in the creation of false debt, attempting to strip Centurion Pecos of its chief asset, the Reeves County Property, and using Centurion Pecos' assets to procure funds for other projects in Reeves County and Brownsville.

74.     Centurion Logistics and Centurion Pecos were created chiefly to purchase the Reeves County Property and to develop a railway terminal in order to transport petroleum and petroleum products.  Rather than pursue these objectives with loyalty fiduciaries owe, Calce, with Ramsey, assisted in the creation of Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP to thwart the efforts of Centurion Logistics and Centurion Pecos and to compete with Centurion Logistics and Centurion Pecos.

75.     Based on the content of the Centurion Midstream and JupiterMLP websites, Centurion Midstream and JupiterMLP covertly assisted Calce in his plan to take over the Reeves County Property, and to build a railway terminal and other projects for his own benefit and for the benefit of Centurion Midstream and JupiterMLP.

MR.889

76. Based on its affiliation with Calce, Centurion Terminals was aware that Calce was not authorized to undertake any obligation to Centurion Terminals on behalf of Centurion Pecos. Nonetheless, Centurion Terminals entered into the note and threatened to enforce it.

77. Centurion Brownsville accepted the ill-gotten proceeds of Calce's breach and has used the $750,000 to construct a railway terminal and refinery in Brownsville, Texas without the participation of Centurion Logistics or Centurion Pecos.

78. The breaches of fiduciary duty of Calce and Stampede, committed with the assistance of Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP, proximately caused Plaintiffs to suffer actual damages in an amount exceeding the minimum jurisdiction of the Court.

79. As Defendants' participation in the breaches of fiduciary duty were intentional and exemplary damages are recoverable for the breaches of fiduciary duty, Plaintiffs pray for exemplary damages against Ballengee, Ballengee Interests, Mott, Hock, Jilla, Ramsey, Centurion Midstream, Centurion Terminals, Centurion Brownsville and JupiterMLP.

**D.    Fourth Cause of Action: Money Had and Received (<u>Unjust Enrichment</u>)**

80. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

81. A claim for money had and received arises when the defendant obtains money or a benefit that in equity and good conscience belongs to the plaintiff. It is an equitable doctrine applied to prevent unjust enrichment. A cause of action for money had and received is not based on wrongdoing but, instead, looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another. A claim for money had and received is based upon the doctrine of unjust enrichment.

MR.890

82. Further, where a defendant obtains a benefit from the plaintiff by fraud, duress, or taking undue advantage, the plaintiff may recover money or property under the theory of unjust enrichment.

83. Ballengee and Ballengee Interests colluded with Calce to encumber property of Centurion Pecos to secure debts of Ballengee Interests, including the notes to purchase the Reeves County Property and the $750,000 line of credit. These proceeds have been used by Centurion Midstream, JupiterMLP and Centurion Brownsville to develop a competing railway terminal in Reeves County, Texas, as well as a terminal and refinery in Brownsville, Texas.

84. Ballengee and Ballengee Interests have, therefore, been unjustly enriched by pledges of property to secure Ballengee Interests' debt, including the $750,000 line of credit, and unauthorized assumption of the Ballengee Interests' obligations to TCB. Indeed, pursuant to the cross-collateralization clauses, the deeds of trust pledged the Reeves County Property to secure all Ballengee Interests' debts to TCB, not merely those related to Centurion Pecos. Defendants Ballengee and Ballengee Interests should be required to disgorge and to turn over to Centurion Pecos any benefits obtained through these transactions.

85. Centurion Midstream, JupiterMLP and Centurion Brownsville have been unjustly enriched through the use of the proceeds of the unauthorized loan obtained by Calce and Ballengee. These entities should be required to disgorge the $750,000 as well as a share of the profits from the projects that the funds were used to develop.

86. On information and belief, Calce and Ramsey have received a salary and other benefits from Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP, in exchange for effectuating Calce's and Ballengee's plan, namely, to fraudulently

MR.891

obtain ownership of the Reeves County Property and use the assets of Centurion Pecos to fund projects for the benefit of Defendants. This remuneration constitutes unjust enrichment.

87. In obtaining these benefits, Defendants have acted with fraud and malice. Accordingly, Plaintiffs pray that these Defendants be found liable for exemplary damages.

**E.      Fifth Cause of Action:  <u>Fraud/Fraudulent Inducement</u>**

88. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

89. Ballengee and Ballengee Interests represented to Centurion Pecos that they would make a capital contribution by purchasing the Reeves County Property on behalf of Centurion Pecos.  At the 11th hour, Ballengee and Ballengee Interests demanded that Centurion Pecos agree to deeds of trust on the Reeves County Property to secure large loans to Ballengee and Ballengee Interests.  Ballengee and Ballengee Interests did not disclose that the purpose of this demand was to eventually surreptitiously shift the payment obligations on those loans to Centurion Pecos and cause a default on the loans so as to ultimately transfer of the Reeves County Property from Centurion Pecos to Ballengee Interests, and to use the Reeves County Property to fund other projects in Reeves County and Brownsville, including development of a competing railway terminal in Reeves County, Texas, and a terminal and refinery in Brownsville, Texas.

90. Centurion Pecos justifiably relied on Ballengee's and Ballengee Interests' professions that their purpose was to invest in, and to promote, the Centurion Pecos Terminal project.

91. Ballengee's and Ballengee Interests' actions have injured Centurion Logistics (and Marrocco and Albanese) and Centurion Pecos, in that Defendants used the TCB loans and

MR.892

deeds of trust, as well as unauthorized and fraudulently executed documents, to complete their grand scheme to obtain the Reeves County Property for a competing entity, Centurion Midstream and/or JupiterMLP, and to use the equity in the property to fund other projects from which Centurion Logistics and Centurion Pecos were excluded.

92. The wrongful fraudulent acts and omissions have proximately caused Plaintiffs to suffer damages. Because Defendants' wrongful fraudulent acts and omissions were conducted with intent, Plaintiffs seek both actual and exemplary damages.

**F. Sixth Cause of Action: <u>Aiding and Abetting Fraud/Fraudulent Inducement</u>**

93. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

94. Defendants Calce, Ramsey, Mott, Hock, Jilla, Stampede, Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP provided knowing and intentional assistance to the fraud committed by Ballengee and Ballengee Interests. Calce and Stampede, including its managing member, Mott, its President, Hock, and its designated representative Jilla, were aware of the fraudulent scheme and Stampede allowed itself to be used as a conduit through which Ballengee Interests made its payments for the Reeves County Property. As fiduciaries, Calce and Stampede, including Mott, had a heightened duty to disclose Ballengee's true intent, but they remained silent. Indeed, they actively furthered the scheme through their participation in the creation of false and unauthorized transactions and the creation of fraudulent documents.

95. Calce's and Stampede's assistance and encouragement constituted a substantial factor in causing the fraud. Without their participation, it is unlikely that Ballengee and Ballengee Interests could have attempted the scheme, given the limitations imposed on

MR.893

Ballengee by the non-compete agreement. Moreover, these Defendants furthered the plan through a series of threatening communications.

96. Centurion Midstream, Centurion Terminals, Centurion Brownsville, and JupiterMLP were aware of the fraud and provided knowing assistance by accepting funds that were the product of the fraud, using them to construct other projects in Reeves County and Brownsville from which Centurion Logistics and Centurion Pecos were excluded.

97. These other Defendants' participation in the fraudulent scheme has proximately caused Plaintiffs to suffer damages. Because these Defendants' participation in the wrongful fraudulent scheme was conducted with knowledge and intent, Plaintiffs seek both actual and exemplary damages.

**G.      Seventh Cause of Acton:  Texas Theft Liability Act, Tex. Civ. Prac. &Rem. Code §§134.001-134.005**

98. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

99. Defendants Calce, Ballengee, and Ballengee Interests have unlawfully appropriated the Reeves County Property through the unauthorized transfer of the property from Centurion Pecos to Ballengee Interests.

100. Centurion Pecos has suffered actual damages from Defendants' appropriation, which not only deprived Centurion Pecos of the Reeves County Property, but prevented Centurion Pecos from developing a railway terminal on that property.

101. In addition, Ballengee and Ballengee Interests stole and appropriated the $750,000 obtained from the loan made possible by the unauthorized use of the Reeves County Property as collateral. These funds rightfully belonged to Centurion Pecos.

MR.894

102. Plaintiffs seek, and should recover, actual damages, including lost profits, as well as exemplary damages for Defendants' violations of the Texas Theft Liability Act.

**H.    Eighth Cause of Action:  <u>Tortious Interference with Contract</u>**

103. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

104. Pursuant to the company agreement of Centurion Pecos, Centurion Logistics had a valid and enforceable contract with Stampede.  With knowledge of this contract, Defendants, other than Stampede, willfully and intentionally interfered with the performance of the contract.

105. Pursuant to the company agreement of Centurion Logistics, Centurion Logistics was comprised of a valid and enforceable agreement between Marrocco, Albanese and TXC Energy.  With knowledge of this contract, Defendants willfully and intentionally interfered with the performance of the contract.

106. The purpose of Centurion Pecos and Centurion Logistics was to purchase the Reeves County Property and build the Centurion Pecos railway terminal on the property.  By interfering with the performance of the company agreements of Centurion Pecos and Centurion Logistics, Defendants prevented the development of the railway terminal.

107. Plaintiffs seek, and should recover, actual damages, including lost profits, as well as exemplary damages for Defendants' tortious interference with contract.

**I.    Ninth Cause of Action:  <u>Fraudulent Inducement</u>**

108. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

109. Calce, Ballengee and Ballengee Interests represented to Centurion Pecos that they would cooperate with Centurion Pecos to develop the Centurion Pecos terminal.  Calce,

MR.895

Ballengee and Ballengee Interests further represented to Centurion Pecos that Ballengee Interests would provide funds to purchase the Reeves County Property free and clear of any liens or encumbrances. Centurion Pecos relied on these representations when it negotiated to purchase the Reeves County Property and entered into the contract to purchase the Reeves County Property.

110. Calce, Ballengee and Ballengee Interests were aware that the representations made to Centurion Pecos were false.

111. Based on the false representations by Calce, Ballengee and Ballengee Interests, Centurion Pecos was also induced to grant TCB deeds of trust on the Reeves County Property. Calce, Ballengee and Ballengee Interests also falsely represented that Centurion Pecos would receive remuneration from projects developed through the deeds of trust placed on the Reeves County Property. Moreover, neither Centurion Pecos, Centurion Logistics, Marrocco nor Albanese were aware that Centurion Pecos was ultimately going to be responsible to pay the Ballengee loans secured by the Reeves County Property, since it was represented that the property was only collateral for Ballengee's obligation to pay the loans.

112. Centurion Pecos has been damaged by the fraudulent inducement because Defendants have used the loans and deeds of trust to interfere with Centurion Pecos' ownership of the Reeves County Property and prevent the development of the Centurion Pecos terminal. Centurion Pecos has also been damaged because it has been denied its share of profits from the projects developed through loans secured by deeds of trust on the Reeves County Property.

113. Defendants' fraudulent inducement has proximately caused Plaintiffs to suffer actual damages. Furthermore, Plaintiffs seek, and should recover, exemplary damages.

MR.896

## J.     Tenth Cause of Action:  Promissory Estoppel

114.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.    Calce, Ballengee and Ballengee Interests promised Centurion Pecos that they intended to cooperate with Centurion Pecos to develop the Centurion Pecos terminal.  Centurion Pecos reasonably, foreseeably, substantially and detrimentally relied on Defendants promises when they purchased the Reeves County Property and agreed to place deeds of trust on the Reeves County Property.

116.    Calce, Ballengee and Ballengee Interests also promised Centurion Pecos that they would share with Centurion Pecos the profits from any projects that were developed through proceeds obtained by placing deeds of trust on the Reeves County Property, including, but not limited to, the Centurion Pecos terminal.  Centurion Pecos reasonably, foreseeably, substantially and detrimentally relied on Defendants' promises when it agreed to place deeds of trust on the Reeves County Property.

117.    To avoid injustice, Defendants should be required to fulfill the promises upon which Centurion Pecos relied and restore Centurion Pecos to the position it was in before it altered its position in reliance on Defendants' promises.

## K.     Eleventh Cause of Action:  Declaratory Judgment

118.    Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

119.    A justiciable controversy exists between Centurion Pecos and Stampede regarding the status, rights, obligations and legal relations between Centurion Pecos and Stampede in

MR.897

connection with the Company Agreement. The justiciable controversy concerns the right of members and managers of Centurion Pecos to expel Stampede as a member and manager.

120. Pursuant to the terms of the Company Agreement, transfer of membership interests is prohibited unless certain conditions were met. Among the conditions is the obligation of the transferor and transferee to provide information to assure that the transfer comported with the Company Agreement and the transferee agreed to be bound by the Company Agreement. Transfer of a membership interest includes any transfer by merger or business combination.

121. Stampede or its predecessor transferred its membership interest within the definitions of the Company Agreement through one or more of three business transactions. First, Stampede Energy, LLC, a Louisiana limited liability company, converted to Stampede. Second, Stampede merged with Stampede Energy, LLC, a Delaware limited liability company. Third, Stampede divided into two entities, Stampede and Centurion Brownsville.

122. Subsequently, both the transferor and transferee companies expressly refused to provide information about the transactions, as required by the Company Agreement, for any transfer of a membership interest to be permitted. Centurion Pecos duly called a meeting of the managers and members of Centurion Pecos in order to discuss Stampede's violations and its removal as a member and manager.

123. At the June 13, 2016 meeting, Centurion Logistics, as manager of Centurion Pecos, voted to remove Stampede as a member of Centurion Pecos. As the party whose removal was at issue, Stampede was an interested manager excluded from voting. Accordingly, Stampede was removed as a member of Centurion Pecos.

MR.898

124.     Following the June 13, 2016 managers meeting, a meeting of members was held to determine whether Stampede should be removed as a manager of Centurion Pecos for cause. Centurion Logistics, the only remaining member, voted to expel Stampede, based on its prohibited transfer of membership interest, as well as its other misconduct, as set forth in this Petition.

125.     In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiffs seeks a declaratory judgment against Defendant Stampede, wherein the Court declares that following:

(a)     The June 13, 2016 meeting was a valid meeting under the Company Agreement;

(b)     The removal of Stampede as a member of Centurion Pecos was a valid, binding and enforceable action of the managers of Centurion Pecos;

(c)     The removal of Stampede as a manager of Centurion Pecos was a valid, binding and enforceable action of the members of Centurion Pecos.

126.     In addition, there is a real and justiciable controversy between Centurion Pecos, on the one hand, and Ballengee, Ballengee Interests, and Centurion Terminals, on the other hand, concerning the enforceability of certain financial obligations that Defendants purport were entered into on behalf of Centurion Pecos. As set forth above, Calce, without authority to act for Centurion Pecos, and in violation of his fiduciary duties, created documents purporting to obligate Centurion Pecos to pay the notes that Ballengee Interests entered into with TCB and to make other payments to Ballengee Interests. Similarly, Calce, again without the authority to act for Centurion Pecos, and in violation of his fiduciary duties, apparently created a promissory note in favor of Centurion Terminals, purportedly obligating Centurion Pecos to make certain payments to Centurion Terminals.

MR.899

127. In accordance with Tex. Civ. Prac. & Rem. Code § 37.001, et seq., Plaintiffs seek a declaratory judgment against Defendants Ballengee, Ballengee Interests, and Centurion Terminals, wherein the Court declares the following:

(a) Any assumption agreement purported to exist between Ballengee Interests and Centurion Pecos is invalid, void and unenforceable;

(b) Any agreement that purports to create a financial obligation of Centurion Pecos to Ballengee Interests is invalid, void and unenforceable; and

(c) Any promissory note purported to create financial obligations between Centurion Pecos and Centurion Terminals is invalid, void and unenforceable.

128. In addition and cumulative of other relief sought herein, Plaintiffs are entitled to declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without authority, and in violation of his fiduciary duties, purported to create on behalf of Centurion Pecos.

## L. Twelfth Cause of Action: <u>Fraudulent Transfer</u>

129. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

130. Defendants made transfers of assets, property or business interests that were once held by Centurion Midstream and Centurion Terminals.

131. The transfers were made to an insider, subsidiary or affiliate of Centurion Midstream and Centurion Terminals, including, but not limited to JupiterMLP.

132. The individuals and/or entities that were/are in control of Centurion Midstream and Centurion Terminals retained control over the assets, property or business interests that were transferred from Centurion Midstream and Centurion Terminals to the insiders/affiliates (including JupiterMLP), and concealed the transfers.

MR.900

133. Prior to the transfers, Centurion Midstream and Centurion Terminals were already involved in litigation with the Plaintiffs, who were seeking significant damages from Centurion Midstream and Centurion Terminals. Prior to the transfers, Centurion Midstream and Centurion Terminals had significant assets that could have been used to satisfy any judgments against them. However, as a result of the transfers, and on information and belief, Centurion Midstream and Centurion Terminals no longer have sufficient assets to satisfy any judgments rendered against them.

134. While this litigation was pending, the individuals and/or entities that were/are in control of Centurion Midstream and Centurion Terminals undertook a pattern and course of conduct to divest Centurion Midstream and Centurion Terminals of their assets, property and business interests so as to make any judgment against them uncollectible. Based upon information and belief, the transfers were completed with inadequate consideration.

135. The transfers were completed with either actual or constructive intent to hinder, delay or defraud any judgment creditors of Centurion Midstream and Centurion Terminals.

136. Hence, this Court should deem the transfers fraudulent. Because Defendants' participation in the fraudulent transfer scheme was conducted with knowledge, intent and malice, the transfers should be set aside, and Plaintiffs be awarded both actual and exemplary damages.

## VII.
## ATTORNEYS' FEES AND COSTS

137. Plaintiffs hereby restate and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

138. As a result of Defendants' actions, Plaintiffs were forced to retain the legal counsel of Shamoun & Norman, LLP ("S&N") to bring this lawsuit. Plaintiffs retained the services of S&N to prosecute these claims and agreed to pay S&N its usual, customary and

MR.901

reasonable attorneys' fees. Such action and payment is necessary for the enforcement of Plaintiffs' rights.

139. Plaintiffs seek the recovery of attorneys' fees and costs that they incur in prosecuting the above-stated claims pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, or any other applicable law.

## VIII.
## CONDITIONS PRECEDENT

140. All conditions precedent to Plaintiffs' right to obtain the relief requested herein has been performed or has occurred.

## IX.
## PRAYER

WHEREFORE, Plaintiffs Centurion Logistics LLC, individually and on behalf of Centurion Pecos Terminal LLC, and Marc Marrocco and Antonio Albanese, individually and derivatively on behalf of Centurion Logistics, respectfully request that upon final trial of this cause the Court enter judgment against James Ballengee, Ballengee Interests, LLC, John Calce, Chris A. Mott, Stampede TX Energy, LLC, Tom Ramsey, Centurion Midstream Group, LLC, Centurion Terminals, LLC, Centurion Brownsville, LLC, and JupiterMLP, LLC as follows:

A. Against all Defendants and in favor of Plaintiffs for the amount of actual damages sustained by Plaintiffs;

B. Against all Defendants and in favor of Plaintiffs for the disgorgement of unjust enrichment and money had and received;

C. Against all Defendants and in favor of Plaintiffs for exemplary damages;

D. Entering a declaratory judgment concerning the status of Stampede under the Company Agreement and the enforceability of certain financial obligations that Calce, without

MR.902

authority, and in violation of his fiduciary duties, purported to enter into on behalf of Centurion Pecos;

E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper, at law or in equity.

Respectfully submitted,

**SAYLES WERBNER, P.C.**

/s/ *Mark E. Torian*_____
Mark E. Torian
State Bar No. 24028051
mtorian@swtriallaw.com
Darren P. Nicholson
State Bar No. 24032789
dnicholson@swtriallaw.com
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone:  (214) 939-8700
Facsimile:  (214) 939-8787

**ATTORNEYS FOR PLAINTIFF CENTURION LOGISTICS LLC INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF CENTURION PECOS TERMINAL LLC**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document has been served upon the counsel of record on May 2, 2018 in accordance with the *Texas Rules of Civil Procedure*.

/s/  *Mark E. Torian*_____
Mark E. Torian

**PLAINTIFFS' SECOND AMENDED PETITION**                                   **Page 37**

| | | |
|---|---|---|
| CENTURION LOGISTICS LLC, individually and derivatively on behalf of CENTURION PECOS TERMINAL LLC, a Texas limited liability company, | § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| vs. | § § | DALLAS COUNTY, TEXAS |
| JAMES BALLENGEE, BÁLLENGEE INTERESTS, LLC; JOHN CALCE; CHRIS A. MOTT; TOM RAMSEY; STAMPEDE TX ENERGY, LLC, CENTURION MIDSTREAM GROUP LLC; CENTURION TERMINALS, LLC; CENTURION BROWNSVILLE TERMINAL, LLC; JAMES HOCK; JUPITERMLP, LLC | § § § § § § § § § § § | |
| Defendants, | § § | B-44th JUDICIAL DISTRICT |
| and CENTURION PECOS TERMINAL LLC, a Texas limited liability company | § § § | |
| Nominal Defendant. | § | |

## ORDER DENYING JOHN CALCE'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING COUNTERCLAIM AGAINST CENTURION LOGISTICS LLC

Before the Court is *John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Amended Motion") filed by Defendant John Calce, ("Defendant") to which Plaintiff Centurion Logistics, LLC ("Centurion Logistics") filed *Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC* (the "Response") in response thereto. Having considered the Amended Motion, the Response, and arguments of counsel, the Court finds that the Amended Motion should be DENIED.

---

MR.904

IT IS THEREFORE ORDERED that *John Calce's Amended Motion for Partial Summary*

*Judgment Regarding Counterclaim Against Centurion Logistics LLC* is hereby DENIED.

SIGNED this 21st day of May, 2018.

_____
HON. BONNIE LEE GOLDSTEIN

*Order Denying John Calce's Amended Motion for Partial Summary Judgment*
*Regarding Counterclaim Against Centurion Logistics LLC*                    Page 2

MR.905



## Tex. Business Organizations Code § 8.104

This document is current through the 2017 Regular Session and 1st C.S., 85th Legislature

*Texas Statutes & Codes Annotated by LexisNexis® > Business Organizations Code > Title 1 General Provisions (Chs. 1 — 12) > Chapter 8 Indemnification and Insurance (Subchs. A — D) > Subchapter C Permissive Indemnification and Advancement of Expenses (§§ 8.101 — 8.150)*

## Sec. 8.104. Advancement of Expenses to Present Governing Persons or Delegates.

**(a)** An enterprise may pay or reimburse reasonable expenses incurred by a present governing person or delegate who was, is, or is threatened to be made a respondent in a proceeding in advance of the final disposition of the proceeding without making the determinations required under Section 8.101(a) after the enterprise receives:

> **(1)** a written affirmation by the person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this chapter; and

> **(2)** a written undertaking by or on behalf of the person to repay the amount paid or reimbursed if the final determination is that the person has not met that standard or that indemnification is prohibited by Section 8.102.

**(b)** A provision in the governing documents of the enterprise, a resolution of the owners, members, or governing authority, or an agreement that requires the payment or reimbursement permitted under this section authorizes that payment or reimbursement after the enterprise receives an affirmation and undertaking described by Subsection (a).

**(c)** The written undertaking required by Subsection (a)(2) must be an unlimited general obligation of the person but need not be secured and may be accepted by the enterprise without regard to the person's ability to make repayment.

**(d)** With respect to a limited partnership, a vote of a majority-in-interest of the limited partners in a vote that excludes the interest held by each general partner who is not disinterested and independent constitutes an authorization under Subsection (b). For purposes of this subsection, "majority-in-interest" means, with respect to limited partners, limited partners who own more than 50 percent of the current percentage or other interest in the profits of the partnership that is owned by all of the limited partners.

## History

Enacted by Acts 2003, 78th Leg., ch. 182 (H.B. 1156), § *1*, effective January 1, 2006; am. Acts 2005, 79th Leg., ch. 64 (H.B. 1319), §§ *23*, 24, effective January 1, 2006; am. Acts 2007, 80th Leg., ch. 688 (H.B. 1737), § *42*, effective September 1, 2007; am. Acts 2011, 82nd Leg., ch. 139 (S.B. 748), § *6*, effective September 1, 2011.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2018 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.

---

**End of Document**